1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

The Honorable John C. Coughenour

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| MYRIAM ZAYAS, | NO. 2:20-cv-00747 JCC |
| Plaintiff, | DECLARATION OF BRENDAN LENIHAN IN SUPPORT OF DEFENDANTS JEFFREY WHITNEY, AMBER WHITNEY & DAVID LA RAUS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| ANNETTE MESSITT, JEFFREY WHITNEY, AMBER WHITNEY, et al., | |
| Defendants. | |

Brendan Lenihan hereby declares as follows:

1.      I am over the age of 18 and am competent to testify about the matters stated herein. I am an Assistant Attorney General, and I represent Defendants Jeffrey Whitney and Amber Whitney in this case. As such, I am familiar with the contents of the case file in the matter. I make this declaration based on my personal knowledge and the records in this case.

2.      *Exhibit 1* of this declaration is a true and correct copy of Kelsey Owens' Amended Dependency Petition, dated March 16, 2020, and filed in King County Superior Court Juvenile Division, cause number 20-7-00666-0 KNT.

DECLARATION OF BRENDAN
LENIHAN IN SUPPORT OF
DEFENDANTS JEFFREY WHITNEY,
AMBER WHITNEY AND DAVID LA
RAUS' MOTION FOR SUMMARY
JUDGMENT -NO.  2:20-cv-00747 JCC

1

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

3.      *Exhibit 2* of this declaration is a true and correct copy of the Order to Take Child Into Custody and Place in Shelter Care, dated March 16, 2020, and filed in King County Superior Court Juvenile Division, cause number 20-7-00666-0 KNT.

4.      *Exhibit 3* of this declaration is a true and correct copy of the Shelter Care Hearing Order, dated March 17, 2020, and filed in King County Superior Court Juvenile Division, cause number 20-7-00666-0 KNT.

5.      *Exhibit 4* of this declaration is a true and correct copy of the Order Continuing Fact-Finding/Trial, dated July 6, 2020, and filed in King County Superior Court Juvenile Division, cause number 20-7-00666-0 KNT.

6.      *Exhibit 5* of this declaration is a true and correct copy of the Pretrial Conference Order, dated August 24, 2020, and filed in King County Superior Court Juvenile Division, cause number 20-7-00666-0 KNT.

7.      *Exhibit 6* of this declaration is a true and correct copy of the Order of Dependency as to mother, Myriam Zayas, dated October 8, 2020, and filed in King County Superior Court Juvenile Division, cause number 20-7-00666-0 KNT.

8.      *Exhibit 7* of this declaration is a true and correct copy of the Clerk's Minute Entry, March 17, 2020.

9.      *Exhibit 8* of this declaration is a true and correct copy of the Transcript of March 17, 2020 Initial Shelter Care Hearing.

10.     *Exhibit 9* of this declaration is a true and correct copy of May 18, 2020 Audio File of Court Proceedings.

11.     *Exhibit 10* of this declaration is a true and correct copy of the June 9, 2020 Transcript of Court Proceedings.

12.     *Exhibit 11* of this declaration is a true and correct copy of the June 14, 2021 deposition of Myriam Zayas.

DECLARATION OF BRENDAN
LENIHAN IN SUPPORT OF
DEFENDANTS JEFFREY WHITNEY,
AMBER WHITNEY AND DAVID LA
RAUS' MOTION FOR SUMMARY
JUDGMENT -NO.  2:20-cv-00747 JCC

2

ATTORNEY GENERAL OF WASHINGTON
Torts Division
7141 Cleanwater Drive SW
PO Box 40126
Olympia, WA 98504-0126
(360) 586-6300

1

2          I declare under penalty of perjury of law under the laws of the State of Washington that the

3    foregoing is true and correct.

4          EXECUTED in Olympia, Washington on this 5th day of August 2021.

5

6                              /s/ Brendan Lenihan
                               BRENDAN LENIHAN, WSBA No. 56066
7                              Assistant Attorney General

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF BRENDAN                    3         ATTORNEY GENERAL OF WASHINGTON
LENIHAN IN SUPPORT OF                                          Torts Division
DEFENDANTS JEFFREY WHITNEY,                              7141 Cleanwater Drive SW
AMBER WHITNEY AND DAVID LA                                      PO Box 40126
RAUS' MOTION FOR SUMMARY                                   Olympia, WA 98504-0126
JUDGMENT -NO.  2:20-cv-00747 JCC                               (360) 586-6300

# EXHIBIT 1

<table>
<tr><td>☐King West  ☐OICW<br>☐ West Seattle  ☐MLK<br>☐King East  ☒King South East<br>☐King South West  ☐Adoptions/BRS</td><td>FILED<br>2020 MAR 16<br>KING COUNTY<br>SUPERIOR COURT CLERK</td></tr>
</table>

CASE #: 20-7-00666-0 KNT

<table>
<tr><td colspan="2"><strong>Superior Court of Washington<br>County of King Juvenile Court</strong></td></tr>
<tr><td>Dependency of: ACZ<br><br>D.O.B.: ACZ</td><td><strong>No:20-7-00666-0 KNT</strong><br><br><strong>Amended Dependency Petition<br>(DPP)</strong></td></tr>
</table>

## I. Basis

I represent to the court the following:

**1.1    Petitioner**

☒    DCYF by (name) Kelsey Owens _____.
☐    (Name) _____.

**1.2    Child alleged to be dependent:**                                                      ACZ

| Name | ACZ |
|---|---|
| Date of Birth | ACZ |
| Home Address | ACZ |

**1.3    Parent(s) or Legal Guardian(s):**

| | ☒ **Mother** | ☒ **Father** ☐ presumed ☒ ~~alleged~~ |
|---|---|---|
| Name | Myriam Zayas | |
| Date of Birth | | |
| Marital status | ☒ single ☐ married ☐ other | ☒ ~~single~~ ☐ ~~married~~ ☐ ~~other~~ |
| Driver's License or Identicard (# and State) | | |
| Home Address | | |

| | ☒ **Father** ☐ presumed ☐ alleged | ☐ **Custodian/Legal Guardian** |
|---|---|---|
| Name | Unknown | 4 |
| Date of Birth | Unknown | |
| Marital status | ☐ single ☐ married ☐ other | |
| Driver's License or | | |

| Identicard (# and State) | | |
|---|---|---|
| Home Address | | |

FOR OFFICIAL USE ONLY
Juv. Ref. No:_____

1.4   **Child's Indian Status**:

☒   Based upon the following, the petitioner does not have reason to know the child is an Indian child as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4), and the Federal and Washington State Indian Child Welfare Acts do not apply to this proceeding:

The child is not enrolled or eligible for enrollment in any federally recognized tribe. The mother denied any Native American ancestry or eligible for membership of any Federally Recognized Tribe. There is no reason to being the alleged father has any Native American ancestry or eligible for membership of any Federally Recognized Tribe.

☐   Based upon the following, the petitioner knows or has reason to know the child is an Indian child as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4), and the Federal and Washington State Indian Child Welfare Acts do apply to this proceeding:

_____
_____

☐   The petitioner has made the following preliminary efforts to provide notice of this proceeding to all tribes to which the petitioner knows or has reason to know the child may be **(1)** a member or **(2)** eligible for membership if the biological parent is also a member:

_____
_____

1.5   **Dependency**: The child should be declared dependent according to RCW13.34.030(6) as follows:

☐   (a) the child has been abandoned as defined in RCW 13.34.030;
☐   (b) the child is abused or neglected as defined in chapter 26.44 RCW; or
☒   (c) the child has no parent, guardian or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development.

1.6   **Allegations**: The allegation of Dependency is based on the following facts:

1.   Myriam Zayas (DOB: 11/05/1980) is the biological mother of the children: JZ (DOB: JZ ), MBZ (DOB: MBZ ), ACZ (DOB: ACZ ), and CZ (DOB: CZ ). _____ is the biological father to JZ. JZ was legally free as a youth on 04/21/2015. _____ (DOB: _____ ) is the biological father to MBZ and is listed on the birth certificate. _____ (DOB: _____) is the alleged father of ACZ and is not listed on the birth certificate. There is no listed father for CZ. CZ was adopted at birth through Family Law Services and is not in Ms. Zayas care.

2.   _____ was dismissed from the previous dependency (14-7-01695-4 SEA) on 12/31/2014 after paternity testing established that he is not the biological father of ACZ.

3.   **ACZ** was previously dependent under cause number 14-7-01695-4 SEA.  Her dependency was dismissed in October 2015 after a successful return home to her mother.

4.   The Department of Children, Youth, and Families (DCYF) is requesting a shelter care hearing for child **ACZ**.  Ms. Zayas is the primary parent providing care for **ACZ** and is actively using methamphetamines. The safety threat is the following: the caregiver will not or cannot control their behavior and their behavior impacts child's safety.

5.   On 2/9/2020, the Department received an intake regarding a newborn baby by Ms. Myriam Zayas. Mandatory Referrer (Ref) at UW Medical Center in Seattle, WA, reports mother Myriam Zayas gave birth today to a term baby girl. Mother had inconsistent prenatal care and tested positive on 2/7/2020 for methamphetamines. Mother has an extensive CPS history and is only parenting her 5-year-old daughter, **ACZ**. Referrer reports the mother has so far made an adoption plan and the adoptive parent, is currently at the hospital. The family has been working with Family Law Solutions. Baby is being observed for NAS but she is too young to have symptoms. The adoptive family would like to take the infant home from the hospital. Referrer reports both the bio mother and adoptive parent are worried about CPS involvement. This worker clarified the risk/concern would be mother taking baby home with her, not if the adoption goes through.

6.   On 02/18/2020, Investigator Owens completed Subject Interview with Ms. Zayas. Ms. Zayas reported criminal of manufacturing from 2000-2002. Mother reported that one time at Purdy was enough. Ms. Zayas reported domestic violence with the father of **ACZ** beginning in 2009 including physical abuse. Ms. Zayas reported substance use of methamphetamines starting at 18 years old. Investigator asked for the last time she used, she stated a couple years ago. Investigator asked what started the use, she stated being around other people who are a bad influence. She reported receiving treatment through the courts. Investigator asked about the positive tox of amphetamines. Ms. Zayas reported that it was Benadryl. SW asked if Ms. Zayas would complete a urinalysis (UA) for the Department. Ms. Zayas stated no, not without a court order.

7.   On 02/21/2020, Investigator Owens received a call from hospital social worker at Auburn Medical. Hospital Social Worker reported that Ms. Zayas was currently receiving care at their hospital and reported the mother as manic. Hospital social worker showed concerns if mother was to refuse a mental health assessment, and return to caring for **ACZ**

8.   On 2/23/2020, Investigator Owens texted Ms. Zayas regarding FTDM scheduled for 2/24/2020. Ms. Zayas replied the following:

"my daughter is at home with me im sorry but im not sure i understand what the hell you are talking about
Im not attending any meeting of yours I can barely breathe and im in a wheelchair so you can suck my ass and thanks for not helping me when i asked you for help
tell your open investigation to go jump off of a fucking cliff how about that
we will be out of town for the next 2 weeks thanks for letting us know when to take our vacation.
IF YOU DONT STOP HARASSING ME I WILL CALL THE FUCKING POLICE
LEAVE ME THE FUCK ALONE
THE LAST THING I NEED IS SORRY ASS CPS UP MY FUCKING ASS FOR NO FUCKING REASON IM CLEAN BITCH I ALMOST DIED FROM PRE ECLAMPSIA YOU ARE NOT MAKING ANY DECISIONS ON MY DAUGHTER EVER SO GET THAT OUT YOUR FUCKING DUMB ASS BLANK RETARDED ASS HEAD
INVENTING MEETINGS AND SHIT CUZ YOUR BORED BITCH IM SORRY IT DOESNT WORK LIKE THAT
HERE IS YOUR FUCKING SUPPORT SYSTEM BITCH GO JUMP OFF A CLIFF
NOBODY GIVES A FUCK ABOUT CPS GO FUCK YOURSELF AND LEAVE ME THE FUCK ALONE YOU GOT NOTHING HOE

AND YOUR BLOCKED FROM EVER CONTACTING THIS PHONE AGAIN IF YOU COME TO MY DOOR I WILL CALL THE POLICE DUMB BITCH"

9. On 2/24/2020, the Department held a Family Team Decision Making Meeting (FTDM). Ms. Zayas arrived at DCYF office with **ACZ** **ACZ** sat in play room with Investigator Allen. Ms. Zayas refused to sign release of information (ROI) form for the Department. Investigator went over the intake the department received. Ms. Zayas reported that **ACZ** "won't be a child of yours" referring to mother's history with the department. Ms. Zayas reported that no one is taking anyone's kid. Ms. Zayas reported that she UA'd for the hospital and it was Benadryl. Ms. Zayas stated that the hospital has UA's that state they are for medical use only not for court use. When stated again that Ms. Zayas tested positive for methamphetamines, she stated "what are you going to do about it". Ms. Zayas reported that she is diagnosed with congestive heart failure. Ms. Zayas reported that she doesn't cooperate with CPS. Ms. Zayas stated she would pee in a cup for the department. Ms. Zayas stated "I almost died, so I'm not going to get high". Investigator Supervisor Black asked if mother would accept services from the department, Ms. Zayas reported "hell no". Ms. Zayas reported that her rights were terminated when she was sober. She stated the department took 3 of her children, "I'm keeping this one". Ms. Zayas agreed to 30 days of UAs at STOP. Ms. Zayas denied any other services at this time to help her through medical diagnoses or mental health needs.

10. On 03/10/2020, Investigator Owens received UA result from 03/05/2020 of Ms. Zayas testing positive for amphetamines and methamphetamines.

11. On 03/13/2020, Investigator Owens informed Ms. Zayas of FTDM being held on 03/16/2020 regarding the positive UA received. Ms. Zayas stated "I am never that dumb if i was dirty why the fuck would i give you my pee think long and hard this is insane". Ms. Zayas then stated "all you have to do is drink 2 spoons of baking soda and your pee is clean in 2 hours everyone knows this why would i pee dirty google it your guys are making this up. I don't know i am even giving you guys the secret but this is how i know you are lying https://www.youtube.com/watch?v=xcF0IFOgDtg".

12. On 03/13/2020, Investigator Owens attempted to locate and interview ███████ as the last known address provided in ACES. An unknown man answered the door stating that ███████ does not live at that home and he doesn't know anyone by that name.

13. Mother has nineteen prior screened-in intakes regarding substance use and lack of providing basic needs to her children. Mother has six screened-out intakes. The mother received five prior founded findings including Negligent Treatment/Maltreatment, Medical Neglect, and Physical Abuse.

14. On 02/06/2001, the Department received the following concerns regarding medical neglect: Caller reported that ███ **JZ** ███ who will be on years old this month was born with significant health problems and was in the NICU for some time. Child has acute asthma and needs to be followed by MD on a regular basis. Mom is not keeping appointments either with NICU folks or others who are assigned to help her. Condition of the child is unknown as no providers are seeing her. She should be on a nebulizer and is not. Mother is on drugs and tries to quit on her own. Does not follow through with treatment issues for herself either. Caller did a home visit and found that a window was broken completely out of the home. Mother was either not there or did not respond to her caller. There was also an eviction notice on the door. Mother received a founded finding for this intake.

15. On 04/27/2001, the Department received the following concerns regarding physical abuse and negligent treatment/maltreatment. Referent reported that there is no electricity to the apartment. The home is nearly devoid of furniture and other household goods. The mother spends little or no money on diapers and other needed items for ███ **JZ** ███ There is no preparation for the soon to be born. ███ **JZ** ███ is on SSI apparently due to congenital deficiencies from premature birth. Mother is reported to use drugs on nearly daily basis. Methamphetamines are reported to be used and some alcohol. Mother is seen carrying the child by one arm or one leg, endangering child's libs and subjecting them to deforming forces. Though she reported to no longer have a car, she was seen placing the child in

a vehicle without securing child in a car seat or seat in car. The mother received founded findings for both allegations.

16. On 07/27/2001, the Department received an intake with the following concerns: Mother, Myriam Zayas, was arrested for a warrant and possibly a meth lab in her apartment. Child, ▇JZ▇ (age ▇JZ▇ is being removed by the police. Mother's sister and child's father is unable to take the child. Another anonymous referent called with additional information about this family. This ref. stated that mother is 7 months pregnant and has had very little prenatal care (1 appointment). The mother states that when this child is born she will sell it over the internet for $30,000. Myriam is producing methamphetamines in her home and there are so many chemicals in the air that the air is a misty blue color. Mother, Myriam also smokes methamphetamine. She will leave the child alone in the home and has picked her up by her arm and thrown her across the room. She also calls the child a "slut". Child was placed into protective custody and mother was taken to jail. Mother received a founded finding.

17. On 01/17/2003, the Department received an intake with the following concerns: Ref is calling to report that her sister Myriam has a 2-month old baby ▇MCZ▇ she is staying at the Union Gospel Mission shelter and had a positive UA this week for Meth. She is being kicked out of the shelter at noon today 01/17/03. Ref is very worried about this baby. Myriam has lost 2 other children by CPS due to drugs. Ref also believes that Myriam is breast feeding the child. Ref told her sister to call her at noon and let her know where she is going to go.

18. On 09/08/2009, the Department received an intake with the following concerns: Referrer reported that Myriam is prostituting on Craigslist and using drugs. Referrer reported while Myriam is prostituting she has people who use drugs babysit ▇MCZ▇ Referrer reported that the babysitter's dog bit ▇MCZ▇ in the face. Referrer reported that ▇MCZ▇ had to go to the hospital for the dog bite. Referrer believes that the same person is babysitting ▇MCZ▇ again. Referrer reported they do not know who has the dog that bit ▇MCZ▇ Referrer reported that the dog previously bit the owner's child in the face. Referrer reported they were in the house on Friday and there was no food in the freezer or in the house. Referrer reported that Myriam was feeding the children cereal for dinner. Referrer is upset because Myriam received her food assistance on Wednesday and had not bought food. Referrer reported Myriam told them they are planning on selling the food assistance for drugs.

19. On 07/07/2014, the Department received an intake with the following concerns: Referrer (ref) is a social worker at the Harborview Women's Clinic calling about the newborn daughter of Myriam Zayas. Ref spoke with assigned SW this morning to advise her of the birth and SW directed her to call intake. Baby was born on ▇CZ▇ at 39.6 weeks, with Apgar's of 8/9. Ref did not have access to the weight of the baby or the results of tox screens on mother and baby, which ref believes are pending. Ref said the baby was delivered at UWMC. Chart note indicates that a hold will be put in place, but ref did not have confirmation that this had occurred as yet. Ref said that, per chart, the mother used meth during her pregnancy. Her use was particularly heavy during the first and second trimesters. Mother admits to meth use, but at a lower level than what is documented in the chart. Mother had "inconsistent" prenatal care at Swedish, where she had UA's that were positive for meth, but then transferred to Harborview at 39.1 weeks' pregnancy. Ref said it is highly unusual that a woman would change her prenatal care provider with the baby due at any time.

20. Per intake of 07/03/2014, called in by assigned Child Family Welfare Services (CFWS) Social Worker (SW): Myriam Zayas is currently restricted to her bed until the baby delivers and she is at Harborview Hospital. The recommendation is Myriam to remain in the hospital until the child is born. Placement for the newborn has been arranged. Myriam was at Swedish Hospital for about a week and a half until yesterday 07/02/2014. Myriam left Swedish Hospital against medical advice and admitted herself to Harborview Hospital. Myriam had been in inpatient treatment for substance abuse at Swedish. Myriam left Swedish because she did not want the hospital to have access to her substance abuse records. Myriam believes she will be taking the newborn home with her but that is not the case plan. Myriam has two open dependencies in King and Pierce County regarding ▇JZ▇ and ▇MCZ▇ Myriam was in inpatient treatment at Swedish in December 2013. The discharge

recommendation was for a 1-2 year, long term residential treatment facility. Myriam did not agree with the recommendation and instead chose to go to Union Gospel Mission's Hope Place. Hope Place although a good program does not meet criteria as a residential treatment program. Myriam did not engage in any further supportive services other than Hope Place and relapsed in May 2014. Myriam has been using since the age of 18 and supports herself through prostitution. Myriam reports she relapsed in May because if she had waited until the baby was born CPS would take the child. The recommendation for Myriam when she left Swedish was random urinalysis 3 times weekly. Myriam shared with the CDP that she can beat random urinalysis if the tests are less frequent. The CDP again recommended long term residential treatment for Myriam but she again refuses. Myriam understands she would have the option of taking her baby with her to treatment. Myriam reports she won't go because she can't take ▮▮JZ▮▮ with her and she wants ▮▮JZ▮▮ home. ▮▮JZ▮▮ does not want to return home to her mother Myriam. The current dependency on ▮▮JZ▮▮ is her 3rd and ▮▮▮▮ wants permanency. Myriam has been telling the social worker at Harborview she will not be returning to Hope Place after the birth. Myriam plans to leave the hospital with the baby and get her own apartment. Myriam reports the presumed father of the newborn is currently in a Washington State Correctional Facility. Myriam states she wants the presumed father to have a relationship with the newborn. There is a 10 year no contact order between Myriam and the presumed father due to his trying to kill Myriam. The presumed father tried to strangle Myriam in 2009 in front of ▮▮JZ▮▮ and ▮▮MCZ▮▮ The presumed father is identified in FAMLINK as Maniac Unknown as that is his alias. The presumed father's actual name is ▮▮▮▮▮▮▮ The Hope Place case manager has spoken to referrer and has expressed concern about Myriam. Case manager reports when Myriam leaves the building she risks relapse due to her inability to resist drugs use. Myriam will not be breastfeeding as she has implants and medically it has been recommended she not breastfeed.

21. On 11/02/2016, the Department received the following concerns: ▮▮ACZ▮▮ years old) recently was returned to parent on October 28, 2015. Referrer has been in the home about a month ago and found that there is minimal food for ▮▮ACZ▮▮ There is oatmeal and biscuits and spoiled milk in the refrigerator. ▮ACZ▮ diaper was full. That was a week day where child goes to the daycare. The house is messy. Garbage is overflowing and no clean dishes. There are different people coming into the house. Mother would leave ▮ACZ▮ alone in the living room and stay in the bedroom with friend/s for about 30 to 45 minutes.

22. On 11/20/2017, the Department received the following concerns: The referrer was recently at the home. He responded to an ad from back page and met the mother at her apartment. They went into her room and did sexual things and smoked methamphetamines together. The referrer saw a little girl sleeping on the floor under a blanket in the mother's room and there was another child in the apartment. They were both exposed to the methamphetamines smoke. The referrer is very concerned that the mother would do sexual things with men with her children present and was concerned that the mother would smoke methamphetamines in the apartment with her children present. The referrer reports that on his way into the apartment was another man leaving. On his way out there was another man coming in.

23. On 06/01/2019, the Department received the following concerns from Officer Robinson with Kent Police Department wrote in her law enforcement report: "I then spoke with ▮▮MCZ▮▮ who stated the following: "He asked ▮▮▮▮ to come pick him up because he was not happy at home with his mother, He does not like the fact that he has to babysit his sister all the time. Approximately 1 month before our conversation ▮MCZ▮ was in Myriam's room, when he found methamphetamine and a pipe inside her drawer. He recognized the items, because he has friends who use it. He decided to snort the methamphetamine in his mother's drawer, and did not enjoy the sensation. Almost every month Myriam sells her $500.00 in food stamps. When she sells them she gives ▮▮MCZ▮▮ $40,001 When men text his mother's phone asking for sex, they do not offer her anything to her in return other than "their love".

24. On 07/15/2019, the Department received the following concerns: Referrer originally called for ARY because ▮MCZ▮ is using hallucinating drugs and marijuana. Referrer mentioned talking to ▮▮▮▮ who was the CPS worker for ▮MCZ▮ Referrer was told to call CPS for a YAR due to ▮MCZ▮ using drugs.

Referrer was upset that ▓▓▓ knew MCZ was using marijuana, but did not know the mother was supplying MCZ with marijuana. Referrer did not understand why the Referrer was not informed of this. Referrer was unable to say what kind of hallucinating drugs MCZ is using. On 7/12, Referrer picked up MCZ and his friends from somewhere and they "weren't there mentally". Referrer waited for MCZ to be sober and had sent him to his mother's house. When the Referrer was at the home, MCZ was in his room with the door locked. When the Referrer was able to go inside the bedroom, Referrer saw marijuana "crumbs" on a plate. Referrer stated the stems were still on the plate. Referrer found out that the mother was providing MCZ with marijuana for pain relief due to being hit by a car on the 12th. Referrer noted MCZ knee was bruised and he had scrapes on his body from the car accident.

25. The mother has criminal history including: Conspire to Violate Controlled Substances, Control Substance Violation Section A, Harassment, Prostitution, and Criminal Trespassing.

26. The alleged father has significant criminal history including: Felony Violation of No Contact Order, Possession of Drug Paraphernalia, multiple Assault 4th Degree, Harassment, Assault 4th degree- DV, Attempt to Elude Police, Assault 3- Law Enforcement Officer, Possession of Stolen Vehicle, Possession of Stolen Property, Riot Deadly Weapon Felony, Unlawful Imprisonment, Criminal Attempt, Domestic Violence, Escape 2nd Degree, multiple Control Substances Violation Section D, multiple Control Substances Violation Section A, Control Substances Violation section E, Theft 3, Reckless Endangerment, Malicious Mischief 3rd Degree, and multiple Burglary 2nd Degree. There is multiple active No Contact Orders and Protections Orders with ▓▓▓ as the respondent.

27. At this time, the Department contends that there are no available parents that can appropriately and safely parent ▓▓▓ ACZ ▓▓▓ The mother, Ms. Zayas has a long-standing drug addiction issues that remains untreated. Ms. Zayas tested positive for methamphetamines on 03/05/2020. The mother has refused any services from the Department outside of UA's. The mother has prior dependencies based upon the same safety threats to her children that are described in the petition above. Paternity needs to be established, as there is no father listed on the birth certificate. The alleged father, ▓▓▓ also is not the child's primary parent. At this time, the Department is requesting a pick up order and shelter care hearing due to the mother and alleged father's inabilities to appropriately and safely parent ACZ ▓▓▓

Efforts to provide services to the family to prevent or eliminate the need for removal of the child from their home include the following: DCYF held an FTDM On 02/24/2020, the mother refused any other services than completing UA's for the Department. The mother reported that she is diagnosed with congestive heart failure and can die if she was to get high again. Mother tested positive for methamphetamines on 03/05/2020. Mother was previously offered Homebuilders in July 2019, mother declined services from assigned worker. At this time, there are no additional services the Department can place into the home to remedy the safety threats to the child. The department is requesting licensed foster care placement until a relative or suitable other can be located and approved by the Department.

At this time, there are no services available to prevent removal of the child and an out of home placement. There are no services that the Department can place into the home to remedy the safety threats to the child. The Department is requesting a licensed foster care placement, until an approved relative or suitable other can be located by the Department.

**Amended to reflect that ▓▓▓ is not the biological father.

1.7    ☐    Educational Liaison

The child meets the criteria for appointment of an educational liaison. DCYF recommends that the court appoint an educational liaison.

## II. Relief Requested

The petitioner requests that the court find the child dependent, enter an order of dependency, and grant the relief below:

☒    enter a disposition order that includes placement, parent-child and sibling visitation, and services.
☐    appoint an educational liaison.
☒    order a parent to cooperate with the establishment of paternity.
☒    order a parent to sign releases for information.
☐    Other:

## III. Certification

I declare under penalty of perjury under the laws of the State of Washington that the foregoing representations are true and correct.

Signed at _____ Kent _____ (City), Washington on _____ 03/16/2020 _____ (Date).

Quyet Le for
_____    _____Kelsey Owens_____
Signature of SW             Print Name

                           _____Kejana Black_____
_____    Print Name
Signature of SW supervisor

Reviewed/approved on March 16, 2020 by:

_____
Derek Paul Leuzzi
Assistant Attorney General
WSBA # 45508

# EXHIBIT 2



RECEIVED
KING COUNTY, WASHINGTON

MAR 16 2020

KNT DEPARTMENT OF
JUDICIAL ADMINISTRATION

☐ King West  ☐ OICW
☐ White Center  ☐ MLK
☐ King East  ☒ King South

| Superior Court of Washington County of King, Juvenile Court | |
|---|---|
| Dependency of:  ACZ | No: 20-7-00666-0 KNT |
| DOB:  ACZ | Order to Take Child Into Custody and Place in Shelter Care (ORTCC) |

## I. Basis

The court has considered a motion, statement and declaration requesting an order to take the above-named child into custody.

## II. Findings

2.1    A petition has been filed with the court alleging that the child is dependent pursuant to RCW 13.34.030.

2.2    It is currently contrary to the child's welfare for the child to remain at home. The petition and/or supporting declarations and affidavits establish reasonable grounds to believe that the child is dependent and that, if the child is not taken into custody, the child's health, safety, and welfare will be seriously endangered.

2.3    The petitioner has demonstrated that there is a risk of imminent harm to the child in the child's home. The assessment of risk by petitioner constitutes reasonable efforts to prevent or eliminate the need for removal of the child from the child's home and:

☐ because of the risk of imminent harm to the child, there are no reasonably available services that can be provided to the parent(s) to maintain the child in the child's home at this time;

☒ services previously offered or provided to the parent(s) have not remedied the unsafe conditions in the home;

☐ petitioner is currently unaware of any parent, guardian, or legal custodian known who is    available to take custody of the child; and/or

☐ Other:

**01010037**

Order Taking Child into Custody / Place in Shelter Care (ORTCC) – King County
WPF JU 02.0110 ----  JuCR 2.1, 2.2; RCW 13.34.030, .050, .060

Page 1 of 2
Feb 2010

002-00000001

## III. Order

3.1 ==A law enforcement officer, probation counselor, or child protective services worker shall take the above named minor child into custody and place the child in a facility licensed pursuant to RCW 74.15.030, or in a home not required to be licensed pursuant to that section, under the supervision of (name of DSHS or Supervising Agency):==

3.2 ==The supervising agency may authorize evaluations of the child's physical or emotional condition, routine medical and dental examination and care, and all necessary emergency care.==

3.3 The child shall remain in shelter care for not more than 72 hours from the time the child is taken into custody, excluding Saturdays, Sundays, and holidays, unless the court enters an order authorizing continued shelter.

**MAR 1 6 2020**

_____          _____
Dated                                                          Judge / ~~Commissioner~~

**Presented by:**

_____
Signature

_____
Quyet Le, MSW
Print Name & Title

**01010038**

Order Taking Child into Custody / Place in Shelter Care (ORTCC) – King County          Page 2 of 2
WPF JU 02.0110 ---- JuCR 2.1, 2.2; RCW 13.34.030, .050, .060          Feb 2010

002-00000002

# EXHIBIT 3

☐King West ☐OICW
☐White Center ☐MLK
☐King East ☐King Southwest
☒King Southeast ☐Adoptions/BRS

**Superior Court of Washington**
**County of King Juvenile Court**

Dependency of:

**ACZ**

DOB:

**ACZ**

No: **20-7-00666-0 KNT**

**Shelter Care Hearing Order**
☐ Agreed as to ☐ mother ☐ father ☐ other
☒ Contested as to ☒ mother ☐ father ☐ other
☒ Default as to ☐ mother ☒ father ☐ other
**(SCOR)**

☒ Clerk's Action Required. Para. 3.5 (EDL), 3.10

The parties shall:
☐ Hold a ☐ case conference ☐ mediation:
On: [Date] _____ at _____ a.m./p.m.

☐ King County Courthouse, 8th floor, 516 Third Avenue, Seattle, WA
☐ Kent Regional Justice Center, Courtroom 1L, 401 4th Ave. N., Kent, WA

☐ Not hold a case conference at this time because the parent ☐ did not appear at shelter care ☐ did not want to participate, or ☐ the court set a mediation instead.

☒ Not hold a mediation because the court has determined that this case is not appropriate for mediation.
DUE TO PUBLIC HEALTH CRISIS

The court shall conduct a:

| | Date | Time |
|---|---|---|
| Shelter Care Hearing | 04/14/2020 | 08:00 AM |
| ☐ King County Courthouse, Courtroom E854, 8th floor, 516 Third Avenue, Seattle, WA ☒ Kent Regional Justice Center, Courtroom 1L, 401 4th Ave. N., Kent, WA | | |
| Pre Trial Conference | 05/04/2020 | 01:30 PM |
| ☐ King County Courthouse, Courtroom E863, 8th floor, 516 Third Avenue, Seattle, WA ☒ Kent Regional Justice Center, Courtroom 1L, 401 4th Ave. N., Kent, WA | | |
| Fact – Finding | 05/18/2020 | 01:30 PM |
| ☐ King County Courthouse, Courtroom E863, 8th floor, 516 Third Avenue, Seattle, WA ☒ Kent Regional Justice Center, Courtroom 1L, 401 4th Ave. N., Kent, WA | | |

## I. Hearing

1.1 **Petition**: A dependency petition was filed in this matter on _03/16/2020_ [Date] by ☒ DCYF ☐ Other _____
The child was removed from the parents' care on ___03/16/2020___ (Date) by ☒ court order ☐ protective custody ☐ hospital/doctor hold ☐ voluntary placement agreement. The court held a shelter care hearing on this date or on_ 03/17/2020 _ (Date).

**Shelter Care Hearing Order** (SCOR) - Page 1 of 11
**WPF JU 02.0200** (10/2019) - JuCR 2.1, 2.3, 2.4; RCW 13.34.062, .065

01010039

003-00000001

1.2  **Appearance**: The following persons appeared at the hearing:

| | |
|---|---|
| ☐ Child | ☐ Child's Lawyer |
| ☒ Mother | ☒ Mother's Lawyer 쓰·Gold NDO |
| ☐ Father | ☐ Father's Lawyer |
| ☐ Alleged Father _____ | ☐ Alleged Father _____ |
| ☐ Guardian or Legal Custodian | ☐ Guardian's or Legal Custodian's Lawyer |
| ☐ Child's GAL/CASA | ☐ GAL's Lawyer |
| ☒ DCYF Worker | ☒ DCYF's Lawyer |
| ☐ Tribal Representative | ☐ Current Caregiver |
| ☐ Interpreter for ☐ mother ☐ father | ☐ Other _____ |
| ☐ other _____ | |

1.3  **Basis**: The court considered the dependency petition, declarations, testimony, if any, and the relevant court records.

☐   The child is 12 years old or older and the court made the inquiry required by RCW 13.34.100(6).

## II. Findings

2.1  **Notice**: The petitioner gave adequate notice as required under RCW 13.34.062 to the ☒ mother ☐ father ☐ child if age 12 or older ☐ guardian ☐ legal custodian ☐ other: _____

The petitioner ☐ has ☐ has not made reasonable efforts to provide notice to the ☐ mother ☐ father ☐ child ☐ guardian ☐ legal custodian ☐ other: _____ and to inform them of their rights.

2.2  **Child's Indian Status**: The court asked each participant on the record whether the participant knows or has reason to know that the child is an Indian child.

The petitioner ☒ has ☐ has not made a good faith effort to determine whether the child is an Indian Child.

☒   Based upon the following, there is not a reason to know the child is an Indian child as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4), and the Federal and Washington State Indian Child Welfare Acts do not apply to this proceeding:

The child is not enrolled or eligible for enrollment in any federally recognized tribe. The

mother denied any Native American ancestry or eligible for membership of any Federally

Recognized Tribe. There is no reason to know the unknown father has any Native

American ancestry or eligible for membership of any Federally Recognized Tribe.

☐   Based upon the following information currently available to the court, there is reason to know the child is an Indian child as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4), and the Federal and Washington State Indian Child Welfare Acts do apply to this proceeding, unless and until it is determined on the record that the child does not meet the definition of an Indian child:

_____

_____

**Shelter Care Hearing Order** (SCOR) - Page 2 of 11
**WPF JU 02.0200** (10/2019) - JuCR 2.1, 2.3, 2.4; RCW 13.34.062, .065

☐ Based upon the following, the child is an Indian child as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4), and the Federal and Washington State Indian Child Welfare Acts do apply to this proceeding:

_____

_____

☐ The petitioner ☐ has ☐ has not made preliminary efforts to notify all tribes to which the petitioner or court knows or has reason to know the child may be a member or eligible for membership of this proceeding.

2.3 **Rights**: The parties present at the hearing were informed of their rights pursuant to RCW 13.34.065 and 13.34.090.

2.4 **Waiver of Shelter Care Hearing**: The ☐ mother ☐ father ☐ guardian ☐ legal custodian requested a waiver of the shelter care hearing. The court determined that the parent, guardian, or legal custodian ☐ was ☐ was not represented by an attorney and the waiver of the shelter care hearing was knowing and voluntary.

2.5 **Shelter Care Factors**:

The court considered the following factors:

(a) What services DCYF provided to the family to prevent or eliminate the need for removal of the child from the child's home.

☐ If lack of suitable housing was a significant factor in removal of the child, whether DCYF provided housing assistance to the family.

(b) Whether the child can be safely returned to the home pending the dependency fact-finding hearing.

(c) Whether restraining orders or orders excluding an allegedly abusive household member from the house of a nonabusive parent, guardian, or legal custodian, will allow the child to safely remain in the home.

(d) What efforts DCYF made to place the child with a relative or other suitable person known to the child and with whom the child has a relationship. The court inquired whether DCYF has discussed this issue with the parents.

(e) Whether the placement proposed by DCYF is the least disruptive and most family-like setting that meets the needs of the child.

(f) Appointment of an attorney or guardian *ad litem* for the child's parent, guardian, or legal custodian, or for the child.

(g) The terms and conditions for parental, sibling, and family visits.

2.6 **Reasonable Efforts**:

☒ Petitioner made reasonable efforts to prevent or eliminate the need for removal of the child from the child's home. For the reasons set forth in the dependency petition, supporting declarations and affidavits, and/or the testimony presented to the court:

☒ The risk of imminent harm to the child as assessed by petitioner establishes reasonable cause for the continued out-of-home placement of the child pending the fact finding hearing; and/or

☐ Specific services offered or provided to the parent(s) have been unable to remedy the unsafe conditions in the home and make it possible for the child to return home; and/ or

**Shelter Care Hearing Order** (SCOR) - Page 3 of 11
**WPF JU 02.0200** (10/2019) - JuCR 2.1, 2.3, 2.4; RCW 13.34.062, .065

003-00000003

☒ Returning the child to the home would seriously endanger the child's health, safety, and welfare.

☐ Additional reasonable efforts findings:

_____

_____

2.7 **Shelter Care**:

☐ The court does not find reasonable cause to believe that shelter care is needed.

☒ It is currently contrary to the welfare of the child to remain in or return home. The child is in need of shelter care because there is reasonable cause to believe:

    ☒ The child has no parent, guardian, or legal custodian to provide supervision or care for such child; and/or

    ☒ The release of the child would present a serious threat of substantial harm to the child; and/or

    ☐ The parent, guardian or custodian to whom the child could be released is alleged to have violated RCW 9A.40.060 or 9A.40.070.

☐ The child is or there is reason to know the child is an Indian child as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4). The child is in need of shelter care to prevent imminent physical damage or harm to the child.

2.8 **Placement**:

☐ A ☐ relative or ☐ suitable person is available or willing to care for the child and to meet any special needs of the child or to facilitate the child's visitation with siblings.

    ☐ Placement with the relative or other suitable person is in the child's best interests.

    ☐ DCYF needs to further investigate the character and suitability of the proposed relative or other suitable person to determine if the placement is in the child's best interests.

    ☐ Placement with the relative or other suitable person is not in the child's best interests as there is reasonable cause to believe that placement of the child with the relative or suitable person would ☐ jeopardize the health, safety or welfare of the child ☐ hinder efforts to reunite the parent and child.

☒ A ☒ relative or ☐ suitable person is not available or willing to care for the child and to meet any special needs of the child or to facilitate the child's visitation with siblings.

☐ DCYF made the following efforts toward placement with a relative or other suitable person:

_____

_____

_____

_____

2.9 **Restraining Order**:

Shelter Care Hearing Order (SCOR) - Page 4 of 11
**WPF JU 02.0200** (10/2019) - JuCR 2.1, 2.3, 2.4; RCW 13.34.062, .065

**01010042**

003-00000004

☐ The court finds reasonable cause to believe that an incident of sexual or physical abuse has occurred and that a restraining order is necessary pursuant to RCW 26.44.063(2).

☐ A restraining order ☐ has been ☐ shall be entered pursuant RCW 26.44.063 and shall be incorporated by reference into this order. Placement of the child with _____ [name] shall be contingent on continued compliance with the terms of the restraining order.



**Shelter Care Hearing Order** (SCOR) – Page 5 of 11
**WPF JU 02.0200** (10/2019) – JuCR 2.1, 2.3, 2.4; RCW 13.34.062, .065

**01010043**

2.10   **Services**:

The court inquired into whether the child, the parent or parent(s), or the legal guardian requires examinations, evaluations, or immediate services.  The court also inquired into whether the parent(s) agree(s) to any recommended services, and the parent(s) agree(s) to participate in the services listed in the Order.

☒       The Department recommends the following examinations, evaluations, or immediate services for the child:

Well child exam within 30 days and follow up appointments as scheduled.

☐ The child is 12 or older and ☐ agrees to the services ☐ was notified of the services ☐ was notified that he/she may request an attorney.

2.11   **Education status**:

☐   The child is not of school age.

☒   The court considered whether it is in the best interest of the child to remain enrolled in the Pine Tree Elementary [name of school, developmental program, or child care] the child was in prior to placement and what efforts have been made to maintain the child in the school, program, or child care if it would be in the best interest of the child to remain in the same school, program, or child care.

☐   The child should not remain enrolled in the child's present school, developmental program, or child care and the reasons for the transfer to a new school, developmental program, or child care are:

_____

☐   DCYF should enroll the child in school, developmental program, or child care immediately and within seven school days and request transfer of records.

☒   DCYF is responsible for coordinating the student's educational information.

☐   The child meets the criteria for appointment of an educational liaison.  DCYF recommends that the court appoint (name) _____ as the child's educational liaison.

☐     The parents are not able to serve as the educational liaison because:

_____

2.12  ☒   **Other: The Department recommends the following services for the parents**:

Mother: Drug and alcohol assessment following recommendations, random UAs four times per month, mental health assessment following recommendations, and a parenting assessment following recommendations.

Father: To be assessed once identified.

**Shelter Care Hearing Order** (SCOR) - Page 6 of 11
**WPF JU 02.0200** (10/2019) - JuCR 2.1, 2.3, 2.4; RCW 13.34.062, .065

**01010044**

003-00000006

## III. Order

3.1    **Placement**:

☐    The child is released to the child's parent, guardian or legal custodian:

Name(s): _____

Address: _____

_____

Subject to the following conditions: _____

_____

☒    The child is placed in or shall remain in shelter care, in the temporary custody and under the supervision of DCYF, which shall have the authority to place the child in:

☒    Licensed foster care.

☐    Relative placement with _____ [name].

☐    Placement with a suitable person: _____ [name].

Placement with the relative or suitable person is contingent upon the caregiver's cooperation with the DCYF case plan and compliance with this, and all subsequent court orders related to the care and supervision of the child, including but not limited to parent-child contact, sibling contacts, and any other conditions imposed by the court.

Placement conditions: Relatives placement will complete a home study application within ten days. If relatives do not complete within ten days or pass the home study the Department has the authority to remove child(ren).

_____

_____

☒    DCYF shall continue to make reasonable efforts to locate and investigate an appropriate relative or other suitable person who is available and willing to care for the child, and is authorized to share information with potential relative or other suitable person placement resources as necessary to determine their suitability and willingness as a placement for the child.

☐    DCYF shall have authority to place the child with an appropriate relative with prior reasonable notice to the parties, subject to review by the court.

3.2    **Visitation**: DCYF shall provide visits between the child and parent, guardian, or legal custodian as follows:

☐    Per visitation attachment.

☒    As follows: TWO
Mother: Minimum twice a week for ' o hours supervised by caregiver or DCYF designee.
Father: To be assessed once identified. DEPARTMENT TO ACCOMODATE FOUR HOUR VISITS IF POSSIBLE. The Dept will provide a visit today.

If siblings are not placed together, DCYF shall provide sibling visits or contact as follows:

**Shelter Care Hearing Order** (SCOR) - Page 7 of 11
**WPF JU 02.0200** (10/2019) - JuCR 2.1, 2.3, 2.4; RCW 13.34.062, .065

☒ Visitation may be expanded upon agreement of the parties.

3.3 **Attorney/GAL Appointments**:  Attorney and guardian *ad litem* appointments are as follows:

☐ attorney ☒ guardian *ad litem* for _____ ACZ _____ [Name].

☐ attorney ☐ guardian *ad litem* for _____ [Name].

☐ attorney ☐ guardian *ad litem* for _____ [Name].

☐ attorney ☐ guardian *ad litem* for _____ [Name].

3.4 **Services**:

☐ DCYF shall offer or provide and the parent/guardian/custodian shall participate in the following agreed upon examinations, evaluations, or immediate services:

☐ The mother shall participate in the following:

_____

_____

☐ The father shall participate in the following:

_____

_____

☐ The alleged father _____ (name) shall participate in the following:

_____

_____

☐ The guardian/legal custodian shall participate in the following:

_____

_____

☐ DCYF shall provide and the child shall participate in the following examinations, evaluations, or immediate services:

_____

_____

☐ Per attached service plan.

☐ Other: _____

_____

3.5 **Education**:

☐ DCYF or its designee shall immediately and within seven school days timely enroll the child in school and request transfer of records.

**Shelter Care Hearing Order** (SCOR) - Page 8 of 11
**WPF JU 02.0200** (10/2019) - JuCR 2.1, 2.3, 2.4; RCW 13.34.062, .065

**01010046**

003-00000008

☐ DCYF or its designee shall provide the child's school with a certified copy of the Order and Authorization Re Health Care and Education.

☐ (Name) _____ is appointed as the child's educational liaison to carry out the responsibilities described in RCW 13.34.046. The educational liaison must complete criminal background checks required by DCYF.

3.6 **Parental Cooperation**:

The parents shall cooperate with DCYF and provide a current address and phone number to the social worker at all times. Within two weeks of the entry of this order, the parents shall provide additional information necessary for placement and notice purposes including:

(a) The names, addresses, and phone number of any relatives or other suitable persons who may be placement resources for the child.
(b) The names, addresses, phone numbers and other identifying information of any alleged parent(s) of the child.
(c) Any known information regarding possible membership in or descent from an Indian tribe.
(d) Information necessary to determine financial eligibility for services or foster care.
(e) Other:_____
The parents shall sign and maintain current releases of information during the course of these proceedings for exchange of information between all evaluators and service providers, DCYF, CASA/GAL, Juvenile Court, AAG, and the parents' attorneys.

3.7 **Paternity**:

☐ The alleged father(s) _____ shall cooperate in the establishment of paternity and shall complete all interviews, paperwork, and genetic testing within _____ days of the entry of this order.

☒ The mother shall cooperate in the establishment of paternity and shall complete all interviews, paperwork, and genetic testing within _____ days of the entry of this order.

☒ The child shall be made available for genetic testing.

☒ If paternity has not been established regarding the child, the court authorizes the King County Prosecutor's Office to proceed in the King County Superior Court, Family Law Division, on the issue of paternity, current and past child support, and costs.

3.8 **Release of Information**:

All court-ordered service providers shall make all records and all reports available to DCYF, attorney for DCYF, parent's attorney, the guardian ad litem and attorney for the child. Parents shall sign releases of information and allow all court-ordered service providers to make all records available to DCYF and the guardian ad litem or attorney for the child. Such information shall be provided immediately upon request. All information, reports, records, etc., relating to the provision of, participation in, or parties' interaction with services ordered by the court or offered by DCYF may be subject to disclosure in open court unless specifically prohibited by state or federal law or regulation.

3.9 **General**:

DCYF shall have the right to access, inspect, and copy all records pertaining to the above-named child, including but not limited to health, medical, mental health and educational records.

DCYF may authorize evaluations of the child's physical or emotional condition, routine medical and dental examination and care, and all necessary emergency care.

DCYF shall make reasonable efforts to advise the child's ☐ mother ☐ father ☐ legal guardian or custodian of the status of this case, including the date and time of the hearing(s) scheduled below and their rights under RCW 13.34.090.

**Shelter Care Hearing Order** (SCOR) - Page 9 of 11
**WPF JU 02.0200** (10/2019) - JuCR 2.1, 2.3, 2.4; RCW 13.34.062, .065

**01010047**

003-00000009

3.10    **Restraining Order**:

☐    The court signed a separate restraining order on this date.

☐    The restraining order entered pursuant to RCW 26.44.063 is incorporated into this order.

Placement of the child with _____ is contingent on continued compliance with the terms of this restraining order. Failure to comply with any and all terms of this order may result in removal of the child.

The person having physical custody of the child has an affirmative duty to assist in the enforcement of this restraining order and to notify law enforcement, DCYF, and the court as necessary to request assistance and/or report violations of the order.

3.11    **Child's Indian Status:**

Any party who subsequently receives information that provides a reason to know the child is an Indian child under 25 C.F.R. § 23.107 shall inform the court.

3.12    All parties shall appear at the next scheduled hearing (see page one).

3.13    Other:

☐ The child shall remain in court-ordered placement and comply with all rules of placement. Failure to comply may result in a finding of contempt and sanctions.

_____

_____

_____

_____

Dated: _____ **MAR 17 2020** _____         _____

Commissioner

**Ann Danieli**

Presented by:

_____

Assistant Attorney General
WSBA # 50261

Copy Received. Approved for entry, notice of presentation waived.

_____        _____

Signature of **Child**                           ☐ Signature of Child's Lawyer

                                                 _____
                                                 Print Name                      WSBA No.

                                                 _____
☐ Signature of **Mother**                        ☐ Signature of Mother's Lawyer
☐ Pro Se, Advised of Right to Counsel
                                                 _____
                                                 Print Name                      WSBA No.

**Shelter Care Hearing Order** (SCOR) - Page 10 of 11
**WPF JU 02.0200** (10/2019) - JuCR 2.1, 2.3, 2.4; RCW 13.34.062, .065

**01010048**

| | |
|---|---|
| ☐ Signature of **Father**<br>☐ Pro Se, Advised of Right to Counsel | ☐ Signature of Father's Lawyer |
| | Print Name                    WSBA No. |
| ☐ Signature of **Guardian or Legal Custodian**<br>☐ Pro Se, Advised of Right to Counsel | ☐ Signature of Guardian or Legal Custodian's Lawyer |
| | Print Name                    WSBA No. |
| ☐ Signature of Child's **GAL** | ☐ Signature of Lawyer for the Child's GAL |
| Print Name | Print Name                    WSBA No. |
| Signature of **DCYF Representative** | Signature of DCYF Representative's Lawyer |
| Print Name | Print Name                    WSBA No. |
| ☐ Signature of **Tribal Representative** | ☐ Signature |
| Print Name | Print Name                    WSBA No.<br>Lawyer for _____ |

**Shelter Care Hearing Order** (SCOR) - Page 11 of 11
**WPF JU 02.0200** (10/2019) - JuCR 2.1, 2.3, 2.4; RCW 13.34.062, .065

**01010049**

003-00000011

# EXHIBIT 4

☒King South East

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON FOR KING COUNTY
JUVENILE DIVISION

| In re the Dependency of: | No: 20-7-00666-0 KNT |
|---|---|
| ACZ<br>dob:    ACZ<br><br>minor child | **Order Continuing Fact-Finding/Trial**<br>☒ Dependency    ☐ Termination<br>• Good cause found<br>Clerk's Action Required. **(ORCTD)** |

This matter came before the court for consideration of an oral motion for continuance of PTC and FF dates made by CASA, on the basis that:

Mother is representing herself *pro se*, at her request granted at a prior hearing, and publication to unknown father is pending. On 5/18/20 the PTC and FF dates were continued for assignment of CASA for trial, however a CASA has not yet been assigned and a CASA is necessary for trial. CASA indicates that a CASA will need 8 weeks to be prepared to proceed to trial. I

WHEREFORE IT IS ORDERED that

☒ The court hereby continues the Fact Finding/Trial from 7/06/20 to: ____**8/24/20**____ at **1:30 pm**

☒ This continuance will exceed the Fact Finding by 75 Days timeliness measure. Good cause is found to continue past 75 days (good cause previously found 5/18/20).

☒ A pre-trial hearing is necessary and is continued from 7/06/20 to: _____8/24/20_____ @ 1:30 pm

*** If no CASA has been assigned to the case at the next hearing the court should make a good cause finding that the case should proceed without a CASA to avoid further delays.
*** The mother filed a motion to dismiss which should be heard at the next hearing date.

Dated: __7/06/20__

**Commissioner Pro Tem Kessler**

Submitted electronically by:
 David La Raus, #33715  AAG for DCYF
Approved as to form for entry:
 Mother, Miriam Zayas
 Kathleen Martin, CASA program counsel (No NOA yet filed, but heard by the court at the hearing)

**Order Continuing Fact Finding/Trial (ORCTD) -** Page 1 of 1                    Revised 5/9/18

**01010050**

004-00000001

# EXHIBIT 5

☐King East ☐King West ☐MLK
☐OICW ☐West Seattle
☒King South East ☐King South West
☐Private

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON FOR KING COUNTY
JUVENILE DIVISION

| In re the Dependency of: | **No**: 20-7-00666-0 KNT |
|---|---|
| ACZ<br>dob:    ACZ | **Pretrial Conference Order (ORPTC)** |
| Minor child | ☒ Dependency ☐ Termination |
| | **Trial Date:**    9/21/20 |
| | If this date differs from the date on the Case Schedule, a separate Order of Continuance must be submitted. |

## I.    INTRODUCTORY MATTERS

The parties affirm that this trial will be as to:

☒ Mother Only                    [publication pending as to unknown father]

The parties estimate that the entire trial will take _____8_____ days.
The Department estimates its case will take _____3.5_____ days
The mother estimates her case will take _____3_____ days
The CASA estimates _____0.5_____ days for the CASA's case.

☐ ~~ICWA applies~~: The _____ tribe/nation/band has intervened or otherwise participated.

☐ ~~Interpreter needed for~~ _____ (party or witness name) in _____ language. Interpreter to be arranged by DCYF and/or its counsel pursuant to RCW 2.43.040(2).

## II.    TRIAL DATE CONFLICTS

The parties assert that the date listed above does not conflict with previously-scheduled leave of any attorney, the assigned social worker or the CASA or, in the alternative that the parties believe the trial can proceed on this date even if such conflict exists.  A partial day leave for a medical appointment or similar issue can be accommodated.

If for some reason the trial is not assigned out on the current trial date, the following conflicts exist in the month following the trial date:

01010051
005-00000001

List party by LAST NAME

| | | | |
|---|---|---|---|
| AAG/SW: | La Raus / Magee | Dates: | AAG on leave 8/31-9/04 |
| GAL/C: | Duke / Cowan | Dates: | GAL is unavailable 9/14-9/16 and 11/12-11/16. GAL Attorney is unavailable 9/14-9/18; 10/19-10/20. |
| Mother/C: | Zayas (*pro se*) | Dates: | |

## III. SETTLEMENT

Settlement:     ☒ Has been attempted.

## IV. PRETRIAL DISCLOSURES

1. Answer Filed: ☐ Mother

   If not yet completed, answer will be filed by __8/31/20__ .

2. Exchange of Exhibit Lists

   ☒ Petitioner          ☐ Mother

   If not yet completed, exhibit lists will be exchanged by __8/31/20__ .

   Numbering for the Exhibits will be as follows:

   | | | |
   |---|---|---|
   | AAG | Number Start: (i.e., 1 – 50) | 1-199 |
   | CASA | Number Start: (i.e., 51 – 100) | 200-299 |
   | Mother | Number Start: (i.e., 151 – 200) | 300-399 |

3. Inspect Non-documentary Exhibits

   ☒ Petitioner          ☐ Mother

   If not yet completed, exhibit lists will be exchanged by __8/31/20__ .

4. Disclosure of Witnesses

   ☒ Petitioner          ☒ Mother

   If not yet completed, witness lists will be exchanged by __8/31/20__ .

5. GAL Report

   ☐ Is complete.
   ☒ Must be completed and provided to all parties by __9/02/20__ .

6. Discovery

   **a.** All discovery available to the petitioner ☒ has ☐ has not been provided to opposing parties. If not yet provided, it will be provided by: __8/31/20__ .

   b. All discovery available to responding parties ☐ has ☒ has not been provided to opposing parties. If not yet provided, it will be provided by: __8/31/20__ .

**01010052**
005-00000002

c. ☒ Updated discovery is expected to be received.   It shall be provided no later than two business days following receipt.   The general nature of this updated information is expected to be: information r.e. parent's most recent participation in visitation / services

d. ☒ The formal discovery cut off is extended to __8/31/20__.

## V.  STIPULATIONS

The parties agree to the following stipulations;

1. Electronic Court Records copies of orders entered in dependency, termination, and parentage actions involving the parents or alleged parents of the above-named child(ren) and/or the child(ren)'s siblings are deemed authenticated for purposes of admissibility.

2. Certified copies of all criminal and civil court records regarding the parents are deemed authenticated.

3. Telephonic testimony shall be allowed.

4. Previously supplied Notices of Intent to Take Testimony are effective for the trial date as assigned via brokerage.

## VI. SPECIAL ISSUES

1. ☐ The ☐ Father ☐ Mother ☐ Youth is incarcerated.  Transportation, or the ability to participate telephonically or through some other means, is to be arranged by counsel for that party.

2. ☐ There are on-going competency issues and a Guardian ad Litem has been appointed for:

3. ☐ There will be a need to arrange appropriate accommodations pursuant to the American with Disabilities Act, that is: _____

4. ☐ An out-of-state witness will be called in this matter.

5. ☐ The following special issues exist: _____

## VII. OTHER

CASA requested a colloquy on mother's need for litigation GAL; court conducted colloquy with mother

today on the record and determined that she is competent to proceed without a litigation GAL.

Dated: __8/24/20__

_____
Judge A. Messitt

☒ Confirmed on the record ☐ approved for entry via emails attached

David La Raus         Assistant Attorney General

**Pretrial Conference Order (ORPTC) –** Dependency **-** Page 3 of 4                    Revised 8/5/19

**01010053**
005-00000003

Myriam Zayas        Mother, *pro se*
Jennie Cowan        Counsel for CASA

**01010054**

005-00000004

# EXHIBIT 6

☐King West  ☐OICW
☐White Center  ☐MLK
☐King East  ☐King Southwest
☒King Southeast  ☐Adoptions/BRS

| | |
|---|---|
| **Superior Court of Washington County of King Juvenile Court** | **No**: 20-7-00666-0 SEA |
| Dependency of:<br><br>ACZ<br>dob:  ACZ<br><br>minor child | **Order of Dependency as to the mother, Myriam Zayas** <br>**(OROD)**<br>☒ Contested as to ☒ mother ☐ father ☐ other<br>☒ Disposition Order (ORDD) Included<br>**CLERK'S ACTION REQUIRED**<br>Paragraphs 4.1, 4.3, 4.6 (EDL), 4.15, and the boxes below. |

The court will hear an ☒ initial progress review hearing on (date) __12/09/20__, at 11:00 a.m. at:

King County Superior Court, Room/Department: Rm. W-719, located at:
☒ King County Courthouse, 516 Third Avenue, Seattle, Washington 98104.

Instructions for the option of attending that hearing virtually will be circulated via email prior to the hearing date.

**Additional clerk's action required: Enter the code(s) that apply.**
*About today's hearing:*
Was adequate and timely notice given to the child's caregiver?  Yes (CGATN) ☒    No (CGNATN) ☐
Did the court receive a caregiver report?  Yes (CGRR) ☐ / No ☒    ☐ The caregiver appeared. N/A

### I. Hearing

1.1    **Petition**: A petition was filed by DCYF alleging that the above-named child is dependent, and the Court held a hearing on September 21, 22, 28, 29, 30, and October 1, 2020. The Court issued its oral ruling on October 7, 2020.

1.2    **Appearance**: The following persons appeared at the hearing (remotely due to COVID protocols):
☒    Mother - Myriam Zayas  (*See 1.4*)       ☐    Mother's Lawyer- n/a - *pro se*
☒    Child's CASA – Pauline Duke              ☒    GAL/CASA's Lawyer – Jennie Cowan
☒    DCYF Worker - Jamaal Magee              ☒    Agency's Lawyer - David LaRaus

1.3    **Basis**: ☒ The court took evidence and heard testimony as indicated on the record.

1.4    The mother intermittently appeared and participated throughout the proceedings, as indicated in the record. The mother Ms. Zayas also periodically sent emails to the parties and the Court, which were admitted into evidence.

**Order of Dependency (OROD, ORDYMT) -** Page 1 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

01010055

## II. Findings

Except where otherwise indicated, the following facts have been established by a preponderance of evidence:

2.1   **Child's Indian Status**: ☒ On ___9/21/20___ and ☒ On ___03/17/2020___, the court asked each participant on the record whether the participant knows or has reason to know the child is an Indian child.

The petitioner ☒ has ☐ has not made a good faith effort to determine whether the child is an Indian child.

☒   Based upon the following, there is not a reason to know the child is an Indian child as defined in RCW 13.38.040 and 25 U.S.C. § 1903(4), and the Federal and Washington State Indian Child Welfare Acts do not apply to this proceeding:

The mother has denied any Native American ancestry, or eligibility for membership in any Federally Recognized Tribe, in this and in prior dependency proceedings. Paternity is not established. There is no reason to believe the child is a member or eligible for membership of any Federally Recognized Tribe.

2.2   **Facts**: ☒ The following facts establishing dependency have been proved:

a.   Myriam Zayas (DOB: ▓▓▓▓▓ is the mother of the child ▓▓ACZ▓▓ (DOB: ▓ACZ▓ Ms. Zayas is not a service member. No father is listed on the birth certificate for the child, and the father of the child is unknown. Previously the mother had identified ▓▓▓▓ as the child's alleged father, but he was dismissed as a party to a previous dependency for this child (14-7-01695-4 SEA) on 12/31/2014, after genetic paternity testing established that he is not the biological father of ▓▓ACZ▓▓

b.   Myriam Zayas is also the biological mother of three other children: ▓JZ▓ (DOB: ▓JZ▓ ▓MBZ▓ (DOB: ▓MBZ▓ and ▓CZ▓ (DOB: ▓cz▓

c.   On 2/09/20 Myriam Zayas gave birth to ▓CZ▓ at the UW Medical Center in Seattle. Hospital employees contacted DCYF due to concerns that Ms. Zayas had inconsistent prenatal care and tested positive on 2/07/20 for methamphetamines. ▓CZ▓ was adopted at birth through a private action with the agreement of Ms. Zayas.

d.   ▓MBZ▓ (DOB: ▓MBZ▓ and ▓JZ▓ (DOB: ▓JZ▓ were declared dependent in Pierce County in 2009 (case nos. 09-7-01466-7 / 465-9), on the basis that the mother's use of methamphetamines and alcohol impaired her ability to safely and adequately care for the children. The children were placed out of the home. ▓JZ▓ was later returned to the mother's care and the dependency as to her was dismissed. The dependency case for ▓MBZ▓ was dismissed after his father obtained a parenting plan placing the child in his care.

e.   ▓JZ▓ was declared dependent a second time, in King County in 2013 (case no. 13-7-12094-0 SEA). The mother entered an agreed order of dependency on 3/14/14, agreeing to facts providing a basis for dependency that included her continuing use of methamphetamines, despite repeated attempts to engage in treatment. ▓JZ▓ was placed in licensed care, and the mother agreed to participate in services including a drug/alcohol evaluation and follow recommendations, urinalysis (UA) testing, and a foster care reunification assessment. ▓JZ▓ was not returned to the mother's care during that dependency; the mother participated in the ordered services, but did not engage in regular visitation with the child, and the mother relinquished her parental rights to ▓JZ▓ on 1/21/15 (case no. 15-7-00270- SEA).

**Order of Dependency (OROD, ORDYMT) -** Page 2 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

f.     ACZ     was previously declared dependent in King County as an infant (case no. 14-7-01695-4 SEA).  The mother entered an agreed order of dependency as to ACZ on 11/19/14.    The mother agreed to facts creating a basis for dependency, including that (summarized):  she had a fifteen-year history of substance abuse, particularly of methamphetamines; she had previously completed inpatient and outpatient treatment programs but had relapsed; the mother was currently participating in intensive outpatient treatment and had scheduled an intake for mental health services.  As part of that order the mother agreed to participate in random UA tests, ongoing chemical dependency treatment, parent coaching, and a neuropsychological evaluation and to follow any resulting recommendations.

g.     During the course of the 2014 dependency case for ACZ the mother participated in services including urinalysis testing, chemical dependency treatment, and parent coaching.  She also participated in a neuropsychological evaluation performed by Dr. Paul Connor, to evaluate whether there were biological reasons that multiple treatment efforts had been ineffective in preventing further substance use.  Dr. Connor reported that testing of Ms. Zayas' problem-solving and decision-making abilities indicated that these were areas of strength for her, but that if she resumed actively using substances these skills could be significantly and negatively impacted. The dependency case was dismissed by the court on 10/28/15, after the child had been successfully returned home to her mother.

h.   The Department filed the current dependency action as to ACZ after attempting to work with the mother following the birth of ACZ   On 02/18/20, CPS Investigator Owens spoke with Ms. Zayas, who reported a history of substance use of methamphetamines starting at age 18, but that the last time she used it was a couple years ago. When asked about her positive test for amphetamines on 2/07/20, Ms. Zayas attributed the result to her having taken Benadryl. When asked if she would complete a urinalysis test for the Department. Ms. Zayas stated she would not do so without a court order. Then on 02/21/20, Investigator Owens received a call from hospital Auburn Medical, reporting concerns of manic and strange behavior by Ms. Zayas.  On 2/23/2020, Investigator Owens texted Ms. Zayas regarding her participation in a Family Team Decision Making Meeting (FTDM) scheduled for 2/24/2020. Ms. Zayas replied in curse-and-insult-filled texts, refusing to attend the meeting, and telling the worker that if she continued to contact her the mother would call the police and have the worker charged with harassment.

i.     On 2/24/20 Ms. Zayas showed up with ACZ for the FTDM.  Ms. Zayas again asserted that her positive UA result at the hospital was due to her taking Benadryl.  When confronted with the fact that Ms. Zayas tested positive for methamphetamines and not Benadryl, she stated "what are you going to do about it." Ms. Zayas did agree to do 30 days of UAs, but refused to sign a release of information (ROI) form for the Department to have direct access to the results.  When asked if she would like or accept any other services from the department, to help address her medical or mental health needs, and Ms. Zayas responded "hell no."

j.     On 03/05/20 the mother provided a UA sample, which tested positive for amphetamines and methamphetamines. On 03/13/20, Investigator Owens informed Ms. Zayas that another FTDM was scheduled for 03/16/20 to discuss that positive UA result. Ms. Zayas stated that the test was incorrect, and that she knew how to defeat a UA test for amphetamines if she had been using them.

k.     The Department filed a dependency petition on ACZ and an initial shelter care hearing was held on 3/17/20.  The mother was represented at that hearing and contested the need for out-of-home placement for the child. Following a hearing the court ordered that ACZ be placed in licensed foster care.  At the hearing the Department recommended that the mother engage in remedial services including drug/alcohol assessment and follow recommendations, random UA testing, mental health evaluation and follow recommendations, and a parenting assessment and follow recommendations.  The mother did not agree to having any services ordered at that hearing.

**Order of Dependency (OROD, ORDYMT) -** Page 3 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

01010057

l.      Since the initial shelter care hearing on 3/17/20 the mother has provided seven (7) verified UA tests.  Of these, the sample collected on 04-23-20 was invalid because it was diluted, the sample collected on 05-13-20 was positive for methamphetamines and amphetamines, and the sample collected on 09-25-20 was positive for methamphetamines and amphetamines.  The mother provided the Department with some other tests results she said she had obtained privately, but identification information was redacted and the mother would not provide the Department with an ROI to verify the results.  The mother also obtained a drug/alcohol evaluation in April, in which she denied any current use; the evaluation recommended intensive outpatient treatment based on her long history of abuse, but she did not fully complete that treatment.  She obtained a subsequent evaluation in September of 2020 that recommended inpatient treatment.

m.      Since the initial shelter care hearing on 3/17/20 the mother has been inconsistent in attending available visitation with the child ACZ despite the department explaining to her how important it is for the child's emotional welfare for the mother to maintain regular contact with the child.  When in-person visitation was suspended due to COVID the mother refused to engage in the available virtual visitation for 6 weeks, despite being provided with a video-ready phone by the Department for that purpose.  She would also periodically email the Department stating that visits should be cancelled because she would not participate, but then later she would ask to participate.

n.      Since the initial shelter care hearing on 3/17/20 the mother has engaged in concerning behaviors, including appearing at the DCYF office with police and accusing the Department of kidnapping her child, and then (after the police left) threatening to blow up the office and/or kill the assigned social worker, Jamaal Magee, if her child was not returned to her.  She is the subject of an anti-harassment order obtained by the initial foster placement for ACZ after Ms. Zayas located the foster home via an application in ACZ iPad, threatened to demonstrate outside their home, and then (after the child had been removed from the home due to the mother's behaviors) began sending the foster father accusations though his "Linked In" account.

o.      On 6/09/20, assigned dependency Judge Messitt conducted a pretrial hearing on the mother's request to represent herself in the dependency proceedings *pro se*, and to determine whether the mother was in need of a litigation Guardian ad Litem pursuant to RCW 4.08.060.  The Court found that the mother was competent to proceed without appointment of a GAL, and that the mother met the criteria to allow her to proceed with *pro se* representation.  During this trial, despite often inappropriate and erratic behavior, the mother's presentation has reinforced the finding that she does not require a litigation GAL, and that she fully understands the nature and consequences of the proceedings.

p.      The mother has been in regular communication with the Department throughout the dependency.  She has maintained that there are no safety risks to ACZ if returned to her care, and asserts that the Department's actions since the birth of the infant CZ are unrelated to any concerns for the child's welfare, but are instead motivated by racism against white women and/or by the Department's desire to obtain federal funding by placing ACZ out of the mother's care.  The mother has sent pages and pages of accusatory emails to the Department during this period, repeatedly refusing to cooperate with the Department or to acknowledge the legitimacy of any concerns about ACZ welfare.  The mother has repeated these same allegations in her emails to, and testimony before, the Court.  She testified that both she and ACZ are "perfect" and are not in need of any services.  The mother has consistently argued but has not presented evidence in support of her claims of discriminatory or financial motivations by the Department.  To the contrary, the evidence demonstrates that the mother's preoccupation with these theories and lack of priority for the needs of her child impair her ability to adequately meet this child's basic physical, developmental, and emotional needs.

q.      ACZ attended kindergarten in the classroom of teacher Erin Boyett from September of 2019 until March of 2020, when classes were closed due to COVID.  Ms. Boyett had significant

**Order of Dependency (OROD, ORDYMT) -** Page 4 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

concerns about ■ACZ■ welfare during that time. ■ACZ■ would frequently miss school or be late, more than the other children; the mother would report that they overslept or that ■ACZ■ didn't sleep well so she was keeping her home to sleep. ■ACZ■ frequently arrived to school tired and hungry, and underdressed for cold weather. ■ACZ■ frequently mentioned that she could only have pancakes or cold cereal at home, and that she couldn't eat too much or she wouldn't have any food for later; ■ACZ■ would accept any food that was offered to her, and gathered up leftovers from school lunches to take home.

r.     Ms. Boyett's biggest concern, shared by this Court, was that ■ACZ■ was "so emotionally out of control." ■ACZ■ struggled to appropriately manage her emotions, often presenting "extreme reactions to minor matters;" she would disrupt the class by yelling and throwing things, or hiding under the table and "completely shutting down." This behavior was unusual compared to the other children in the class; it often resulted after she received any negative feedback (such as being asked wait or not to interrupt), or from receiving attention when she wasn't ready for it. When asked why she was upset, she often responded that she was hungry or tired. Other times she entered class in an escalated emotional state, but when asked the cause she wouldn't want to talk about it. She could generally be refocused if Ms. Boyett gave her a snack and some conversation, but she needed "lots of nurturing attention" and was "very clingy." ■ACZ■ academic progress was delayed as a result of her poor attendance and her behavioral issues.

s.     Ms. Zayas communicated with Erin Boyett on several occasions, including asking Ms. Boyett to apologize to ■ACZ■ for the mother because "she didn't mean to react that way." Ms. Zayas told Ms. Boyett that at home ■ACZ■ would run away from her and hide, and it could take a long time to find her, and that Ms. Zayas found ■ACZ■ behavior difficult to manage. ■ACZ■ attended daycare before and after school, and sometimes when she found out her mother was going to pick her up from school instead, she would say she didn't want to go with her and wanted to go to daycare.

t.     The facts establish that ■ACZ■ would be in danger of substantial damage to her psychological or physical development in the absence of continued involvement by the Department, and supported by necessary Court authority and oversight. The mother has demonstrated that she will not cooperate with the Department in any voluntary efforts to address these risks.

u.     The mother has continued to abuse methamphetamines, which previously impaired her ability to care for her children and resulted in the prior dependency cases for siblings ■MBZ■ and ■JZ■ and ■ACZ■ herself. The exact level of her recent use is unclear, given the mixture of negative, positive, and adulterated UA results. The test results, however, must be viewed in light of the mother's established history of methamphetamine use since age 18. The Court is not persuaded by the mother's insistence that any positive results are due to medications that she has been taking since February. If she has been taking those medications on a daily basis as she testified, and if the medications were responsible for the results, then the results should be consistently positive and they are not. Ms. Zayas also has not provided definitive medical evidence that her specific use of the medication would have resulted in false positives. The use of medications does not explain an adulterated result, which must be viewed in light of the mother's testimony that she knows how to defeat a UA test.

v.     Ms. Zayas testified that drug use is not relevant to these proceedings, and that a child would not be removed from a parent for use of legal substances like alcohol or marijuana. While illegality is a factor, severity of use is a more important factor. Whether legal or illegal, use of a substance to the point that it impacts the ability to adequately care for a child is a proper basis to find that court intervention is required.

w.     In 2015, Dr. Connor articulated that Ms. Zayas' problem-solving and decision-making abilities could be significantly negatively impacted if she resumed actively using substances. There

**Order of Dependency (OROD, ORDYMT) -** Page 5 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

01010059

is a distinct difference between the mother's ability to cooperate and engage with the Department and service providers at that time, and her current refusal to do so. But regardless of whether or not substance abuse is the ultimate cause, the mother has demonstrated erratic and unpredictable behaviors since the initiation of this dependency action, as well as an inability to consistently make good decisions on behalf of [ACZ]. The Court finfd the testimony of GAL Pauline Duke, teacher Erin Boyett, and social worker Jamaal Magee to be especially informative and credible in this regard.

x.      At age 6, [ACZ] is entirely dependent on an adult for meeting all of her supervision and care needs. When in the mother's care, however, [ACZ] often was late to or missed school days and frequently came to school hungry and underdressed, demonstrating that her basic care needs were not being met. [ACZ] unusually clingy behavior and excessive need for attention show that her emotional needs were not being fully met in the mother's care. The mother's refusal to participate in visitation for extended times, if not occurring on her preferred terms - despite it being explained how important regular parent contact is to a child's welfare - is an example of the mother's failure to prioritize [ACZ] needs over her own. [ACZ] is at a developmental stage where she needs to be learning healthy ways to deal with frustrations and social interactions. Yet by her impulsive and angry outbursts (for which she asked Ms. Boyett to apologize to [ACZ] on her behalf), the mother has modeled unhealthy behavior that is not only harmful for [ACZ] to experience, but which the child has exhibited, showing her own emotional fragility and delaying her progress in school. When told [ACZ] was hitting other children at school, Ms. Zayas responded "good", she wants [ACZ] to defend herself. Since placement and engaging in counseling, [ACZ] has been doing better with her anger and using her words. The mother has involved [ACZ] in inappropriate conversation of adult subjects, such as her belief that DCYF kidnapped the child, causing [ACZ] to become confused and upset. Treating [ACZ] as a confidant and talking with her as an adult about the mother's problems with DCYF is not an appropriate burden to put on a child, who looks to the parent to provide stability and security. [ACZ] is too young to self-protect or to reliably report any problems she may be experiencing in the mother's home that need remedial attention. This is compounded by the mother admittedly instructing her not to discuss her home life with others, an instruction that [ACZ] has followed such as when she told Mr. Magee, "Mom says I can't talk about that" after he asked about her home life. It is very concerning for a parent to prevent a child from providing the limited information a child might express about her needs, especially in light of the evidence that [ACZ] regularly has experienced hunger, being tired, and anxiety.

y.      Both before and during trial, Ms. Zayas has not shown an appreciation of why the above-listed behaviors are inappropriate or constitute parenting deficits. Instead, she has insisted that she and [ACZ] are "perfect," she deflects from her behaviors by attacking the Department and other participants in the dependency proceedings, and the proceedings themselves. There is no question that Ms Zayas loves her daughter and she is fiercely protective of her autonomy. But unlike [ACZ] first dependency case - in which the mother worked with the Department and providers to secure [ACZ] return – Ms. Zayas now consistently declares that she won't participate in any services to try to remedy behaviors underlying this dependency action. This opposition contradicts a motivation to place [ACZ] needs above her own.

z.      The mother is not a credible witness or a reliable reporter of historical events. It is not clear how much of this is due to intentional misrepresentation and how much is due to her emotional volatility, exhibited during trial, that obstructs her ability to accurately assess and report the facts. ==Ms. Zayas also denies basic facts that are clearly established, such as her contention that the initial shelter care hearing did not occur, although it is of record that it did occur and Ms. Zayas participated.== In this proceeding, Ms. Zayas has denied ever using methamphetamines in the past, asserts that [MBZ] dependency proceeding was due to a dog bite, and argues that [ACZ] first dependency action was due to her losing housing for three weeks. Dependency records refute these claims.

**Order of Dependency (OROD, ORDYMT) -** Page 6 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

2.3     **Statutory Basis**: ☒  The child is dependent according to RCW 13.34.030(6), in that the child:
  ☐     (a) has been abandoned, as defined in RCW 13.34.030;
  ☐     (b) is abused or neglected, as defined in Chapter 26.44 RCW, by a person legally
          responsible for the care of the child; and/or
  ☒     (c) has no parent, guardian or custodian capable of adequately caring for the child, such
          that the child is in circumstances which constitute a danger of substantial damage to the
          child's psychological or physical development.

2.4     **Placement**:

  ☒     It is currently contrary to the child's welfare to return home.  The child should be placed or
          remain in the custody, control and care of ☒ DCYF ☐ a relative ☐ an other suitable
          person for the following reasons:

          ☒     there is no parent or guardian available to care for the child; and/or
          ☐     the parent or guardian is unwilling to take custody of the child; and/or
          ☐     the court finds by clear, cogent and convincing evidence that a manifest danger
                  exists that the child will suffer serious abuse or neglect if the child is not removed
                  from the home, and an order under RCW 26.44.063 will not protect the child from
                  danger.

  ☒     The child should be placed or remain in:
          ☐     Relative placement.
          ☐     Placement with a suitable person
          ☐     person with whom the child's siblings or half-siblings live.
          ☒     Licensed care:
                  ☐     pending completion of DCYF investigation of relative placement options.
                  ☒     because there is no relative or other suitable person who is willing,
                          appropriate, and available to care for the child, with whom the child has a
                          relationship and is comfortable.
                  ☐     because there is reasonable cause to believe that relative placement
                          would jeopardize the safety or welfare of the child; and/or hinder efforts
                          to reunite the parent(s) and child.
          ☐     The child is an Indian child as defined in RCW 13.38.040, and this placement
                  complies with the placement priorities in RCW 13.38.180, and 25 U.S.C. § 1915.

2.5     **Reasonable Efforts**:
  ☒     DCYF made reasonable efforts to prevent or eliminate the need for removal of the child from
          the child's home; but those efforts were unsuccessful because:
          ☒     The health, safety, and welfare of the child cannot be adequately protected in the
                  home.
          ☒     Specific services have been offered or provided to the parent and have failed to
                  prevent the need for out-of-home placement and make it possible for the child to
                  return home.  The following services have been offered or provided to the child and
                  the child's parent(s): ☒ see facts para. 2.2 above
          ☒     The whereabouts of the unknown father are unknown.

  ☐     Reasonable efforts are not required at this time to attempt to reunify the child with his/her
          parent(s), guardian or legal custodian because:
          ☐     The child has been abandoned.
          ☐     Aggravated circumstances exist

  ☐     The court ordered the child removed from the home and DCYF has recommended that a
          petition be filed seeking termination of the parent-child relationship

**Order of Dependency (OROD, ORDYMT) -** Page 7 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

01010061

2.6     **Sibling contact**: N/A – no siblings under court jurisdiction

2.7     **Child's school**:
☒     The court found that the child should be removed from the home pursuant to RCW 13.34.130(1)(b) and placed into out-of-home care. A placement that allows the child to remain in the same school he or she attended prior to the start of the dependency proceeding ☒ is ☐ is not practical and ☒ is ☐ is not in the child's best interests.

☐     [educational liaison - N/A due to age]

## III. Conclusions of Law

3.1     **Jurisdiction**: The court has jurisdiction over:     ☒     the child
☒     the mother

3.2     **Notice**: The following have received timely and proper notice of these proceedings: The ☒ mother ☐ father ☐ child if 12 or older.

3.3     **Default**: N/A

3.4     **Dependency**: ☒ The child should be found dependent pursuant to RCW 13.34.030.

3.5     **Termination petition**: ☐ A termination petition should be filed pursuant to RCW 13.34.132.

## IV. Order

4.1     **Dependency**: ☒ The child is dependent pursuant to RCW 13.34.030(6) ☐ (a) ☐ (b) ☒ (c).

4.2     **Social study**: ☒ DCYF has conducted a social study, dated ___9/21/20___, a report of which was filed and provided to the parties and to the Court.

4.3     **Disposition hearing**:     ☒ A disposition hearing has been held.

4.4     **Placement**:
☒     The child is placed in the custody, control and care of DCYF, which shall have the authority to place and maintain the child in:
☐     Relative placement with _____ (name).
☐     Placement with a suitable person: _____ (name).
☐     The home of a person with whom the child's siblings or half-siblings live.
☒     Licensed care:
☐ pending completion of DCYF investigation of relative placement options.
☒ because there is no relative or other suitable person with whom the child has a relationship and who is willing, appropriate and available to care for the child.
☐ because there is reasonable cause to believe that relative placement or placement with a proposed other suitable person would jeopardize the safety or welfare of the child and/or hinder efforts to reunite the parent(s) and child.

Absent good cause, DCYF shall follow the wishes of the natural parent regarding the placement of the child in accordance with RCW 13.34.260.

4.5     **Services**: Services for the mother entered pursuant to RCW 13.34.130 are as follows:
**Order of Dependency (OROD, ORDYMT) -** Page 8 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

**01010062**

[any evaluation must comply with RCW 13.34.370]:

**A. Drug/alcohol evaluation and follow treatment recommendations**
- The parent's compliance shall be based upon making the initial appointment, completing all steps necessary to complete the evaluation, and enrolling in and successfully completing any recommended treatment program. Progress will be verified by reports from the service provider.
- The evaluation completed by the mother at STOP in September of 2020 may satisfy this requirement. If not, the evaluation shall be initiated within 30 days of the date of this order and completed as recommended by the treatment provider.

**B. Random urinalysis 1x/week for 90 days and the Department may request an additional random UA up to 6 times per month upon suspicion of use**
- The parent's compliance with this requirement shall be based upon attendance at all required UAs and consistent negative results. An unexcused missed appointment, violation of program rules, or diluted UA shall be deemed a positive result.
- The parent shall refrain from all legal and illegal intoxicating substance use during the UA period. Any results showing use will be considered a positive UA unless a valid prescription is provided to the collector at the time of collection of the sample.
- Participation in this service shall begin immediately.
- This requirement shall be completed after 90 days of clean, not missed, not diluted UAs.
- Responsibility for payment: The Department, if at an agency referred to by the Department.
- Upon suspicion of use, the Department may request an additional UA, up to 6 per month. The parent shall submit to the UA within a reasonable amount of time of the referral, no more than 24 hours after the request for the UA submission. If the UA request is made by 9:00 a.m. the parent shall submit to the UA the same day unless otherwise agreed by the social worker.

**C. Psychological Evaluation with Parenting Component and follow all recommendations**
- The parent's compliance with the assessment will be evaluated based upon the parent's cooperation in selecting a mutually agreed upon provider in a timely fashion; the participation in and cooperation with the assessment in a timely fashion; and the compliance with recommended services, if any. The assessment may include direct observation of the parent and child together, a parenting and family history, collateral contacts, review of records, and standardized testing.
- The assessment is to be scheduled by the parent within thirty (30) days of the date of this order. The assessment is to be completed within ninety (90) days of the date of this order, as allowed by the schedule of the provider. Any services recommended are to be initiated promptly.
- The Department shall pay for the assessment.

**D. Upon Imminent Reunification: evidence-based in-home parenting service**
- The parent's compliance with the service will be evaluated based upon the parent's participation in and cooperation with the provider's assessment of any support needs to assist in the safe and healthy transition of the child back into the mother's care.
- The Department shall pay for the service.

**E. Cooperate with establishment of paternity**
- Parent is to contact Family Support Division of King County Prosecutor's Office at King County Courthouse, 516 3rd Avenue, Seattle, WA 98104, telephone (206) 296-9020 OR 610 W. Meeker Street, Suite 203, Kent, WA 98032, telephone (206) 296-9595, and

**Order of Dependency (OROD, ORDYMT)** - Page 9 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

01010063

provide child(ren)'s name and dependency cause number(s). Parent shall provide the prosecutor's office a copy of the shelter care hearing or other court order ordering paternity be established. Parent shall set up and attend paternity interview if requested.
- Parent's compliance with above requirement will be evaluated based on their cooperation with the prosecutor's office; appearance and cooperation in the paternity action; and participation in genetic testing if necessary. Service shall be deemed completed upon entry of a final court order determining paternity. Parent shall keep the Department apprised of status of parentage action.
- <u>Service to begin</u>: upon identification of a specific individual as a potential biological father to the child. Service to be completed: as soon as possible after identification.
- Responsibility for payment: As determined by the prosecutor's office.

☒    DCYF shall provide and the child shall participate in the following examinations, evaluations, or services:

**All necessary medical appointments; continue in therapy as recommended by provider.**

☐    The child is 12 or older and ☐ agrees to the services ☐ was notified of the services ☐ was notified that he/she may request an attorney.

4.6    ☐    Educational Liaison – N/A due to age.

4.7    **Visitation:** ☒    The specific visitation plan between the child and mother shall be as follows:

Two visits per week for 2 hours per visit, supervised by DCYF or designee; visits to occur at DCYF offices.

☒    Visitation between the mother and the child may be expanded upon agreement of the parties.

☐    The specific plan for visitation or contact between the child and child's siblings shall be: n/a – no siblings under court jurisdiction

4.8    **Restraining Order**:
☐    The court entered a separate restraining order pursuant to RCW 26.44.063.

4.9    **Parental Cooperation**: The parents shall cooperate with reasonable requests by DCYF and provide DCYF with income and asset information necessary to establish and maintain the child's eligibility for medical care, evaluations, counseling and other remedial services, foster care reimbursement, and other related services and benefits.

4.10    **Health Care**: DCYF with custody of the child shall have full power to authorize and provide all necessary, routine and emergency medical, dental, or psychological care as recommended by the child's treating doctor or psychologist, subject to review by the court, as needed.

4.11    **Release of Information**: All court-ordered service providers shall make all records and all reports available to DCYF, attorney for DCYF, parent's attorney, the guardian ad litem and attorney for the child. Parents shall sign releases of information and allow all court-ordered service providers to make all records available to DCYF and the guardian ad litem or attorney for the child. Such information shall be provided immediately upon request. All information, reports, records, etc., relating to the provision of, participation in, or parties' interaction with services ordered by the court or offered by DCYF may be subject to disclosure in open court unless specifically prohibited by state or federal law or regulation.

**Order of Dependency (OROD, ORDYMT) -** Page 10 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

**01010064**

DCYF may continue to make reasonable efforts to locate and investigate an appropriate relative or other suitable person who is available and willing to care for the child, and is authorized to share information about the child, as necessary, with potential relative or other suitable person placement resources to determine their suitability and willingness as a placement for the child.

4.12    **Reports**: DCYF shall submit a report for the next review hearing to the court and to the parties in a timely manner.

4.13    **Termination Petition**: N/A

4.14    **Child's Indian Status:** Any party who subsequently receives information that provides a reason to know the child is an Indian child under 25 C.F.R. § 23.107 shall inform the court.

4.15    All parties shall appear at the next scheduled hearing (see page one).

4.16    **Other**:
☒ The permanent plan for the child is to return home to the ☒ mother ☐ father ☐ other:

☒ DCYF is authorized to consent to travel by the child with their licensed foster parent/relative caregiver/other suitable person placement for up to two weeks within Washington State or to other states within the United States. If the travel will interfere with scheduled visits between the child and a parent, DCYF shall give 10 calendar days' notice to that parent so that a plan for make-up visits can be made. The licensed foster parent/relative caregiver/other suitable person placement may consent to emergency medical and dental care during these trips.

Dated: October 8, 2020.

_Judith H Ramsey_
**Judge JUDITH H. RAMSEYER**

Presented by:

/s/ David La Raus

_____
David La Raus, WSBA #33715
Assistant Attorney General

Copy Received; Approved for Entry;

_Jennie Cowan_

_Declined to sign – see attached email_
Signature of **Mother, Myriam Zayas**        Signature of Lawyer for the Child's GAL
☒ Pro Se, Advised of Right to Counsel        Jennie Cowan, WSBA # 40323

**Notice: A petition for permanent termination of the parent-child relationship may be filed if the child is placed out-of-home under an order of dependency. (RCW 13.34.180.)**

**Order of Dependency (OROD, ORDYMT) -** Page 11 of 11
**WPF JU 03.0400** (07/2018) - JuCR 3.7; RCW 13.34.030, .046, .110, .120, .130, .132

01010065

From: M. Zayas < ACZ angel@gmail.com>
Sent: Thursday, October 08, 2020 10:52 AM
To: La Raus, David W (ATG) <david.laraus@atg.wa.gov>
Cc: Myriam Zayas- School <myriam.zayas@bellevuecollege.edu>; Cowan, Jennie
<jcowan@kingcounty.gov>; Court, Ramseyer <Ramseyer.Court@kingcounty.gov>
Subject: Re: proposed order for entry following trial 20-7-00666-0 SEA Curnal-Zayas

[EXTERNAL]

F*** you f*** the casa f*** the judge f*** all of you I will never do what you say go f*** yourself and bury
yourself in a ditch because you're getting sued all of you are being sued and you're all not going to have a
job next year at this time I guarantee it watch I will make sure of it.

> On Thu, Oct 8, 2020, 10:11 AM La Raus, David W (ATG) <david.laraus@atg.wa.gov> wrote:
> Greetings to the Court,

> Please see the attached proposed order for entry following the court's oral ruling yesterday. This
> order has been approved for entry by Ms. Cowan on behalf of CASA. However based upon the
> response of Ms. Zayas, below, it does not appear that she will agree to sign off on the order, or identify
> specific disagreements with the contents of the order for discussion by the parties.

> Sincerely,
> David La Raus
> Assistant Attorney General
> Division of Social & Health Services, Seattle
> 800 5th Ave. Ste. #2000
> Seattle, WA 98164
> (206) 464-7470
> fax (206) 464-6338
> ********************************************************************************************************************
> ********************************************************
> NOTE: THIS EMAIL TRANSMISSION IS INTENDED ONLY FOR THE ADDRESSEE SHOWN
> ABOVE. IT MAY CONTAIN PRIVILEGED ATTORNEY-CLIENT COMUNICATION OR ATTORNEY
> WORK PRODUCT, OR OTHER INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, OR
> OTHERWISE PROTECTED FROM DISCLOSURE. ANY REVIEW, DISSEMINATION, OR USE OF
> THIS TRANSMISSION OR ITS CONTENTS BY PERSONS OTHER THAN THE ADDRESSEE IS
> STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE
> DESTROY AND NOTIFY SENDER IMMEDIATELY BY EMAIL OR TELEPHONE AT THE ABOVE
> NUMBER. THANK YOU.
> ********************************************************************************************************************
> ********************************************************

> From: M. Zayas < ACZ angel@gmail.com>
> Sent: Thursday, October 08, 2020 9:21 AM
> To: La Raus, David W (ATG) <david.laraus@atg.wa.gov>
> Cc: Myriam Zayas- School <myriam.zayas@bellevuecollege.edu>; Cowan, Jennie
> <jcowan@kingcounty.gov>; Magee, Jamaal (DCYF) <jamaal.magee@dcyf.wa.gov>; Duke, Pauline
> <Pauline.Duke@kingcounty.gov>
> Subject: Re: proposed order for entry following trial

> [EXTERNAL]

YOU TOLD ERIN BOYETT TO LIE ON THE STAND THATS PERJURY AND I HAVE THE PROOF
SHE IS BEING SUED, SO ARE ALL OF YOU STOP FUCKING EMAILING ME

From: La Raus, David W (ATG)
Sent: Thursday, October 08, 2020 9:16 AM
To: Myriam Zayas- School <myriam.zayas@bellevuecollege.edu>; 'M. Zayas'
< ACZ angel@gmail.com>
Cc: 'Cowan, Jennie' <jcowan@kingcounty.gov>; Magee, Jamaal (DCYF)
<jamaal.magee@dcyf.wa.gov>; Duke, Pauline <Pauline.Duke@kingcounty.gov>
Subject: proposed order for entry following trial

Hello Ms. Zayas,

You left the court hearing early yesterday, before the procedure for entering a written order had
been discussed.

I have attached a proposed order for submission the court, which has been reviewed and
"approved for entry" by Ms. Cowan. That means that she agrees that it accurately reflects what
the court has ordered, and the evidence that was presented at the trial.

Since you are representing yourself, please review the order, and then
- if you also approve the order for entry, please sign it and email a scanned copy of the
signature page back to me, or
- if you do not approve this order for entry, please specify why not.
<< File: OrdFFCLDpyTrial-CZ.docx >>
Sincerely,
David La Raus
Assistant Attorney General
Division of Social & Health Services, Seattle
800 5th Ave. Ste. #2000
Seattle, WA  98164
(206) 464-7470
fax (206) 464-6338
********************************************************************************************************************
********************************************************************
NOTE:  THIS EMAIL TRANSMISSION IS INTENDED ONLY FOR THE ADDRESSEE SHOWN
ABOVE.  IT MAY CONTAIN PRIVILEGED  ATTORNEY-CLIENT COMUNICATION OR
ATTORNEY WORK PRODUCT, OR OTHER INFORMATION THAT IS PRIVILEGED,
CONFIDENTIAL, OR OTHERWISE PROTECTED FROM DISCLOSURE.  ANY REVIEW,
DISSEMINATION, OR USE OF THIS TRANSMISSION OR ITS CONTENTS BY PERSONS
OTHER THAN THE ADDRESSEE IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED
THIS TRANSMISSION IN ERROR, PLEASE DESTROY AND NOTIFY SENDER
IMMEDIATELY BY EMAIL OR TELEPHONE  AT THE ABOVE NUMBER.  THANK YOU.
********************************************************************************************************************
********************************************************************

# EXHIBIT 7

**CLERK'S MINUTES**

SCOMIS CODE:  SCCHRG

Pro Tem Commissio Ann Danieli                                      Dept. PRO
              Bailiff:  Linda Nguyen                              Date:  3/17/2020
         Court Clerk:  Tara Shoemaker
      Digital Record:  DR 1L
               Start:  9:57:47
               Stop:  10:29:56

---

### KING COUNTY CAUSE NO.:  20-7-00666-0 KNT

### IN RE THE DEPENDENCY OF: ▇▇▇▇ ACZ ▇▇▇▇

---

**Appearances:**

State's Attorney: Sebastian Miller
Mother  is present, represented by counsel,  Hannah Gold
Caseworker / Social Worker: Kelsey Owens is present

### MINUTE ENTRY

This cause comes on for 72 Hour Shelter Care Hearing as to:

Mother: Shelter Care: Contested, Placement: Contested, Visitation: Contested

9:59:38 Kelsey Owens is sworn and examined on behalf of the State

10:04:50 Cross examination

State rests

10:15:02 Hannah Gold presents an offer of proof as to the mother

Mother rests

10:18:52 Parties present closing argument

**THE COURT FINDS:**
The Child(ren) is / are not an Indian child as defined by the statute.
Mother is not in the military.

**IN RE THE DEPENDENCY OF:** <span>████ ACZ ████</span>
**King County Cause No. 20-7-00666-0 KNT**

## AS TO SHELTER CARE:

☒ The petitioner made reasonable efforts to prevent or eliminate the need for removal child from child's home.

☒ It is currently contrary to the welfare of the child to remain in or return home and shelter care is needed.

## AS TO PLACEMENT:

Child(ren) shall be placed in: Licensed Foster Care

## AS TO VISITATION:

Visitation of the Mother shall be: 2 times per week for 2 hours supervised by DCFS or designee with authorization to liberalize.

Other visitation as follows:

## OTHER FINDINGS:

All service providers to be mutually agreed upon and parties shall follow all treatment recommendations.

DCFS / CASA shall have access to child(ren)'s medical records.

Notice is given to parent(s) / child(ren) of 30-Day Shelter Care Hearing.

Order and Authorization Re Health Care and Education is signed.

Parties to sign release of information to all service providers (copies to DCFS /CASA).

☐ Parties shall cooperate in establishing paternity and is required to undergo DNA Testing

☐ No contact between:

☐ The child(ren) should remain in current school, if of school age.

☒ Attorney / GAL / CASA to be appointed

☐ The Court further orders:

Prior Order(s) remain in full force and effect except as amended by this order.

## NEXT HEARING: Mediation: TBD

Orders to be presented

# EXHIBIT 8

     

2200 Sixth Avenue, Suite 425, Seattle, WA 98121 • 206.389.9321 • Toll Free: 855.329.0919     2208 North 30th Street, Suite 202, Tacoma, WA 98403 • 253.627.6401 • Toll Fee: 800.649.2034

# ONE-WEEK TRANSCRIPT TURNAROUND

Digital Transcripts • Internet Realtime • HD Legal Video • Picture-in-Picture Depositions
Remote Depositions • Designation Editing • Nationwide Scheduling • HD Videoconferencing

## Verbatim Transcript of Proceedings

(From Audio Recording)

*March 17, 2020*

———————————————

## In RE DEPENDENCY OF ████ ACZ ████ v.

20-7-00666-0 KNT

Thank you for choosing BA Litigation Services for your court reporting, legal video, and deposition technology needs. It is always our goal to provide you with exceptional service. If there is anything we can do to assist you, please don't hesitate to let us know.

*Sarah Fitzgibbon, CCR*
Vice President



The Premier Advantage™
PDF transcript bundle contains:

• Full-size and condensed transcripts
• Printable word index
• Hyperlinked selectable word index
• Embedded printable exhibit scans
• Hyperlinked selectable exhibit viewing
• Common file formats: txt, lef, mdb
  accessed via *paperclip* icon

STRATEGY    •    TECHNOLOGY    •    DESIGN    •    DEPOSITIONS

01010070

```
 1              IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

 2                    IN AND FOR THE COUNTY OF KING

 3      _____
                                       )
 4      IN RE THE DEPENDENCY OF  ACZ    )
            ACZ          ,             )
 5                                      )    No. 20-7-00666-0 KNT
                                        )
 6                                      )
                                        )
 7      _____

 8                   VERBATIM REPORT OF PROCEEDINGS

 9      _____

10

11

12

13

14      APPEARANCES:

15          FOR THE DEPARTMENT:      SEBASTIAN MILLER
                                     ASSISTANT ATTORNEY GENERAL
16

17          FOR THE MOTHER:          HANNAH GOLD
                                     ATTORNEY AT LAW
18

19

20

21

22      Before the Honorable Ann Danieli

23      March 17, 2020
        Kent, Washington
24

25
            Jamie Booker, RPR, CCR      jamiebooker229@gmail.com
```

01010071

```
 1                        GENERAL INDEX

 2

 3   Argument .............................................22

 4   Court's Ruling .......................................27

 5

 6                         TRIAL INDEX

 7   WITNESS

 8   Kelsey Owens
        Direct Examination by Sebastian Miller ..................4
 9      Cross Examination by Hannah Gold .......................10

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
          Jamie Booker, RPR, CCR       jamiebooker229@gmail.com
```

In RE DEPENDENCY OF ███████ ACZ
Verbatim Report of Proceedings,  - March 17, 2020                                    Page 3

```
 1        TUESDAY, MARCH 17, 2020; KENT, WASHINGTON

 2                      --oo0oo--

 3        COURT STAFF: ████████████    Cause

 4   No. 20-7-00666-0.  If parties will please put

 5   themselves on the record, beginning with madam social

 6   worker.

 7            KELSEY OWENS:  Kelsey Owens, CPS

 8   investigator.

 9            SEBASTIAN MILLER:  And Sabastian Miller,

10   attorney with the Department.

11            HANNAH GOLD:  Hannah Gold representing the

12   mother.

13        Go ahead and say your name.

14            MERRIAM ZAYAS:  Merriam Zayas (phonetic), the

15   mother.

16            THE COURT:  So good morning.

17            MERRIAM ZAYAS:  Hi.

18            THE COURT:  So we're all advised to stay six

19   feet away from each other so --

20            MERRIAM ZAYAS:  Oh.

21            THE COURT:  I know it's hard when you're

22   trying to confer with your attorneys, but --

23                (Indiscernible crosstalk.)

24            THE COURT:  -- you know, it's for everyone's

25   own good.
                      COLLOQUY
```

In RE DEPENDENCY OF ████ ACZ ████
Verbatim Report of Proceedings,  - March 17, 2020                        Page 4

```
 1        So we're here for shelter care hearing.  And so
 2   what are the parties doing?
 3        Ms. Gold, I'll turn it over to you.
 4            HANNAH GOLD:  Sure.
 5        So we are asking for no shelter care and placement
 6   with mom.  We're also asking, if the Court does find
 7   shelter care and places out of mother's care, that
 8   visits be four hours two times a week with the
 9   understanding that, if  ACZ  ends up back in school
10   which she might.  School -- depending on what happens
11   with this system -- that we may need to reassess that
12   timing.  But she's not in school currently so we're
13   asking for a little more visitation and to be able to
14   bring -- this is unusual -- but to be able to bring
15    ACZ  puppy to the visits because that's important to
16   her.
17            THE COURT:  Okay.  So -- let's back up.  So
18   are you contesting shelter care?
19            HANNAH GOLD:  We are.  But --
20            THE COURT:  Yeah.  Okay.
21            HANNAH GOLD:  -- we want -- we are also --
22   try to make a -- I think we're trying to propose some
23   specifics --
24            THE COURT:  Okay.
25            HANNAH GOLD:  -- if shelter care is found
                         COLLOQUY
```

```
 1    that include visit changes and also the ability to

 2    bring the issue of placement back at the 30-day.  Just

 3    to clarify that that --

 4             THE COURT:  Okay.

 5             HANNAH GOLD:  -- is an ability.

 6             THE COURT:  So you're getting way ahead of

 7    what -- let's just do the shelter care and then take it

 8    from there.

 9             HANNAH GOLD:  Okay.

10             THE COURT:  Okay.  So are you ready to

11    proceed?

12             SEBASTIAN MILLER:  Yes, Your Honor.

13             THE COURT:  Okay.

14         So call your first witness.

15             SEBASTIAN MILLER:  Would you mind swearing

16    her in, Your Honor.

17         Can you say your last name?

18             KELSEY OWENS:  Owens.

19             SEBASTIAN MILLER:  Owens?

20             KELSEY OWENS:  Yes.

21             THE COURT:  Do you swear or affirm that the

22    testimony you give today will be the truth, the whole

23    truth, and nothing but the truth?

24             KELSEY OWENS:  Yes.

25             THE COURT:  Okay.
              Kelsey Owens/By Sebastian Miller (Direct)
```

In RE DEPENDENCY OF ██████ ACZ ██████
Verbatim Report of Proceedings,  - March 17, 2020                                          Page 6

```
 1                      DIRECT EXAMINATION

 2   BY SEBASTIAN MILLER:

 3   Q.   And can you state your name for the record, please?

 4   A.   Kelsey Owens.

 5   Q.   And are you the assigned social worker for  ACZ

 6             ACZ        ?

 7   A.   Yes.

 8   Q.   Am I saying that right?

 9   A.   It's   ACZ

10                (Indiscernible crosstalk.)

11   Q.    ACZ  .   Sorry.

12             And are you requesting shelter care today?

13   A.   Yes.

14   Q.   And did you -- did you write a petition related to this

15        matter?

16   A.   Yes.

17   Q.   And do you adopt that petition as true and accurate?

18   A.   Yes.

19   Q.   And do you adopt that petition into your testimony

20        today?

21   A.   Yes.

22   Q.   And without going too into the details of what is

23        already provided in the petition, can you briefly state

24        what safety concerns you have with the child remaining

25        in the mother's care?
                  Kelsey Owens/By Sebastian Miller (Direct)
```

```
 1   A.    The safety concern is that mother currently has
 2         substance use with methamphetamines, and she has
 3         reported that she is diagnosed with congestive heart
 4         failure.  And so, if she was to continue her substance
 5         use, it could lead to death, which is a concern as that
 6         having a five-year-old in the home and she is the only
 7         caregiver for that child.
 8   Q.    And what supports this thought that the mother might be
 9         using methamphetamines?
10   A.    On 3/5, mom tested positive for methamphetamines.
11   Q.    And have you --
12               THE COURT:  So, counsel, year.
13               SEBASTIAN MILLER:  Oh, sorry.
14   BY SEBASTIAN MILLER:
15   Q.    Can you state what year that was?
16   A.    The 2020.
17   Q.    So this was -- you're referring to March of this year.
18   A.    Yes.
19   Q.    So approximately a week and a half ago?
20   A.    Almost --
21   Q.    Almost two weeks ago?
22   A.    Yeah.
23   Q.    And have you ever discussed methamphetamine use with
24         the mother?
25   A.    Yes.
              Kelsey Owens/By Sebastian Miller (Direct)
```

In RE DEPENDENCY OF ███████ ACZ
Verbatim Report of Proceedings,  - March 17, 2020                                    Page 8

```
1    Q.    And how did those discussions go?  Just briefly.

2    A.    When we first -- when I first got my intake, mom said

3          it was Benadryl.  And then when we had her FTDM, she

4          again stated it was Benadryl and said that she would do

5          UAs for the Department.  But when asked again about the

6          methamphetamine testing positive during admission to

7          the pregnancy that she had, she said, "So what are you

8          gonna do about it?"

9    Q.    And has -- have you tried to offer the mother any

10         services?

11   A.    Yes.  And she said she will not do any services for the

12         Department except UAs.

13   Q.    And what --

14               THE COURT:  So let's hang on a second.

15         So did your client need, like, a pad and paper to

16         communicate with you?

17               HANNAH GOLD:  I've offered, but --

18               (Indiscernible crosstalk.)

19               MERRIAM ZAYAS:  No.  I already -- I --

20               HANNAH GOLD:  Wait.

21               MERRIAM ZAYAS:  I know.

22               HANNAH GOLD:  She's just --

23               THE COURT:  Okay.  All right.

24               HANNAH GOLD:  -- reacting.

25               MERRIAM ZAYAS:  I'm sorry.
               Kelsey Owens/By Sebastian Miller (Direct)
```

In RE DEPENDENCY OF ██████ ACZ
Verbatim Report of Proceedings,  - March 17, 2020                                                    Page 9

```
 1                    THE COURT:  That's okay.  I just don't -- I

 2         mean, it makes it hard to communicate so I thought

 3         maybe we could offer you pad and paper.

 4                    (Indiscernible crosstalk.)

 5                    HANNAH GOLD:  -- closer if you need to.  I

 6         don't mind.

 7                    THE COURT:  Okay.

 8              All right.  Go ahead, counsel.

 9    BY SEBASTIAN MILLER:

10    Q.   And what services -- what other services other than UAs

11         had you attempted to offer?

12    A.   Well, mom refused during my investigation any other

13         services other than UAs.

14              I know when there was a prior Family Assessment

15         Response case -- I believe it was in July -- she was

16         offered Homebuilders, and she declined Homebuilders.

17    Q.   So just -- mother has a history with the Department

18         involving other children?

19    A.   Yes.

20    Q.   And can you just briefly summarize that history?

21    A.   There is one child that was legally free.  Her name's

22         ██ JZ ██ .   ██ MBZ ██ and ██ ACZ ██ were both in prior

23         dependencies, and ██ MBZ ██ was returned home to the

24         father, and ██ ACZ ██ was returned home to mom.

25    Q.   And relating to the father of  ██ ACZ ██  do you know who
                    Kelsey Owens/By Sebastian Miller  (Direct)
```

In RE DEPENDENCY OF ACZ
Verbatim Report of Proceedings,  - March 17, 2020                                                    Page 10

```
 1        the father of  ACZ  is?
 2   A.   No.
 3   Q.   And have you been able to look on the birth
 4        certificate?
 5   A.   There is nobody on the birth certificate.
 6             THE COURT:  No what?
 7             KELSEY OWENS:  There is no name on the birth
 8        certificate.
 9             THE COURT:  Okay.
10   BY SEBASTIAN MILLER:
11   Q.   And have you attempted to ask the mother who the father
12        is?
13   A.   Yes.
14   Q.   And were you able to get any information as to that?
15   A.   It's not known.
16   Q.   Are you going to continue to make efforts as to
17        identify who the father of  ACZ  is?
18   A.   Yes.
19   Q.   I -- and, to your knowledge, does the Indian Child
20        Welfare Act apply to this matter?
21   A.   No.
22   Q.   And what are you basing that off of?
23   A.   Mom has reported no Native American ancestry, and we
24        don't know who the father is.
25             SEBASTIAN MILLER:  I don't have any further
              Kelsey Owens/By Sebastian Miller (Direct)
```

```
 1        questions at this time, Your Honor.  I believe the

 2        petition has sufficient information.

 3                    THE COURT:  Right.  And you're asking?

 4                    SEBASTIAN MILLER:  So -- oh, and just one

 5        more question.  Or two more questions, actually.

 6   BY SEBASTIAN MILLER:

 7   Q.   Where -- what is the placement you're recommending?

 8                    THE COURT:  Okay.

 9                    KELSEY OWENS:  We are asking for licensed

10        foster care.

11   BY SEBASTIAN MILLER:

12   Q.   And what is the visitation that you're recommending for

13        the mother --

14   A.   We're recommending a minimum of two times a week for

15        two hours supervised by either the caregiver or the

16        Department.

17                    SEBASTIAN MILLER:  No further questions, Your

18        Honor.

19                    THE COURT:  Okay.  And then, as to the

20        father, you're asking the Court to have default on

21        unknown father?

22                    SEBASTIAN MILLER:  Yes.

23                    THE COURT:  Okay.  All right.

24             Any questions?

25                    HANNAH GOLD:  Yes, Your Honor.
```

In RE DEPENDENCY OF ██████ ACZ ██████
Verbatim Report of Procee                                                      Page 12

```
 1                          CROSS-EXAMINATION

 2   BY HANNAH GOLD:

 3   Q.   So I believe this case started because there was an

 4        intake on February 18th, 2020; is that correct?

 5   A.   I don't remember the exact date.  I do know it was in

 6        February, though.

 7   Q.   Okay.  And it was an intake from MultiCare --

 8                   (Indiscernible crosstalk.)

 9   A.   No.  That -- that was a screened out intake.  I believe

10        it was actually --

11   Q.   Okay.

12   A.   -- February 9th.

13   Q.   Oh, I see.  Okay.

14             And that February 9th intake was because the

15        mother had had a newborn that she was giving up for

16        adoption; correct?

17   A.   So the intake was because she tested positive at

18        admission regarding the newborn, yes.

19   Q.   Okay.  And just to be clear, with that newborn, she

20        gave the -- that -- gave the newborn up for adoption

21        voluntarily, and CPS was not involved with that child.

22   A.   That is correct.

23   Q.   Okay.  So there was an additional intake on -- on

24        February 18th after that -- that initial one on this

25        case; correct?
```



In RE DEPENDENCY OF    ACZ
Verbatim Report of Proceedings,  - March 17, 2020                                   Page 13

1   A.   It -- it's a screened out, but yes.  Right.

2   Q.   And in that intake, it was because the mother left the

3        hospital after having some medical issues; correct?

4   A.   Yes.

5   Q.   And the -- the hospital referrer had seen ACZ when

6        making that intake; right?

7   A.   Yes.

8   Q.   And she noted that ACZ looked clean, well-groomed,

9        fed, and happy.  Is that correct?

10  A.   Yes.

11  Q.   And ACZ was with the mother at that point.

12  A.   Yes.

13  Q.   Okay.  And -- and the care -- or the referrer noted

14       that the mother was of sound mind when she left the

15       hospital.

16  A.   (inaudible).

17  Q.   Okay.  And you said -- you just testified briefly that

18       your concern was that the mother's medical -- with the

19       mother -- mother's medical condition, continuance of

20       substance use -- continue -- continuing uses of

21       substances would lead to death; is that correct?

22  A.   It can per her (indiscernible).

23  Q.   Okay.  And the mother has produced three UAs that

24       you've provided to us; is that right?

25  A.   Yes.

In RE DEPENDENCY OF [REDACTED] ACZ
Verbatim Report of Proceedings,  - March 17, 2020                                    Page 14

```
 1   Q.   Okay.  And one of the UAs was on -- let's see --
 2   A.   I believe it was the 24th was the first one.
 3   Q.   February 24th.  And that was negative for all
 4        substances; right?
 5   A.   Yes.
 6   Q.   And then the one you referred to was March 5th?
 7   A.   Yes.
 8   Q.   And that one was positive for amphetamine?
 9   A.   And methamphetamine.
10   Q.   And methamphetamine.
11            And then the most recent one was March 11th.  So a
12        little less than a week ago; right?
13   A.   Yes.
14   Q.   And that one was negative for all substances as well.
15   A.   Yes.
16   Q.   Okay.  And so while there was a positive UA, there's no
17        indication that the mother is using consistently if
18        she's had multiple negative UAs; is that correct?
19   A.   I would refer to the petition where she mentions how
20        she would get a clean UA for the Department.
21   Q.   Okay.  And the mother is -- so the mother's on
22        medication for these heart issues; right?
23   A.   Yes.
24   Q.   And have you researched whether that medication could
25        cause a false positive for the UAs?
```



```
1    A.    I contact -- oh, I had my coworker contact Cordant this

2          morning --

3    Q.    Uh-huh.

4    A.    -- regarding the UA, as mom brought it to my attention

5          last night of her medication.  And they said that it

6          would not test positive for methamphetamines.

7    Q.    Okay.  And is the mother's UA referral outstanding

8          still?  Is it still open?

9    A.    I believe it is still open, yes.

10   Q.    Okay.  You -- I think it was you had a call with Steven

11         Baldwin.  Or no.  I'm sorry.  That was a different

12         social worker.

13               Have you ever interacted with Steven Baldwin?

14   A.    No.

15   Q.    Do you -- are you aware of who he is?

16   A.    No.

17   Q.    Okay.  So your discovery provides some information

18         about a man named Steven Baldwin who's a family friend.

19               Did you review your discovery that you produced

20         today?

21   A.    I (inaudible) over it.

22   Q.    Okay.  Did you read the -- the documents from Mariah

23         Crouse (phonetic)?

24   A.    Not thoroughly, no.

25   Q.    So when I asked you about Steve Baldwin, you don't have
```

```
 1        any recollection of who he is.

 2   A.   No.

 3   Q.   Would there be documents that might -- that might help

 4        you with that?

 5   A.   (indiscernible).

 6   Q.   I can provide them to you.

 7             Would it refresh your recollection to look at --

 8        at your notes?  Okay.

 9             Okay.  And so your coworker, Ms. Crouse, spoke

10        with Steven Baldwin at one point; correct?

11   A.   Yes.

12   Q.   And Steven is a family friend?

13   A.   Yes.

14   Q.   All right.  And Steven reported that ACZ and the

15        mother -- I'm sorry.  Let me repeat that.

16             Steven stated that Merriam is great with ACZ and

17        that they're very bonded?  Okay.

18             And that he's a support for the family?

19             And they celebrate holidays and birthdays

20        together?

21             Okay.

22   A.   Yes.

23   Q.   And then you spoke with ACZ teacher; correct?

24   A.   Yes.

25   Q.   And that was on February 11th looks like?  Does that
```

In RE DEPENDENCY OF ███████ ACZ ██████
Verbatim Report of Proceedings,  - March 17, 2020                                    Page 17

```
 1          sound about right?
 2    A.    (indiscernible).
 3    Q.    Okay.  And   ACZ   teacher, Aaron, reported that the
 4          mother is an open book; correct?
 5    A.    Yes.
 6    Q.    And what does that mean to you?
 7    A.    Well, she had mentioned that she -- she's very open
 8          about talking about things that are going on.
 9    Q.    Okay.
10                    THE COURT:  Talking about what?
11                    KELSEY OWENS:  About things that are going
12          on.  Like, the adoption and --
13    BY HANNAH GOLD:
14    Q.    So it sounds like she -- the teacher is indicating that
15          the mother's been honest with her about some personal
16          issues that were going on.
17    A.    Yeah.
18    Q.    Okay.  And that the mother is -- sounds like asks for
19          help from the teacher for things like food?
20    A.    I mean, I can't say that she asks specifically the
21          teacher.  I know that schools do, do the bag
22          (indiscernible) on the weekends in general.
23    Q.    And that the -- this family participated in that.
24    A.    Yes.
25    Q.    Okay.  Let's see.
```

1               And then you spoke with ACZ -- or ACZ .  I'm

2       sorry -- on March 12th; correct?  Does that sound

3       right?

4               So you met with ACZ at school.

5    A.   Okay.  Yes.

6    Q.   How's that sound?  Okay.  Just -- that would be last

7       week.

8    A.   Yeah.

9    Q.   Okay.

10              HANNAH GOLD:  Do you have a question?

11              MERRIAM ZAYAS:  Aren't they supposed to ask

12       to do that before they do that?

13              HANNAH GOLD:  No.

14   BY HANNAH GOLD:

15   Q.   So you met with her one on one; right?

16   A.   Yes.

17   Q.   Okay.  And, when you asked ACZ if there's something

18       that would make her feel better, she stated that her

19       dog would make her feel better.

20   A.   Yes.

21   Q.   Okay.  And she seemed to focus quite a bit on her puppy

22       throughout that interview; right?  Okay.

23              And has the Department scheduled a visit for the

24       mother at this point?

25   A.   No.  We're waiting for (indiscernible).

In RE DEPENDENCY OF ▮▮▮▮ ACZ
Verbatim Report of Proceedings,  - March 17, 2020                                                    Page 19

```
 1   Q.    Okay.  Is the Department able -- or the Department will
 2         be able to offer the mother a visit today if shelter
 3         care's established?
 4   A.    (inaudible).  Yes.
 5   Q.    Okay.  And given the interesting times we're living in
 6         with this virus, how's the Department intending on
 7         providing the mother visits?
 8   A.    Our office is still open so it's not an issue to
 9         provide visits.
10   Q.    Okay.  And so, if the Department prevails and shelter
11         care's established, would you, yourself, be able to
12         provide those visits?
13   A.    Yes.
14   Q.    Okay.  And, if you can't do it, another employee would
15         be able to do it?
16   A.    Another employee until I can get a referral in to get a
17         visit (inaudible).  Yeah.
18   Q.    Okay.  And it's -- it's true that children benefit from
19         ongoing contact with family -- with their parents?
20   A.    I believe so, yeah.
21   Q.    Okay.  And it's -- it's true that removing a child from
22         a parent can cause trauma to that child.
23   A.    Yes.
24   Q.    Okay.  And is distrust of the Department enough to
25         establish shelter care for a parent?
```



In RE DEPENDENCY OF ███████ ACZ
Verbatim Report of Proceedings,  - March 17, 2020                                      Page 20

```
1    A.    Can you rephrase the question?

2    Q.    Is a parent distrusting the Department enough to

3          establish shelter care?

4                 SEBASTIAN MILLER:  Your Honor, I'm going to

5          object to that.

6                 THE COURT:  I mean, that's a judicial

7          decision.

8                 HANNAH GOLD:  Okay.  I think those are my

9          only questions at this point.

10                THE COURT:  All right.

11          Any redirect by the Department?

12                SEBASTIAN MILLER:  No, Your Honor.

13                THE COURT:  Okay.  Any further witnesses?

14                SEBASTIAN MILLER:  No.

15                HANNAH GOLD:  I'd like to make a short offer

16          of proof on behalf of the mother.

17                THE COURT:  Okay.  So listen very carefully

18          to what your attorney has to say.  After she's done

19          speaking, then I'm going to swear you in and have you

20          affirm that everything she said is true and correct.

21          Okay?

22                HANNAH GOLD:  So if the mother were to

23          testify, she would say that she is asking for placement

24          with her and that she would do any services the Court

25          ordered with ACZ in her care, including UAs or
```

In RE DEPENDENCY OF ███ ACZ ███
Verbatim Report of Proceedings,  - March 17, 2020                                    Page 21

```
 1   treatment or in-home services that the Court might
 2   think would be appropriate.
 3        The mother is very worried about ACZ and wants
 4   to make sure she is okay.  That is her number one
 5   concern.  It's not herself, but her daughter.  And she
 6   loves her very much.
 7        She has noted that ACZ has been really stable
 8   recently and that this is going to be extremely
 9   difficult change for her, and she's probably already
10   struggling with this.
11        ACZ loves her school and her teacher a lot.
12   Apparently ACZ said that she wants to stay in
13   kindergarten forever and with this teacher forever.
14        ACZ on a soccer team that should be starting
15   up hopefully once this virus is laid low, and the
16   mother is actually the head coach on that soccer team.
17   And that's an important thing for the family.
18        The mother is particularly worried that ACZ is
19   extremely bonded with her puppy and that it would be
20   important for ACZ to be able to preferably have her
21   puppy but more likely visit with her puppy during the
22   time -- if shelter care is established.
23        The mother reports she's on Seroquel and -- I
24   don't even know how to say it -- labetalol.
25             MERRIAM ZAYAS:  Labetalol.
```

In RE DEPENDENCY OF █████ ACZ ████
Verbatim Report of Proceedings,  -  March 17, 2020                              Page 22

```
1              HANNAH GOLD:  Labetalol, which she reports
2    may have caused a false positive.  And both are
3    prescribed to her and she is taking regularly.
4         She also notes that she's been very honest about
5    the -- her baby that she just gave up for adoption, and
6    she worked really carefully with  ACZ  to make sure
7    this wasn't a traumatizing experience for her since
8     ACZ  knew that she was pregnant but also knew about
9    the adoption, and that this much change in   ACZ   life
10   at one time is going to be a really big traumatizing
11   event for her, and that is what the mother most
12   concerned about.
13        She is asking that the Court order the ability --
14   or that the Department return -- I'm sorry -- that the
15   Department -- if shelter care is established, that the
16   Department provide a visit today.
17        Mother's asking for visits twice a week for four
18   hours at a minimum and that she be able to bring the
19   dog to the visits.
20        And we have already discussed with the social
21   worker that she will include that  ACZ  has a puppy on
22   the chipper on the placement document.  And that was
23   important to the mother in case the foster parents --
24   if shelter care's established -- in case the foster
25   parents are willing to take the puppy.  The mother
```

```
 1    would like that.
 2              THE COURT:  What's the chipper?  I missed
 3    that.
 4              HANNAH GOLD:  The chipper is the placement --
 5              UNIDENTIFIED SPEAKER:  Referral.
 6              HANNAH GOLD:  -- paperwork.
 7              THE COURT:  Oh, okay.
 8              HANNAH GOLD:  Sorry, Your Honor.  But the
 9    mother would testify that that's what we're requesting,
10    and the social worker was willing to do that.
11         But above -- above all, she is just worried that
12    this is hurting ACZ and wants her daughter to have
13    that stability that she had and that she's able to
14    continue that.
15         If shelter care's established, her number one
16    concern is making sure she gets time with her daughter.
17    And the mother would like to be able to readdress
18    placement, if the Court does establish shelter care,
19    that she be able to readdress placement at the 30-day
20    shelter care hearing.
21              THE COURT:  Okay.
22              HANNAH GOLD:  That would be what she'd ask
23    for.
24              THE COURT:  So raise your right hand.
25         So do you swear or affirm that the testimony your
```

1    attorney gave is all true and correct?

2                    MERRIAM ZAYAS:  Yes.

3                    THE COURT:  Okay.  Put your hand down now.

4         And I'll ask the Department if they have any

5    questions.

6                    SEBASTIAN MILLER:  No, Your Honor.

7                    THE COURT:  Okay.

8         Any further witnesses or evidence that you wanted

9    to present?

10                    HANNAH GOLD:  No, Your Honor.  Just a short

11    argument.

12                    THE COURT:  Okay.  Argument.

13                    SEBASTIAN MILLER:  Your Honor, we're asking

14    for shelter care.  I believe we've met the low

15    threshold for shelter care hearing.

16         The Department has pretty obvious and substantial

17    safety threats with  ACZ  being placed with the mother

18    and especially without Court supervision.

19         This -- the primary concern the Department has, as

20    outlined in the petition, is the mother's

21    methamphetamine use.  But not only that the mother uses

22    methamphetamines, but that she's not very forthcoming

23    about her use to the Department.

24         She has not really showed the Department that

25    she's willing to do services in order to -- in order to
                            Argument

1  rectify this.  And the concerns that she's discussed

2  with the social worker -- the ability to avoid the UAs

3  being accurate for detecting methamphetamine use.  And

4  this is behavior that has occurred under the

5  Department's supervision in the past in terms of

6  previous children under the mother's care.

7       This is all documented very detailed in the

8  petition, going back as far as 2001, with incidents

9  occurring every couple years relating to various

10 children up until this most recent occurrence this

11 month relating to the recent methamphetamine alleged

12 use with  ACZ  in her care.

13      One of the concerning incidents is one of her

14 previous children had stated -- which is outlined in

15 the petition -- that they actually used some of the

16 mother's methamphetamine which was out and within reach

17 of the children.

18      This is obviously concerning to the Department,

19 especially coupled with --

20           THE COURT:  Do we have some Kleenex, please?

21           SEBASTIAN MILLER:  Oh, I'm sorry.

22           UNIDENTIFIED SPEAKER:  That's okay.  First

23 time (indiscernible).

24           SEBASTIAN MILLER:  I think with these past

25 behaviors, Your Honor, and this most recent positive
                         Argument

In RE DEPENDENCY OF ███████ ACZ
Verbatim Report of Proceedings,  - March 17, 2020                                   Page 26

1    UA, in conjunction with the mother's behavior toward

2    the social worker, it's obviously causing us concerns.

3    And because of that, we're asking for the Court to find

4    shelter care and to place into licensed foster care.

5                THE COURT:  Thank you, counsel.

6                HANNAH GOLD:  Thank you, Your Honor.  The

7    mother's requesting that shelter care not be found and

8    that  ACZ  be returned to her; or, in the other option,

9    if shelter care is found, that  ACZ  be placed with

10   her.  Essentially, her biggest concern is having  ACZ

11   with her.

12        She is willing to do what needs to be done.

13   She -- I mean, no one can deny that the mother has a

14   distrust of the Department.  That is a fact.  She has

15   had multiple involvements.  She has lost multiple

16   children.  It is hard for her to trust the Department,

17   and she can't claim otherwise.

18        However, the distrust is not enough to establish

19   shelter care.  And the mother has counsel at this point

20   who can interact with the Department on her behalf to

21   assist her in having more productive conversations with

22   the Department, and that should change the tone

23   hopefully.

24        The mother has had multiple negative UAs, one

25   positive that she strongly believes are false, and we
                              Argument

In RE DEPENDENCY OF ACZ
Verbatim Report of Proceedings,  - March 17, 2020                                    Page 27

1   have not had an opportunity to discuss with any sort of

2   expert on the issue because of the shortened time for

3   shelter care.  But we'll certainly be pursuing to

4   figure out whether or not an expert can -- can identify

5   whether that could have been a false positive.

6       She has been honest and thoughtful about the birth

7   of her new child who she gave up for adoption, knowing

8   that she couldn't care for her.  But she is capable of

9   caring for ACZ and is very clear about that.

10      But, above all else, it's ACZ stability that

11  the mother is worried about.  Removing her from her

12  mother is going to destabilize ACZ.  It's gonna

13  traumatize her.  It's gonna separate her from the

14  people and the animals and the things she loves, and

15  that's the number one concern.

16      If the Court does place ACZ out of the mother's

17  care, the mother is very clear that she would like as

18  much contact as possible with ACZ

19      Her proposal is four hours two times a week for

20  visitations at a minimum, that she be able to bring

21  ACZ puppy to the visit for ACZ sake -- not for

22  the mother's, but for ACZ sake -- and that the

23  Department provide a visit today at the -- today or

24  tomorrow at the very, very earlier -- or very, very

25  latest.
                        Argument



In RE DEPENDENCY OF ████ ACZ ████
Verbatim Report of Proceedings,  - March 17, 2020                                        Page 28

```
1        She'd also ask that the court order very clearly

2   state that she has the ability to -- to readdress

3   placement at the return home -- or I'm sorry -- return

4   home at the 30-day hearing, if shelter care's

5   established.

6             THE COURT:  That's the court rule so I don't

7   understand your argument.

8             HANNAH GOLD:  I think it would be -- it would

9   be helpful for the mother to have it in an order.  We

10  are just asking if the Court could just -- or if I

11  could write in that the court rule allows us to address

12  that.  I think it would just be simply a morale

13  booster.

14        And so we are just asking that  ACZ  be with the

15  mother, that mother do services.  That is not a

16  problem.  She'll continue with her UAs and any

17  treatment or in-home service.

18        And, if there's some concern that this removal has

19  been traumatic for  ACZ  and so the mother -- you know,

20  an in-home service that provides the two counseling may

21  be really helpful for them.

22        So she's being as thoughtful as she can about

23   ACZ  and wants her home and is ready for that.

24             THE COURT:  Okay.  Thank you.

25             HANNAH GOLD:  Thank you.
                    Argument
```

In RE DEPENDENCY OF ACZ
Verbatim Report of Proceedings,  - March 17, 2020                                Page 29

```
 1              THE COURT:  Any rebuttal?

 2              SEBASTIAN MILLER:  No, Your Honor.

 3              THE COURT:  All right.  So the -- the

 4    standard here today -- and I have allergies just so --

 5    everybody, don't freak out -- is reasonable cause, and

 6    the issue is safety.

 7         The child is five years old.  The Court has had a

 8    chance to review the petition and the 27 paragraphs by

 9    the Department and listened to the Department's

10    testimony -- social worker's testimony and the mother's

11    testimony through her attorney.

12         And the Court does believe that the Department has

13    met that reasonable cause standard; that because of

14    ACZ   young age, the alleged use of methamphetamines,

15    and the history of drug use, and the mother's health is

16    concerning to the Court giving how -- how young ACZ

17    is.

18         So the Court does find that returning the child to

19    the home of the mother at this point in time does

20    present a serious threat of substantial harm to the

21    child.

22         The Department did offer services.  The mother

23    didn't engage in any of those services, did the UAs,

24    and then we have the positive UA.

25         There is an allegation that perhaps her prescribed
                         Court's Ruling
```

In RE DEPENDENCY OF ███████ ACZ ████
Verbatim Report of Proceedings,  - March 17, 2020                                    Page 30

```
 1   medication is what caused that positive, but the Court

 2   doesn't have any evidence to establish that today.

 3        So the Court will authorize licensed shelter care

 4   for the -- ACZ  appoint a CASA.  There's -- I guess

 5   we're not setting any mediations.

 6        And then, as far as placement, there's no

 7   relatives, Ms. Gold, that the mother wants the

 8   Department to pursue?

 9             HANNAH GOLD:  No.

10             MERRIAM ZAYAS:  No.

11             THE COURT:  Okay.  And then services are

12   voluntary at this time.

13        You've been through the process before, and I hope

14   this is a better experience for you.

15             MERRIAM ZAYAS:  I want her home in 30 days.

16             THE COURT:  Well, you have a right to a

17   shelter care hearing in 30 days.  That's what the court

18   rule is.  But getting engaged in those services would

19   certainly be helpful for that.  So you understand that?

20             MERRIAM ZAYAS:  They never offered me

21   anything.  I don't know what they're talking about --

22   services.

23             THE COURT:  Now, to deal with the issue of

24   placement of the puppy, what is the Department's

25   response on that?
                         Court's Ruling
```

In RE DEPENDENCY OF ▮▮▮▮▮ ACZ
Verbatim Report of Proceedings,  - March 17, 2020                                      Page 31

```
 1              KELSEY OWENS:  I'm willing to put it on the

 2   referral.

 3              THE COURT:  Okay.

 4              KELSEY OWENS:  But that can't guarantee

 5   anything.

 6              THE COURT:  And how old is the puppy?

 7              MERRIAM ZAYAS:  Six months.

 8              THE COURT:  Six months.  Okay.  So you'd put

 9   that on the referral and --

10              MERRIAM ZAYAS:  She's potty trained.

11              THE COURT:  -- then you look for a family

12   that would be willing to do that?

13         What kind of puppy is it?

14              MERRIAM ZAYAS:  It's a pug.  Really tiny.

15              THE COURT:  Little, little pug.  Okay.

16         So do you put all that information on the chipper?

17              KELSEY OWENS:  Yeah.  You can put it on the

18   chipper; and whether they accept that part or not,

19   that's really up to the placement.

20              THE COURT:  And then the Department is asking

21   for two times per week for two hours supervised?

22              SEBASTIAN MILLER:  Correct.

23              THE COURT:  So if the Department can inform

24   the Court of what's going on right now given the health

25   crisis?  What is the Department doing to provide visits
                           Court's Ruling
```

In RE DEPENDENCY OF <span style="background:black">ACZ</span>
Verbatim Report of Proceedings,  - March 17, 2020                                    Page 32

```
 1   for parents when it's supervised?
 2              KELSEY OWENS:  Like I said, the -- the
 3   Department is still open.  Our office is still open.
 4   Obviously, we like to be aware of the virus that is
 5   going around, and so a lot of us are staying out of the
 6   office and teleworking.
 7              THE COURT:  Okay.
 8              KELSEY OWENS:  But visits are still occurring
 9   for families.
10              THE COURT:  And are -- are there still
11   service providers that are picking up those contracts?
12              KELSEY OWENS:  That I don't know.
13              THE COURT:  Okay.
14              KELSEY OWENS:  But I know the Department --
15   at least for us -- we are still providing visits.
16              THE COURT:  Okay.  And what is your position
17   on the request for two times per week for four hours?
18              KELSEY OWENS:  I think two times a week for
19   two hours is reasonable, especially when school does go
20   back into session.
21              MERRIAM ZAYAS:  She's not going to be there
22   for that long.
23              THE COURT:  All right.  So the Court is well
24   aware of the challenges facing the Department in this
25   health crisis.
                        Court's Ruling
```

1    I would love for  ACZ  to have as much visit time

2  with her mother, given the fact that she was in

3  Department care and then back with mom and now she's

4  back in Department care.

5    So the Court -- because  ACZ  is no longer in

6  kindergarten, two times per week for four hours

7  supervised, if the Department can accommodate the

8  supervision for that amount of time.  I'm not sure what

9  your resources are at this time, but at a minimum, two

10  times per week for two hours, but, as an aspiration,

11  two times per week for four hours.

12    And you can put in the court order, the court

13  rules do allow shelter care hearing at 30 days.

14  There's also that other court rule that -- on six days'

15  notice, you can ask for revisiting shelter care.

16    Don't know what order No. 5 says on those types of

17  hearings, whether they are in person.  It just says

18  shelter care; so.

19    Anyway.  Keep in touch with your attorney.

20    Ms. Gold, do you keep your cases or --

21        HANNAH GOLD:  I'll be keeping the case.

22        THE COURT:  Because things are fast-changing

23  with the court and what's going on.  Okay?

24        HANNAH GOLD:  Are we not supposed to do a

25  mediation?  Are we supposed to schedule it after things
                         Court's Ruling

In RE DEPENDENCY OF ███████ ACZ ███████
Verbatim Report of Proceedings,  - March 17, 2020                    Page 34

1    open?

2              THE COURT:  I have the order said no

3    mediation.

4              UNIDENTIFIED SPEAKER:  I thought

5    (indiscernible) yesterday (indiscernible).

6              HANNAH GOLD:  Okay.

7              UNIDENTIFIED SPEAKER:  -- about it.

8              HANNAH GOLD:  Mediation's on hiatus.  I just

9    didn't know how we're supposed to be dealing with it.

10             UNIDENTIFIED SPEAKER:  From mediation

11   standpoint, that -- they're asking us to not offer

12   mediation (indiscernible).

13             HANNAH GOLD:  Okay.

14             UNIDENTIFIED SPEAKER:  And the ones that are

15   currently scheduled are (indiscernible).

16             HANNAH GOLD:  Gotcha.

17             THE COURT:  And then that order, the -- sign

18   the healthcare and education order, appoint a CASA, and

19   I think that's everything.

20             HANNAH GOLD:  Thank you.

21             (Recording concluded.)

22

23

24

25                    Court's Ruling

In RE DEPENDENCY OF ███████ ACZ ███████
Verbatim Report of Proceedings,  - March 17, 2020                                    Page 35

```
 1                    C E R T I F I C A T E

 2

 3

 4             I, JAMIE L. BOOKER, Certified Court Reporter

 5   in the state of Washington, in the County of Pierce, in

 6   Tacoma, Washington, do hereby certify under penalty of

 7   perjury under the laws of the state of Washington:

 8             That the foregoing proceedings was

 9   transcribed from an audio recording received from trial

10   court to the best of my ability, subject to the quality of

11   audio recording, or was transcribed under my direction;

12             That I am not a relative, employee, attorney

13   or counsel of any party to this action or relative or

14   employee of such attorney or counsel, and I am not

15   financially interested in the said action or the outcome

16   thereof;

17             That this certification applies only to the

18   original and copies supplied under my direction and not to

19   any copies made by other parties;

20             IN WITNESS WHEREOF, I have hereunto set my

21   hand this 8th day of June, 2021.

22

23   e-Signature_____
     Jamie L. Booker, RPR, CCR
24   Certified Court Reporter

25
                         Court's Ruling
```

In RE DEPENDENCY OF ███████ ACZ
Verbatim Report of Proceedings,  - March 17, 2020

-

**--oo0oo--** 3:2

**1**

**11th** 14:11 16:25
**12th** 18:2
**17** 3:1
**18th** 12:4,24

**2**

**20-7-00666-0** 3:4
**2001** 25:8
**2020** 3:1 7:16 12:4
**24th** 14:2,3
**27** 29:8

**3**

**3/5** 7:10
**30** 30:15,17 33:13
**30-day** 5:2 23:19 28:4

**5**

**5** 33:16
**5th** 14:6

**9**

**9th** 12:12,14

**A**

**Aaron** 17:3
**ability** 5:1,5 22:13 25:2 28:2
**accept** 31:18
**accommodate** 33:7
**accurate** 6:17 25:3
**Act** 10:20

**additional** 12:23
**address** 28:11
**admission** 8:6 12:18
**adopt** 6:17,19
**adoption** 12:16,20 17:12 22:5,9 27:7
**advised** 3:18
**affirm** 5:21 20:20 23:25
**age** 29:14
**ahead** 3:13 5:6 9:8
**allegation** 29:25
**alleged** 25:11 29:14
**allergies** 29:4
**American** 10:23
**ACZ** 4:9 6:5,9,11 9:22,24,25 10:1, 17 13:5,8,11 16:14,16 18:1,4,17 20:25 21:3,7,11,12,18,20 22:6,8,21 23:12 24:17 25:12 26:8,9,10 27:9, 12,16,18 28:14,19,23 29:16 30:4 33:1,5
**ACZ** 4:15 16:23 17:3 21:14 22:9 27:10,21,22 29:14
**amount** 33:8
**amphetamine** 14:8
**ancestry** 10:23
**animals** 27:14
**Apparently** 21:12
**apply** 10:20
**appoint** 30:4 34:18
**approximately** 7:19
**argument** 24:11,12,25 25:25 26:25 27:25 28:7,25
**asks** 17:18,20
**aspiration** 33:10
**Assessment** 9:14
**assigned** 6:5
**assist** 26:21
**attempted** 9:11 10:11
**attention** 15:4

**attorney** 3:10 20:18 24:1 29:11 33:19
**attorneys** 3:22
**authorize** 30:3
**avoid** 25:2
**aware** 15:15 32:4,24

**B**

**baby** 22:5
**back** 4:9,17 5:2 25:8 32:20 33:3,4
**bag** 17:21
**Baldwin** 15:11,13,18,25 16:10
**basing** 10:22
**beginning** 3:5
**behalf** 20:16 26:20
**behavior** 25:4 26:1
**behaviors** 25:25
**believes** 26:25
**Benadryl** 8:3,4
**benefit** 19:18
**big** 22:10
**biggest** 26:10
**birth** 10:3,5,7 27:6
**birthdays** 16:19
**bit** 18:21
**bonded** 16:17 21:19
**book** 17:4
**booster** 28:13
**briefly** 6:23 8:1 9:20 13:17
**bring** 4:14 5:2 22:18 27:20
**brought** 15:4

**C**

**call** 5:14 15:10
**capable** 27:8
**care** 4:1,5,7,18,25 5:7 6:12,25 11:10 13:13 19:25 20:3,25 21:22 22:15 23:18,20 24:14,15 25:6,12 26:4,7,9,

19 27:3,8,17 30:3,17 33:3,4,13,15, 18

**care's** 19:3,11 22:24 23:15 28:4

**carefully** 20:17 22:6

**caregiver** 7:7 11:15

**caring** 27:9

**CASA** 30:4 34:18

**case** 9:15 12:3,25 22:23,24 33:21

**cases** 33:20

**caused** 22:2 30:1

**causing** 26:2

**celebrate** 16:19

**certificate** 10:4,5,8

**challenges** 32:24

**chance** 29:8

**change** 21:9 22:9 26:22

**child** 6:24 7:7 9:21 10:19 12:21 19:21,22 27:7 29:7,18,21

**children** 9:18 19:18 25:6,10,14,17 26:16

**chipper** 22:22 23:2,4 31:16,18

**claim** 26:17

**clarify** 5:3

**clean** 13:8 14:20

**clear** 12:19 27:9,17

**client** 8:15

**closer** 9:5

**coach** 21:16

**COLLOQUY** 3:25 4:25

**communicate** 8:16 9:2

**concern** 7:1,5 13:18 21:5 23:16 24:19 26:10 27:15 28:18

**concerned** 22:12

**concerns** 6:24 25:1 26:2

**concluded** 34:21

**condition** 13:19

**confer** 3:22

**congestive** 7:3

**conjunction** 26:1

**consistently** 14:17

**contact** 15:1 19:19 27:18

**contesting** 4:18

**continuance** 13:19

**continue** 7:4 10:16 13:20 23:14 28:16

**continuing** 13:20

**contracts** 32:11

**conversations** 26:21

**Cordant** 15:1

**correct** 12:4,16,22,25 13:3,9,21 14:18 16:10,23 17:4 18:2 20:20 24:1 31:22

**counsel** 7:12 9:8 26:5,19

**counseling** 28:20

**couple** 25:9

**coupled** 25:19

**court** 3:3,16,18,21,24 4:6,17,20,24 5:4,6,10,13,21,25 7:12 8:14,23 9:1,7 10:6,9 11:3,8,19,20,23 17:10 20:6, 10,13,17,24 21:1 22:13 23:2,7,18, 21,24 24:3,7,12,18 25:20 26:3,5 27:16 28:1,6,10,11,24 29:1,3,7,12, 16,18 30:1,3,11,16,17,23 31:3,6,8, 11,15,20,23,24 32:7,10,13,16,23 33:5,12,14,22,23 34:2,17

**Court's** 29:25 30:25 31:25 32:25 33:25 34:25

**coworker** 15:1 16:9

**CPS** 3:7 12:21

**crisis** 31:25 32:25

**CROSS-EXAMINATION** 12:1

**crosstalk** 3:23 6:10 8:18 9:4 12:8

**Crouse** 15:23 16:9

_____ 3:3 6:6

**D**

**date** 12:5

**daughter** 21:5 23:12,16

**days** 30:15,17 33:13

**days'** 33:14

**deal** 30:23

**dealing** 34:9

**death** 7:5 13:21

**decision** 20:7

**declined** 9:16

**default** 11:20

**deny** 26:13

**Department** 3:10 8:5,12 9:17 11:16 14:20 18:23 19:1,6,10,24 20:2,11 22:14,15,16 24:4,16,19,23,24 25:18 26:14,16,20,22 27:23 29:9,12,22 30:8 31:20,23,25 32:3,14,24 33:3,4, 7

**Department's** 25:5 29:9 30:24

**dependencies** 9:23

**depending** 4:10

**destabilize** 27:12

**detailed** 25:7

**details** 6:22

**detecting** 25:3

**diagnosed** 7:3

**difficult** 21:9

**Direct** 5:25 6:1,25 7:25 8:25 9:25 10:25

**discovery** 15:17,19

**discuss** 27:1

**discussed** 7:23 22:20 25:1

**discussions** 8:1

**distrust** 19:24 26:14,18

**distrusting** 20:2

**document** 22:22

**documented** 25:7

**documents** 15:22 16:3

**dog** 18:19 22:19

**drug** 29:15

**E**

**earlier** 27:24



In RE DEPENDENCY OF ████████ ACZ
Verbatim Report of Proceedings,  -  March 17, 2020

education 34:18

efforts 10:16

employee 19:14,16

ends 4:9

engage 29:23

engaged 30:18

Essentially 26:10

establish 19:25 20:3 23:18 26:18
    30:2

established 19:3,11 21:22 22:15,24
    23:15 28:5

event 22:11

everyone's 3:24

evidence 24:8 30:2

exact 12:5

EXAMINATION 6:1

experience 22:7 30:14

expert 27:2,4

extremely 21:8,19

——————————

                    F

facing 32:24

fact 26:14 33:2

failure 7:4

false 14:25 22:2 26:25 27:5

families 32:9

family 9:14 15:18 16:12,18 17:23
    19:19 21:17 31:11

fast-changing 33:22

father 9:24,25 10:1,11,17,24 11:20,
    21

February 12:4,6,12,14,24 14:3
    16:25

fed 13:9

feel 18:18,19

feet 3:19

figure 27:4

find 4:6 26:3 29:18

five-year-old 7:6

focus 18:21

food 17:19

forever 21:13

forthcoming 24:22

foster 11:10 22:23,24 26:4

found 4:25 26:7,9

freak 29:5

free 9:21

friend 15:18 16:12

FTDM 8:3

——————————

                    G

gave 12:20 22:5 24:1 27:7

general 17:22

give 5:22

giving 12:15 29:16

Gold 3:11 4:3,4,19,21,25 5:5,9 8:17,
    20,22,24 9:5 11:25 12:2 17:13
    18:10,13,14 20:8,15,22 22:1 23:4,6,
    8,22 24:10 26:6 28:8,25 30:7,9
    33:20,21,24 34:6,8,13,16,20

good 3:16,25

Gotcha 34:16

great 16:16

guarantee 31:4

guess 30:4

——————————

                    H

half 7:19

hand 23:24 24:3

hang 8:14

Hannah 3:11 4:4,19,21,25 5:5,9
    8:17,20,22,24 9:5 11:25 12:2 17:13
    18:10,13,14 20:8,15,22 22:1 23:4,6,
    8,22 24:10 26:6 28:8,25 30:9 33:21,
    24 34:6,8,13,16,20

happy 13:9

hard 3:21 9:2 26:16

harm 29:20

head 21:16

health 29:15 31:24 32:25

healthcare 34:18

hearing 4:1 23:20 24:15 28:4 30:17
    33:13

hearings 33:17

heart 7:3 14:22

helpful 28:9,21 30:19

hiatus 34:8

history 9:17,20 29:15

holidays 16:19

home 7:6 9:23,24 28:3,4,23 29:19
    30:15

Homebuilders 9:16

honest 17:15 22:4 27:6

Honor 5:12,16 11:1,18,25 20:4,12
    23:8 24:6,10,13 25:25 26:6 29:2

hope 30:13

hospital 13:3,5,15

hours 4:8 11:15 22:18 27:19 31:21
    32:17,19 33:6,10,11

how's 18:6 19:6

hurting 23:12

——————————

                    I

identify 10:17 27:4

important 4:15 21:17,20 22:23

in-home 21:1 28:17,20

inaudible 13:16 15:21 19:4,17

incidents 25:8,13

include 5:1 22:21

including 20:25

Indian 10:19

indicating 17:14

indication 14:17

indiscernible 3:23 6:10 8:18 9:4
    12:8 13:22 16:5 17:2,22 18:25 25:23
    34:5,12,15



inform 31:23

information 10:14 11:2 15:17 31:16

initial 12:24

intake 8:2 12:4,7,9,14,17,23 13:2,6

intending 19:6

interact 26:20

interacted 15:13

interesting 19:5

interview 18:22

investigation 9:12

investigator 3:8

involved 12:21

involvements 26:15

involving 9:18

issue 5:2 19:8 27:2 29:6 30:23

issues 13:3 14:22 17:16

J

JZ 9:22

judicial 20:6

July 9:15

K

keeping 33:21

Kelsey 3:7 5:18,20,24,25 6:4,25 7:25 8:25 9:25 10:7,25 11:9 17:11 31:1,4,17 32:2,8,12,14,18

KENT 3:1

kind 31:13

kindergarten 21:13 33:6

Kleenex 25:20

knew 22:8

knowing 27:7

knowledge 10:19

L

labetalol 21:24,25 22:1

laid 21:15

latest 27:25

lead 7:5 13:21

left 13:2,14

legally 9:21

licensed 11:9 26:4 30:3

life 22:9

listen 20:17

listened 29:9

living 19:5

long 32:22

longer 33:5

looked 13:8

lost 26:15

lot 21:11 32:5

love 33:1

loves 21:6,11 27:14

low 21:15 24:14

M

madam 3:5

make 4:22 10:16 18:18,19 20:15 21:4 22:6

makes 9:2

making 13:6 23:16

man 15:18

MBZ 9:22,23

March 3:1 7:17 14:6,11 18:2

Mariah 15:22

matter 6:15 10:20

ACZ 18:1

mediation 33:25 34:3,10,12

Mediation's 34:8

mediations 30:5

medical 13:3,18,19

medication 14:22,24 15:5 30:1

mentioned 17:7

mentions 14:19

Merriam 3:14,17,20 8:19,21,25 16:16 18:11 21:25 24:2 30:10,15,20 31:7,10,14 32:21

met 18:4,15 24:14 29:13

methamphetamine 7:23 8:6 14:9, 10 24:21 25:3,11,16

methamphetamines 7:2,9,10 15:6 24:22 29:14

Miller 3:9 5:12,15,19,25 6:2,25 7:13, 14,25 8:25 9:9,25 10:10,25 11:4,6, 11,17,22 20:4,12,14 24:6,13 25:21, 24 29:2 31:22

mind 5:15 9:6 13:14

minimum 11:14 22:18 27:20 33:9

missed 23:2

mom 4:6 7:10 8:2 9:12,24 10:23 15:4 33:3

month 25:11

months 31:7,8

morale 28:12

morning 3:16 15:2

mother 3:12,15 7:1,8,24 8:9 9:17 10:11 11:13 12:15 13:2,11,14,19,23 14:17,21 16:15 17:4,18 18:24 19:2,7 20:16,22 21:3,16,18,23 22:11,23,25 23:9,17 24:17,21 26:13,19,24 27:11, 12,17 28:9,15,19 29:19,22 30:7 33:2

mother's 4:7 6:25 13:18,19 14:21 15:7 17:15 22:17 24:20 25:6,16 26:1,7 27:16,22 29:10,15

Multicare 12:7

multiple 14:18 26:15,24

N

name's 9:21

named 15:18

Native 10:23

negative 14:3,14,18 26:24

newborn 12:15,18,19,20

night 15:5

noted 13:8,13 21:7



**notes** 16:8 22:4

**notice** 33:15

**number** 21:4 23:15 27:15

---

**O**

**object** 20:5

**obvious** 24:16

**occurred** 25:4

**occurrence** 25:10

**occurring** 25:9 32:8

**offer** 8:9 9:3,11 19:2 20:15 29:22 34:11

**offered** 8:17 9:16 30:20

**office** 19:8 32:3,6

**ongoing** 19:19

**open** 15:8,9 17:4,7 19:8 32:3 34:1

**opportunity** 27:1

**option** 26:8

**order** 22:13 24:25 28:1,9 33:12,16 34:2,17,18

**ordered** 20:25

**outlined** 24:20 25:14

**outstanding** 15:7

**Owens** 3:7 5:18,19,20,24 6:4 10:7 11:9 17:11 31:1,4,17 32:2,8,12,14, 18

**Owens/by** 5:25 6:25 7:25 8:25 9:25 10:25

---

**P**

**pad** 8:15 9:3

**paper** 8:15 9:3

**paperwork** 23:6

**paragraphs** 29:8

**parent** 19:22,25 20:2

**parents** 19:19 22:23,25 32:1

**part** 31:18

**participated** 17:23

**parties** 3:4 4:2

**past** 25:5,24

**people** 27:14

**person** 33:17

**personal** 17:15

**petition** 6:14,17,19,23 11:2 14:19 24:20 25:8,15 29:8

**phonetic** 3:14 15:23

**picking** 32:11

**place** 26:4 27:16

**placement** 4:5 5:2 11:7 20:23 22:22 23:4,18,19 28:3 30:6,24 31:19

**places** 4:7

**point** 13:11 16:10 18:24 20:9 26:19 29:19

**position** 32:16

**positive** 7:10 8:6 12:17 14:8,16,25 15:6 22:2 25:25 26:25 27:5 29:24 30:1

**potty** 31:10

**preferably** 21:20

**pregnancy** 8:7

**pregnant** 22:8

**prescribed** 22:3 29:25

**present** 24:9 29:20

**pretty** 24:16

**prevails** 19:10

**previous** 25:6,14

**primary** 24:19

**prior** 9:14,22

**problem** 28:16

**proceed** 5:11

**process** 30:13

**produced** 13:23 15:19

**productive** 26:21

**proof** 20:16

**proposal** 27:19

**propose** 4:22

**provide** 16:6 19:9,12 22:16 27:23 31:25

**provided** 6:23 13:24

**providers** 32:11

**providing** 19:7 32:15

**pug** 31:14,15

**puppy** 4:15 18:21 21:19,21 22:21,25 27:21 30:24 31:6,13

**pursue** 30:8

**pursuing** 27:3

**put** 3:4 24:3 31:1,8,16,17 33:12

---

**Q**

**question** 11:5 18:10 20:1

**questions** 11:1,5,17,24 20:9 24:5

---

**R**

**raise** 23:24

**reach** 25:16

**reacting** 8:24

**read** 15:22

**readdress** 23:17,19 28:2

**ready** 5:10 28:23

**reasonable** 29:5,13 32:19

**reassess** 4:11

**rebuttal** 29:1

**recent** 14:11 25:10,11,25

**recently** 21:8

**recollection** 16:1,7

**recommending** 11:7,12,14

**record** 3:5 6:3

**recording** 34:21

**rectify** 25:1

**redirect** 20:11

**refer** 14:19

**referral** 15:7 19:16 23:5 31:2,9

**referred** 14:6

Case 2:20-cv-00747-JCC     Document 54-3     Filed 08/05/21     Page 94 of 185

In RE DEPENDENCY OF ████████ ACZ ████████
Verbatim Report of Proceedings,   - March 17, 2020                    Page 41 Index: referrer..tested

**referrer** 13:5,13

**referring** 7:17

**refresh** 16:7

**refused** 9:12

**regularly** 22:3

**related** 6:14

**relating** 9:25 25:9,11

**relatives** 30:7

**remaining** 6:24

**remember** 12:5

**removal** 28:18

**removing** 19:21 27:11

**repeat** 16:15

**rephrase** 20:1

**reported** 7:3 10:23 16:14 17:3

**reports** 21:23 22:1

**representing** 3:11

**request** 32:17

**requesting** 6:12 23:9 26:7

**researched** 14:24

**resources** 33:9

**response** 9:15 30:25

**return** 22:14 28:3

**returned** 9:23,24 26:8

**returning** 29:18

**review** 15:19 29:8

**revisiting** 33:15

**rule** 28:6,11 30:18 33:14

**rules** 33:13

**Ruling** 29:25 30:25 31:25 32:25
   33:25 34:25

**S**

**Sabastian** 3:9

**safety** 6:24 7:1 24:17 29:6

**sake** 27:21,22

**schedule** 33:25

**scheduled** 18:23 34:15

**school** 4:9,10,12 18:4 21:11 32:19

**schools** 17:21

**screened** 12:9 13:1

**Sebastian** 3:9 5:12,15,19,25 6:2,25
   7:13,14,25 8:25 9:9,25 10:10,25
   11:4,6,11,17,22 20:4,12,14 24:6,13
   25:21,24 29:2 31:22

**separate** 27:13

**Seroquel** 21:23

**service** 28:17,20 32:11

**services** 8:10,11 9:10,13 20:24 21:1
   24:25 28:15 29:22,23 30:11,18,22

**session** 32:20

**setting** 30:5

**she'd** 23:22 28:1

**She'll** 28:16

**shelter** 4:1,5,7,18,25 5:7 6:12 19:2,
   10,25 20:3 21:22 22:15,24 23:15,18,
   20 24:14,15 26:4,7,9,19 27:3 28:4
   30:3,17 33:13,15,18

**short** 20:15 24:10

**shortened** 27:2

**showed** 24:24

**sign** 34:17

**simply** 28:12

**soccer** 21:14,16

**social** 3:5 6:5 15:12 22:20 23:10
   25:2 26:2 29:10

**sort** 27:1

**sound** 13:14 17:1 18:2,6

**sounds** 17:14,18

**SPEAKER** 23:5 25:22 34:4,7,10,14

**speaking** 20:19

**specifically** 17:20

**specifics** 4:23

**spoke** 16:9,23 18:1

**stability** 23:13 27:10

**stable** 21:7

**STAFF** 3:3

**standard** 29:4,13

**standpoint** 34:11

**started** 12:3

**starting** 21:14

**state** 6:3,23 7:15 28:2

**stated** 8:4 16:16 18:18 25:14

**stay** 3:18 21:12

**staying** 32:5

**Steve** 15:25

**Steven** 15:10,13,18 16:10,12,14,16

**strongly** 26:25

**struggling** 21:10

**substance** 7:2,4 13:20

**substances** 13:21 14:4,14

**substantial** 24:16 29:20

**sufficient** 11:2

**summarize** 9:20

**supervised** 11:15 31:21 32:1 33:7

**supervision** 24:18 25:5 33:8

**support** 16:18

**supports** 7:8

**supposed** 18:11 33:24,25 34:9

**swear** 5:21 20:19 23:25

**swearing** 5:15

**system** 4:11

**T**

**taking** 22:3

**talking** 17:8,10 30:21

**teacher** 16:23 17:3,14,19,21 21:11,
   13

**team** 21:14,16

**teleworking** 32:6

**terms** 25:5

**test** 15:6

**tested** 7:10 12:17

In RE DEPENDENCY OF ████████ ACZ ████
Verbatim Report of Proceedings,  -  March 17, 2020
Page 42 Index: testified..Zayas

**testified** 13:17

**testify** 20:23 23:9

**testimony** 5:22 6:19 23:25 29:10,11

**testing** 8:6

**thing** 21:17

**things** 17:8,11,19 27:14 33:22,25

**thought** 7:8 9:2 34:4

**thoughtful** 27:6 28:22

**threat** 29:20

**threats** 24:17

**threshold** 24:15

**time** 11:1 21:22 22:10 23:16 25:23
27:2 29:19 30:12 33:1,8,9

**times** 4:8 11:14 19:5 27:19 31:21
32:17,18 33:6,10,11

**timing** 4:12

**tiny** 31:14

**today** 5:22 6:12,20 15:20 19:2 22:16
27:23 29:4 30:2

**tomorrow** 27:24

**tone** 26:22

**touch** 33:19

**trained** 31:10

**trauma** 19:22

**traumatic** 28:19

**traumatize** 27:13

**traumatizing** 22:7,10

**treatment** 21:1 28:17

**true** 6:17 19:18,21 20:20 24:1

**trust** 26:16

**truth** 5:22,23

**TUESDAY** 3:1

**turn** 4:3

**types** 33:16

**U**

**UA** 14:16,20 15:4,7 26:1 29:24

**UAS** 8:5,12 9:10,13 13:23 14:1,18,

25 20:25 25:2 26:24 28:16 29:23

**Uh-huh** 15:3

**understand** 28:7 30:19

**understanding** 4:9

**UNIDENTIFIED** 23:5 25:22 34:4,7,
10,14

**unknown** 11:21

**unusual** 4:14

**V**

**virus** 19:6 21:15 32:4

**visit** 5:1 18:23 19:2,17 21:21 22:16
27:21,23 33:1

**visitation** 4:13 11:12

**visitations** 27:20

**visits** 4:8,15 19:7,9,12 22:17,19
31:25 32:8,15

**voluntarily** 12:21

**voluntary** 30:12

**W**

**Wait** 8:20

**waiting** 18:25

**wanted** 24:8

**WASHINGTON** 3:1

**week** 4:8 7:19 11:14 14:12 18:7
22:17 27:19 31:21 32:17,18 33:6,10,
11

**weekends** 17:22

**weeks** 7:21

**Welfare** 10:20

**well-groomed** 13:8

**witnesses** 20:13 24:8

**worked** 22:6

**worker** 3:6 6:5 15:12 22:21 23:10
25:2 26:2

**worker's** 29:10

**worried** 21:3,18 23:11 27:11

**write** 6:14 28:11

**Y**

**year** 7:12,15,17

**years** 25:9 29:7

**yesterday** 34:5

**young** 29:14,16

**Z**

**Zayas** 3:14,17,20 8:19,21,25 18:11
21:25 24:2 30:10,15,20 31:7,10,14
32:21

# EXHIBIT 9

1

2

3

4

5

6

7                                                    The Honorable John C. Coughenour

8                       **UNITED STATES DISTRICT COURT**
                       **WESTERN DISTRICT OF WASHINGTON**
9                                **AT SEATTLE**

10   MYRIAM ZAYAS,                          NO. 2:20-cv-00747 JCC

11                      Plaintiff,          NOTICE OF PHYSICAL FILING

12          v.

13   ANNETTE MESSITT, JEFFREY
     WHITNEY, AMBER WHITNEY
14
                       Defendants.
15
              **The attached thumb drive contains an audio file, which should be inserted here.**
16

17

18

19

20

21

22

23

24

25

26

NOTICE OF PHYSICAL FILING                        1                   ATTORNEY GENERAL OF WASHINGTON
No. 2:20-cv-00747 JCC                                                              Torts Division
                                                                            7141 Cleanwater Drive SW
                                                                                  PO Box 40126
                                                                         Olympia, WA  98504-0126
                                                                                (360) 586-6300

# EXHIBIT 10

FILED
Court of Appeals
Division I
State of Washington
3/17/2021 9:48 AM

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

IN RE THE DEPENDENCY OF:     )     Cause No. 20-7-00666-0 SEA
)
████ ACZ ████ ,     )     Appeals No. 81980-1-I
)
Minor Child.     )     PAGES 576-613
)


SUPPLEMENTAL

VERBATIM REPORT OF

DIGITALLY-RECORDED PROCEEDINGS

VOLUME III

June 9, 2020, DR 1L


HEARD BEFORE THE HONORABLE ANETTE MESSITT


FOR THE PETITIONER:      DAVID LaRAUS
Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104-3188

FOR THE RESPONDENT      BRANDT NATHANIEL SYMONS
MOTHER:      King County Dept. of Public Defense
SCRAP Division
1401 East Jefferson Street, Suite 200
Seattle, Washington 98122-5570

FOR THE CASA:      JENNIE COWAN
Dependency CASA Program
401 4th Avenue North
Kent, Washington 98032-4429

ALSO PRESENT:      JAMAAL MAGEE, Social Worker

T A B L E   O F   C O N T E N T S

PAGE NO.

June 9, 2020:

RESPONDENT MOTHER'S MOTION FOR CHANGE OF JUDGE ........ 586

ARGUMENT ............................................. 587

COURT'S RULING RE: CHANGE OF JUDGE ................... 591

COURT INQUIRES OF RESPONDENT MOTHER RE: APPOINTMENT
    OF GAL ........................................... 593

COURT'S RULING RE: APPOINTMENT OF GAL ................ 602

COURT INQUIRES OF RESPONDENT MOTHER RE: PROCEEDING
    PRO SE ........................................... 603

COURT'S RULING RE: RESPONDENT MOTHER PROCEEDING
    PRO SE ........................................... 609

ORDER TO BE PRESENTED ................................ 612

1

1                     June 9, 2020, 9:24 a.m.

2        THE BAILIFF: All parties that are still on the line, the

3    next matter we're going to call is going to be ███ACZ███,

4    but I'm checking to see on Mr. LaRaus's availability in

5    Judge Jarvis's court. So, if you can hold on, please, just

6    a moment.

7        MR. LaRAUS: I'm here.

8        THE BAILIFF: Oh, wonderful. Great. Okay. All right.

9        So, the next matter is going to be ███ACZ███. If the

10    parties could just hold a moment, I'm going to patch in

11    Mother. And just to do a quick check, do I still have Social

12    Worker, Mr. Magee, on the line?

13        MR. MAGEE: Yes, I'm here.

14        THE BAILIFF: Thank you. And Counsel for CASA, Ms. Cowan?

15    Okay. Ms. Cowan might not be on the line. Let me message her

16    to make sure she can join us. Do I have Counsel for Mother,

17    Mr. Symons?

18        MR. SYMONS: Yes, I'm here.

19        THE BAILIFF: Okay. Wonderful. If the parties could just

20    hold a moment, please.

21        MS. ZAYAS: Hello?

22        THE BAILIFF: Hi. Is this Myriam Zayas?

23        MS. ZAYAS: Yes.

24        THE COURT: Ms. Zayas, this is Dependency Court calling

25    regarding ███ACZ███ ████████. We're just waiting on the

1           line for one more person to join in here, and so if you could
2           hold on, please.
3               Do I have CASA counsel, Ms. Cowan, on the call?
4               MS. COWAN: Yes, I'm here.
5               THE BAILIFF: Thank you so much. Your Honor, this is the
6           matter of ████ ACZ █████████, Cause No. 20-7-00666-0. All
7           parties are appearing telephonically.
8               Please say your first and last name clearly for the
9           record after I announce your title. Assistant Attorney
10          General?
11              MR. LaRAUS: Davis LaRaus.
12              THE BAILIFF: Social worker?
13              MR. MAGEE: Jamaal Magee.
14              THE BAILIFF: Counsel for CASA?
15              MS. COWAN: Jennie Cowan and CASA is pending.
16              THE BAILIFF: Counsel for Mother?
17              MR. SYMONS: Brandt Symons.
18              THE BAILIFF: And Mother.
19              MS. ZAYAS: Myriam Zayas.
20              THE COURT: All right. Thank you, everyone. This is
21          Judge Messitt. We are here after a motion to withdraw that
22          occurred a couple of weeks ago, where Ms. Zayas's former
23          counsel made a motion to withdraw. And at that time there
24          was some indication that Ms. Zayas wished to proceed pro se?
25          And there was some question—although the Court did not

1      conduct a colloquy at the time, there was some question about

2      whether a GAL should be appointed.

3           And so, first, there is no request from any party that a

4      GAL be appointed at this time. But, Mr. Symons, I understand

5      you currently represent Ms. Zayas. And so, I understand,

6      based on what was communicated to the Court and the parties

7      yesterday, that Ms. Zayas has indicated to you that she does

8      not wish to be represented. Is that the case?

9           MR. SYMONS: Your Honor, that is correct. The—the last

10     instruction that I have from Ms. Zayas is that I withdraw

11     from her case.

12          THE COURT: All right.

13          MR. LaRAUS: As—

14          THE COURT: And—

15          MR. LaRAUS: Your Honor, this is Dave—I'm—I'm sorry to

16     interrupt. This is David LaRaus. And before the Court makes

17     any rulings, I did want to bring to the Court's attention

18     that in reviewing the mother's many, many pleadings that she

19     has filed herself in this matter, I observed that she had

20     filed a motion and declaration for change of judge from

21     Your Honor on May 4th of 2020. And when I noted that

22     previously, I had believed, based upon the mother's

23     complaints about Your Honor, that it was predicated on

24     Your Honor having ruled on the contested 72-hour hearing.

25     And so there—a discretionary judgment had previously been

1    made. But, in reviewing the 72-hour order, it appears that

2    it was actually Commissioner Danieli who heard that matter.

3    So, I think we need to address that first. And I guess the

4    first question would be if Ms. Zayas actually is still

5    pursuing a motion for change of judge given that you were

6    not the judge who made the ruling that she was unhappy with.

7        THE COURT: And Mr. Symons?

8        MS. ZAYAS: Are you asking me to answer? Am I allowed to

9    talk?

10       THE COURT: Well, currently you are represented by

11   Mr. Symons, so—

12       MS. ZAYAS: Okay. No talking.

13       MR. SYMONS: And so, Your—Your Honor, this is Mr. Symons.

14   I—I guess it would be helpful for us to determine in what

15   order we're going to take these issues. So, if—clearly, it's

16   a difficult situation when there's—if there is a pending

17   motion to change judges and also a pending motion to have

18   Counsel withdraw as a motion that is heard first is—is

19   certainly important in determining how we proceed. So, if

20   the Court could instruct on which motion it intends to hear

21   first, I—I suppose I would have a better sense of what role

22   I should play in this—in this hearing.

23       THE COURT: Thank you, Mr. Symons. Clearly, the issue that

24   needs to be addressed first is the motion for change of

25   judge. The Court—

01010125

1          MS. ZAYAS: All of a sudden you guys are hearing my

2     motions? Are you kidding me right now?

3          THE COURT: So, Ms. Zayas, you're—you're going to—you—you

4     cannot interrupt the proceedings. You currently—

5          MS. ZAYAS: Oh, that's right. Yeah.

6          THE COURT: Currently you're represented by—

7          MS. ZAYAS: Go ahead.

8          THE COURT: —Counsel. And so, I'll hear from your—

9          MS. ZAYAS: Uh-huh.

10         THE COURT: —counsel on these issues—

11         MS. ZAYAS: [Inaudible].

12         THE COURT: —until the Court allows your counsel to

13    withdraw. But, if you keep interrupting, we will—

14         MS. ZAYAS: I'm suing all of you already. I've already

15    filed the lawsuit. Every single one of you are being sued.

16         THE COURT: That is not—

17         MS. ZAYAS: You're—

18         THE COURT: —the issue today—

19         MS. ZAYAS: You're violating my civil rights.

20         THE COURT: —at this hearing.

21         MS. ZAYAS: This is a violation—

22         THE COURT: And so—

23         MS. ZAYAS: —of civil rights.

24         THE COURT: —if you don't stop interrupting the

25    proceedings, I will—

01010126

1          MS. ZAYAS: Okay.

2          THE COURT: —mute you so we don't hear you. Do you

3     understand?

4          MS. ZAYAS: Exactly. There you go, uh-huh.

5          THE COURT: So, I think the first issue that needs to be

6     addressed is the motion of change of judge. I was unaware

7     that that motion was filed. I don't know if it was properly

8     served. So, the Court—well, I will have to look. And I'll

9     ask Mr. Symons to look and see if it was properly filed by

10    your—your client. So, that's the first issue we should

11    address today because if, indeed, the motion of change of

12    judge was filed before this Court made the discretionary

13    ruling, then that should have been granted if it was filed

14    and properly served because there is a right, as you all

15    know, for one change of judge.

16         MR. SYMONS: Yes, Your Honor. Should—should we perhaps

17    take a brief recess to—to consider whether that was properly

18    filed?

19         MS. ZAYAS: Respect the rights of me?

20         THE COURT: Ms. Zayas, I'm going to ask you again not to

21    interrupt.

22         MS. ZAYAS: I'm suing you. You, the Judge. Yeah, you, I'm

23    suing you, okay? Just so you know.

24         THE COURT: That is not—

25         MS. ZAYAS: You're not supposed to do this.

1          THE COURT: So, Ms. Zayas, could you please—

2          MS. ZAYAS: This is illegal.

3          THE COURT: Could you please mute Ms. Zayas—

4          MS. ZAYAS: This is illegal.

5          THE COURT: —so that I can speak—

6          MS. ZAYAS: What you're doing is illegal.

7          THE COURT: —with Mr. Symons? Thank you. So, Mr. Symons,

8     if you would be so kind as to look into that issue so I can

9     hear from the parties whether or not that was properly filed

10    and served, and when it was served in relation to any rulings

11    that this Court made. Then we can proceed on that issue. And

12    if, indeed, the motion of change of judge was properly filed,

13    then we will have to move the remaining issues to a different

14    judge.

15         MR. SYMONS: Yes, Your Honor. I'll—I'll be able to look

16    into that. Would the Court like to take another hearing and

17    then recall this matter?

18         THE COURT: Yes, we'll do that. Thank you.

19         MR. SYMONS: Thank you, Your Honor.

20         MR. LaRAUS: And can I inquire, can—can the parties leave

21    the  call  and  be  notified  by  email  'cause  it's  my

22    understanding there's a 72 that's coming next?

23         THE COURT: There is. And we will go ahead. And it—I

24    believe  it's  fully  contested.  And  so,  we—we  will—we  can

25    interrupt it in order to go back on the record on—on this

01010128

1    case. But, my bailiff will contact you and let you know via

2    email.

3        MR. LaRAUS: Okay. Thank you.

4        THE COURT: Thank you all.

5        MR. SYMONS: Okay.

6        MS. ZAYAS: My rights are being violated.

7        THE BAILIFF: Ms. Zayas, so we're going to recess your

8    matter, and the Court will be calling you right back as soon

9    as we call your hearing again, okay? I'll reach out—

10       MS. ZAYAS: Because you're not going to let me talk again,

11   so what's the point?

12       THE BAILIFF: I'll—I'll reach you—

13       MS. ZAYAS: If—you're not going to let me talk again,

14   right?

15       THE BAILIFF: I'll reach you at the same number. Thank

16   you.

17       MS. ZAYAS: I'm coming to get those recordings today.

18       [Recess taken from 9:34 a.m. to 10:05 a.m.]

19       THE BAILIFF: Your Honor, recalling the matter of

20   ███████ ACZ ███████, Cause No. 20-7-00666-0. All parties are

21   appearing telephonically.

22       And for the record, please say your first and last name.

23   Assistant Attorney General?

24       MR. LaRAUS: David LaRaus.

25       THE BAILIFF: Social worker supervisor?

1          MR. MAGEE: They said "supervisor."

2          MS. DeCAMP: Julie DeCamp.

3          THE BAILIFF: Social worker?

4          MR. MAGEE: Jamaal Magee.

5          THE BAILIFF: Counsel for CASA?

6          MS. COWAN: Jennie Cowan.

7          THE BAILIFF: Counsel for Mother?

8          MR. SYMONS: Brandt Symons.

9          THE BAILIFF: Mother.

10         MS. ZAYAS: Myriam Zayas.

11         THE BAILIFF: Thank you.

12         THE COURT: All right. Thank you. This is Judge Messitt.

13    So, Mr. Symons, were you able to learn anything about when

14    the motion for change of judge was filed, and whether it was

15    properly served?

16         MR. SYMONS: I was, Your Honor. I went back into ECR and

17    found the motion for change of judge. It was properly filed

18    on May 5th at nine a.m. It does appear to have been properly

19    served on the parties. By my—by my review, it does appear

20    that there was one ruling made by Your Honor prior to that

21    on May 4th. It was filed at 1:55 p.m. on the 4th, and that

22    was denying certification of an emergency regarding the

23    mother's counsel's motion to withdraw.

24         THE COURT: All right. Thank you, Mr. Symons.

25         Mr. LaRaus, is that your understanding as well?

1          MR. LaRAUS: That is, Your Honor. I sent the Court and

2     the parties a copy of the motion and the e-service

3     declaration for the Court to review. I don't know whether

4     the motion denying certification as an emergency constitutes

5     a discretionary ruling or not. Under 4—RCW 4.12.50, it says—

6     or Section (2), "Arranging the calendar, setting a date for

7     a hearing or trial, ruling on an agreed continuance, and

8     presiding over," well, "criminal preliminary proceedings" do

9     not cause the loss of right to file a notice of

10    disqualification.

11         THE COURT: Well, we are, from the Court's perspective,

12    in very interesting times. So, anything else, Mr. Symons?

13         MR. SYMONS: Your Honor, I would argue that the denial of

14    the certification for an emergency would constitute a

15    discretionary ruling in this case, that the courts were—were

16    given quite a bit of latitude in determining what would

17    constitute an emergency. There were certainly some

18    guidelines that were set out by—by the Supreme Court and

19    then implemented by the Superior Court as well as the

20    Dependency Court. But, there was discretion that was given

21    in terms of what constituted an emergency to the judges.

22         So, I—I do believe that that would have been a

23    discretionary ruling on the Court's part.

24         THE COURT: All right. Thank you. Any—Mr. LaRaus, anything

25    further before the Court rules?

01010131

1          MR. LaRAUS: I have to defer to the Court on the issue of

2     discretion, but my understanding [inaudible] the courts do

3     not have a lot of discretion in determining whether something

4     was an emergency or not under the guidelines set forth by

5     Judge Rogers that were applicable at the time.

6          I do think it is important, however—I hesitate to say

7     this, but maybe Ms. Curnal-Zayas should inquire if she still

8     wants to maintain that motion, and the reason is she may not

9     understand that, A, Your Honor was not the person who ruled

10    on the 72-hour hearing that Ms. Zayas is so—objecting to so

11    strongly. And, B, she does need to understand that if she

12    does this once, she won't be able to do it again. And C, she

13    needs to understand that Your Honor is not going to be

14    presiding over the actual trial; it's going to be a different

15    judge. So, I think the first step, if—it would be to question

16    whether she still wants to entertain this motion or not at

17    this time.

18         THE COURT: All right. Thank you, Mr. LaRaus.

19         So, Ms. Zayas, did you hear the questions that Mr. LaRaus

20    poses, the issues that you may want to consider with regard

21    to this motion?

22         MS. ZAYAS: Yes, I heard the question.

23         THE COURT: All right.

24         MS. ZAYAS: Or whatever, yeah.

25         THE COURT: And, I'm going to ask you two questions. One,

1    would you like to talk to Mr. Symons about those issues? Or,

2    would you rather address the Court on those issues yourself?

3       MS. ZAYAS: Uhm, yeah, no, I don't need to talk to him. I

4    can tell you.

5       THE COURT: All right. Go ahead.

6       MS. ZAYAS: Uhm, basically the reason that we're

7    continuing—or have continued from day one, uhm, is, uh—is a

8    violation of my civil rights because there has to be probable

9    cause and there has to be, uhm—uhm, extension [sic] of

10   circumstances, and there's not. So, the fact that we're even

11   here at all is kind of—should be, you know—it should be,

12   uhm, told to somebody in a higher court because it's not

13   right. So, I honestly don't mind if you guys continue it to

14   forever because it's going to take me a while to build my

15   case in Federal Court. And, uhm, I have all the time in the

16   world to, uhm—to build it.

17      So, that's fine with me. Do whatever you want to do. Tap

18   dance, whatever. I'm good 'cause as—if I [inaudible] the

19   Federal Court, [inaudible] matters to me this Court is, as

20   I've seen, crooked as all it can be, so I—I would like to,

21   you know—I have all the time to—to—you know, to waste, I

22   guess, 'cause she won't remember any—any of this, thank God.

23   But—

24      THE COURT: So—

25      MS. ZAYAS: —I'm going to go to Federal Court, so.

1          THE COURT: —Ms. Zayas, can I ask—can I tell you a couple

2     of things and ask you a couple of questions?

3          MS. ZAYAS: Yes, go ahead.

4          THE COURT: So, I have heard what you—what you have said

5     with regard to your lawsuit in Federal Court.

6          MS. ZAYAS: Uh-huh.

7          THE COURT: From—this hearing today is on issues that are

8     different than that. They may relate, and you may join these

9     issues or rulings that I make today—

10         MS. ZAYAS: Uh-huh.

11         THE COURT: —in that lawsuit. That's really up to you.

12    But, this Court, I have—I can't do anything about the Federal

13    lawsuit. I don't know anything about it. But, today the issue

14    that we're dealing with is that you have filed a motion for

15    change of judge.

16         MS. ZAYAS: Uh-huh.

17         THE COURT: And the question that Mr. LaRaus has posed,

18    which I think is a good question, is whether you understand

19    that your motion for change of judge, you have a right to—

20    to request for a change of judge one time as a matter of

21    right. And if you exercise this motion of change of judge on

22    me, you will not be able to exercise it on any other judge

23    in this case as a matter of right.

24         And so, this Court will not be hearing your trial. I am

25    only in a position to rule on issues that precede that time

01010134

1    and then perhaps after that time. So, Mr. LaRaus has

2    questioned whether you really understand the consequences of

3    the motion of change of judge and whether that—whether you

4    want to proceed with your motion of change of judge of this

5    Court. So, that's the first question I have for you.

6        And my question for you is, do you want to discuss that

7    with Mr. Symons, and he can explain because he's currently

8    still your counsel, or do you not want to do that?

9        MS. ZAYAS: I want everyone to stop violating my civil

10    rights, and I want to go pro se. And I'm allowed to—I should

11    be allowed to go pro se. And I want to—uhm, because we're

12    not even supposed to be here today, and she was never

13    supposed to be taken [inaudible] because that's a violation

14    of my civil rights. Like, we shouldn't even be having this

15    conversation basically, is what I'm saying.

16        THE COURT: All right. So, with regard to the motion of

17    change of judge, I am going to rule on that first. And then

18    I will go ahead and I'm going to, again, Ms. Zayas, ask you

19    a number of questions because you've indicated to the Court

20    that you wish to represent yourself, okay?

21        MS. ZAYAS: Yes.

22        THE COURT: But, with regard to the motion for change of

23    judge, the Court is going to deny the motion for two reasons.

24    First, there was a discretionary decision that was made prior

25    to this motion of change of judge being filed, and that was

1    the motion denying a hearing on emergency motion that this

2    Court ruled on on May 4th. This Court does find that that

3    was a discretionary ruling and, therefore, this Court cannot

4    be removed as a matter of right with the change of judge.

5        The second reason for that is because the certificate of

6    e-service that was filed shows that a working copy was never

7    provided to the Court, and the Court was not properly served.

8        So, for those two reasons, the Court is going to deny

9    the motion for change of judge.

10        With regard—and—well, with regard to Ms. Zayas wishing

11    to go pro se, Ms. Zayas, I'm going to ask you a few questions.

12    And the first set of questions I'm going to ask you about

13    are really questions about these proceedings and what you

14    understand about them, okay?

15        MR. LaRAUS: Your Honor, I'm sorry, I apologize for

16    interrupting. This is David LaRaus.

17        THE COURT: Of course, Mr. LaRaus.

18        MR. LaRAUS: When the Court—when the Court set this

19    hearing, it specifically said that the matter addressing the

20    need for a GAL would happen. And even if that's a brief

21    colloquy, I think it does need to happen before proceeding

22    to the question of pro se because before making a

23    determination of pro se given the order that was previously

24    entered by the Court, I believe the Court first needs to

25    determine whether the mother is or is not competent to

1    understand the significance of the legal proceedings, the

2    effect of the proceedings on her best interests.

3        THE COURT: Thank you, Mr. LaRaus. That is the Court's

4    intention.

5        MR. LaRAUS: Oh, thank you.

6        THE COURT: All right. All right. So, Ms. Zayas, I have a

7    couple of questions for you, okay? Can you hear me okay?

8        MS. ZAYAS: Uh-huh. Uh, yes.

9        THE COURT: All right. So, the Court is concerned about

10   whether you have a full understanding of the proceedings.

11   And so, I'm going to ask you some—some open-ended questions

12   about these proceedings that I get an understanding about—

13   about your comprehension of these legal proceedings—

14       MS. ZAYAS: Uh-huh.

15       THE COURT: —the significance of them, and the effect of

16   these proceedings in terms of your custody of ████ ACZ Do you

17   understand that?

18       MS. ZAYAS: Yes.

19       THE COURT: All right. So, my first question is just a

20   very simple one. Do you know why we're having this hearing

21   today?

22       MS. ZAYAS: Because of, uh, forcing the GAL into my life,

23   making her a part of this so she could get paid, pretty much,

24   right?

25       THE COURT: So, let me ask it a—a little differently. Do

1    you understand what dependency proceedings are?

2        MS. ZAYAS: Yes. I have had 15 years of experience

3    straight of dependencies. Yes—

4        THE COURT: All right.

5        MS. ZAYAS: —I do.

6        THE COURT: So, you understand why this case—do you

7    understand why we're here today in court with regard to these

8    proceedings? You understand what the proceedings are and the

9    system of dependencies.

10       MS. ZAYAS: Yes.

11       THE COURT: All right.

12       MS. ZAYAS: I do.

13       THE COURT: And, if this case proceeds to a fact-finding

14   trial, do you know what will happen at that proceeding?

15       MS. ZAYAS: I thought we just had one of those. Uhm, I

16   didn't—I thought we just had one, but I guess not. Uhm, I am

17   aware of what a fact-finding trial is. I mean, not under the

18   COVID guidelines, but I'm pretty sure, you know, it would be

19   different if we were in person.

20       THE COURT: And could you—could you tell me what your

21   understanding is of a fact-finding trial?

22       MS. ZAYAS: To basically bring up all the issues that are

23   supposedly happening or not happening in the case?

24       THE COURT: Okay.

25       MS. ZAYAS: And see if we need to go to trial or not.

1        THE COURT: All right. And do you understand—I'm going to

2    back to the—there was a petition filed in this case. Do you

3    understand that? A—

4        MS. ZAYAS: The one I filed or the—which one?

5        THE COURT: The—a petition that was filed by a social

6    worker. Do you know what petition I'm talking about?

7        MS. ZAYAS: Oh. The petition to—the dependency petition

8    that—yes. Oh, yeah, I know that one real good.

9        THE COURT: Okay.

10       MS. ZAYAS: Uh-huh.

11       THE COURT: And can you explain for me in your own words

12   what you understand that petition to be?

13       MS. ZAYAS: Uh, it was, uh, copy-and-pasted, uh, from my

14   2001 dependency. I'm not sure. There was a couple different

15   dependencies pasted on there that didn't really make too

16   much sense. But, uhm, it—it just detailed, uh, a bunch of

17   stuff from before, uh, my daughter was born, actually. It

18   was from—everything was dated from before my daughter was

19   born. Also, uhm, her presumed father, which is not her

20   father, his entire criminal record was pasted in there, too.

21   And, uhm—and then it was, uh, used to remove my daughter.

22   So, kind of like a way to trick the police into thinking

23   that I was a horrible person, pasting all this stuff on there

24   from 20 years ago and getting them to remove my child.

25       Yes, I'm very aware of what the dependency petition is.

01010139

1          THE COURT: All right. And then after that dependency

2     petition was filed, there was a 72-hour shelter care hearing.

3     Do you know what a shelter care hearing is?

4          MS. ZAYAS: It's supposed to be where I'm able to be heard

5     at least and to be able to defend myself for what—for what

6     I was being accused of. And I—and I did that, and I tried

7     to, but I wasn't able to speak. And when I did speak, I was

8     told to bring in the letter, and I—I did, and that didn't

9     matter.

10         So, yeah, I know what it is. It's—it's basically a

11     hearing that a person gets when they're able to contest

12     either 24 or 72 hours after their child is taken whatever

13     happened before it actually goes on to the next step.

14         THE COURT: All right. And do you know what would happen

15     if a fact-finding hearing is held and the court finds a

16     dependency? Do you know what happens then?

17         MS. ZAYAS: Then it goes on for another 10 years. No, it

18     goes on for another six months. And, uhm—and basically, and

19     there, uh—there's another series of court dates that happen

20     after, uh, they find a dependency, like, uh, every three

21     months they check—they check and see if the person's making

22     progress. They make a case plan. They do, uhm, whatever it

23     is that they have to do to try to get their kid back pretty

24     much. And sometimes it takes six years. Sometimes it takes

25     six months. It just depends.

1          THE COURT: All right. And then do you know what a—what a

2     termination proceeding is?

3          MS. ZAYAS: Yep. I've been terminated. I sure do.

4          THE COURT: Okay.

5          MS. ZAYAS: I know exactly what it is. My kids are all

6     older now. They're 20 and 18, and they—they came back home.

7     Well, one came back home, so, yeah, I totally know what it

8     is.

9          THE COURT: All right. Thank you. So, do you understand—

10    and I think you may have just answered this, but I want to

11    make sure that I ask all the questions that I—I need to. If

12    you were to represent—if you were to go to a termination

13    hearing and you were to lose at that hearing, whether you

14    are represented or not, do you know what the effect of that

15    would be?

16         MS. ZAYAS: A huge of violation of my civil rights. I'd

17    be in big trouble, yeah. I don't—I highly doubt that would

18    ever happen. But, if that did happen, I guess I'd be in big

19    trouble. I guess I would be concerned with the system

20    completely. But, no, it's—it'll never happen. I mean, I'm

21    perfectly capable of—

22         THE COURT: So, let me ask you—

23         MS. ZAYAS: —of representing myself and—yeah.

24         THE COURT: Let me ask it differently. Do you know what

25    would happen if the judge ruled against you in that hearing?

```
1          MS. ZAYAS: Uhm—

2          THE COURT: Just as a practical—

3          MS. ZAYAS: —I would be shocked.

4          THE COURT: —matter.

5          MS. ZAYAS: Yeah. Yeah, I would be shocked. I am—I would

6     probably not—yeah, that would never happen. I—I've never

7     been ruled against in something like that because I've never—

8     like, what—what happened with  ███ACZ███  is I relinquished

9     because she wants to be adopted by foster parents. But, I've

10    never had that happen, uhm, because I don't know. I've—it's

11    never gotten that far to the point where someone's actually

12    gotten that far, no. I—pretty much I've—

13         THE COURT: Okay.

14         MS. ZAYAS: —gotten all my kids back before. I know how

15    to do that much.

16         THE COURT: And then—

17         MS. ZAYAS: It's not that hard.

18         THE COURT: —my—

19         MS. ZAYAS: I mean—

20         THE COURT: Oh, sorry, I don't mean to interrupt you.

21         MS. ZAYAS: Uh-huh. Go ahead.

22         THE COURT: All right. And then my last question for you

23    is, what do you want to have happen in this case?

24         MS. ZAYAS: I want—I want to, uhm, basically—my daughter's

25    really confused right now by everything that's going on. She
```

1    cries a lot at every visit, and she's very—I'm not able to

2    really talk to her, tell her what's going on. So, she's kind

3    of thinking that I left her. And so, I—I just want to, uh—I

4    just want to, I guess, if anything, speed it up so that she

5    can be home or, you know, and—and, uh, I know that there's

6    a—it's changed a lot since my last dependency—or my last

7    kids were taken, the system and how fast they work. I—I see

8    that just by the court dates and how they were scheduled,

9    that, you know, it comes a lot quicker. So, I'm hoping that

10   that's the case. I'm not sure because of COVID, you know,

11   we've been all kind of locked down and haven't been able to

12   do anything. But, uhm, at the same time, nobody, uh—there—

13   nobody knows because nobody's ever been through a pandemic

14   or something like this before. So, I understand that, and so

15   I get really frustrated with that, that I—I, uhm—I—I want

16   to, uh—I want to make she's okay, and I want to make sure

17   that she's—she has what she needs to feel like she hasn't

18   been abandoned. And, basically, I—I know that I could move

19   faster than—I mean, there's really not anything to do except

20   for just talk to each other. I mean, there's really not

21   anything—I've already—I was one week away from graduating

22   treatment when—when the payment stopped. I mean, basically

23   I was—I'm all—I'm all done with my part, and I'm in

24   counseling right now. So, there's really not much to do

25   except for talk a few times. I mean, I don't see why we even

1    have to do that, honestly. I mean, I've—

2        THE COURT: All right.

3        MS. ZAYAS: —got nothing but good on my end, so I don't

4    know what's really—

5        THE COURT: All right.

6        MS. ZAYAS: —you know, what's going on. I just kind of

7    come to the court.

8        THE COURT: So, thank you, Ms. Zayas. The—the—that's the

9    first part—

10       MS. ZAYAS: Uh-huh.

11       THE COURT: —of the Court's questioning. I think I have—

12   have asked enough questions. I am going to allow Mr. LaRaus

13   an opportunity to ask questions if he wishes, and Mr. Symons,

14   and then I'll move on with some more questions.

15       Mr. LaRaus, do you have any questions?

16       MR. LaRAUS: Just very briefly. Ma'am, regarding

17   appointment of a GAL, the Court needs to be sure that you

18   understand the impact of dependency on your best interests.

19   And you said that you've been through a dependency before,

20   correct?

21       MS. ZAYAS: Yes. This should not be turning into a

22   dependency. There's no reason for it to. But, yes, I have—

23       MR. LaRAUS: Right, right. I—we understand that's your

24   position. But, we just need to make sure that you understand

25   what a dependency means. So, you understand that this Court—

1    MS. ZAYAS: Yeah.

2    MR. LaRAUS: I—I just wanted to make sure you understand

3    this court proceeding relates to whether ███ACZ███ will be

4    returned to your care and any services that you might be

5    ordered to participate in. Do you understand those things?

6    MS. ZAYAS: Yes. I've already completed all the services.

7    Go ahead.

8    MR. LaRAUS: Okay. Thank you. No further questions on this

9    issue.

10    THE COURT: All right. And Mr. Symons, I'll give you an

11    opportunity. But, do you have any questions?

12    MR. SYMONS: Ms. Zayas, I just want to make sure that it's

13    clear to you that if the Judge allows me to withdraw from

14    your case, that, as you move forward with your motions and

15    with preparation for trial, that you'll be held to the same

16    standard that I would be in terms of evidence and calling

17    witnesses and filing motions. Do you understand that you're

18    not given—you're not given any breaks simply because you're

19    not a lawyer?

20    MS. ZAYAS: There—there should be only probably, uh,

21    nothing there for—for it to go on to a dependency. But, I

22    mean, I guess if—I mean, I—I know what I'm doing as far as—

23    as far as, you know—if they hijack my kids because I don't

24    know what I'm doing, then that's horrible, but I don't think

25    that'll happen.

1        MR. SYMONS: Okay.

2        THE COURT: And—and I'm sorry. I'm going—Mr. Symons, I'm

3    sorry, I don't—I don't mean to interrupt you. But, the Court

4    is going to—

5        MR. SYMONS: Sure.

6        THE COURT: I'm going to—I'm going to allow you to

7    continue, but I wanted to let you know the Court has some

8    additional questions with regard to her request to go pro

9    se. So, but you're welcome to continue asking those questions

10   as well. Go ahead.

11       MR. SYMONS: Just—just to quickly follow up with—with that

12   question. I know you understand that—or I know you believe

13   it shouldn't go that far, Ms. Zayas, but if it does—

14       MS. ZAYAS: Uh-huh.

15       MR. SYMONS: —do you understand that you're responsible

16   in the same way that an attorney would be to follow the Rules

17   of Evidence?

18       MS. ZAYAS: Yes, yes.

19       MR. SYMONS: Okay. I—nothing further, Your Honor.

20       THE COURT: All right. Thank you, Mr. Symons.

21       So, as an initial matter before I—Ms. Zayas, I'll ask

22   you a few more questions about wishing to represent yourself.

23   But, the initial questions that the Court asked, I was really

24   trying to determine whether you understood the significance

25   of these legal proceedings, and the effect of these

1    proceedings in terms of your best interests to determine

2    whether or not the Court should consider whether a guardian

3    ad litem is appropriate. And at this point I—the Court is

4    going to make a finding that you do understand the

5    significance of these legal proceedings and the effect and

6    relationship of these proceedings in terms of your best

7    interests. You have been through a dependency before. You

8    appear to understand what we're doing here. You understand

9    the role of the Department and the attorneys, and you also

10    understand the—the process of dependencies.

11        And so, at this time the Court is going to find that

12    there is no basis to appoint a GAL. And so, that satisfies

13    that concern that I had noted in the last hearing and in

14    that order.

15        So, the—the next series of questions I'm going to ask

16    you have to do with your request to represent yourself. And

17    so, I want to make sure that you understand what your rights

18    are, but I also want to make sure you understand what it

19    means and the effect it may have to represent yourself.

20        So, you do understand that you have the right to be

21    represented by a lawyer and that the Court will appoint one

22    for you free of charge. You understand that; is that correct?

23        MS. ZAYAS: Yes.

24        THE COURT: All right. And, but you also—do you understand

25    you have a right to represent yourself?

1          MS. ZAYAS: Oh, okay, yeah. That's good, yeah.

2          THE COURT: You do understand that?

3          MS. ZAYAS: I do now, yes. No, that's—that's, yeah, what

4     I wanted for a long time. Yeah.

5          THE COURT: All right. But, do you also understand that

6     an attorney would represent you and speak on your behalf in

7     court?

8          MS. ZAYAS: Yes.

9          THE COURT: And an attorney would advise you about your

10    legal rights and your options; do you understand that?

11         MS. ZAYAS: Yes.

12         THE COURT: And do you understand that an attorney would

13    explain and help you with legal and court procedures? Do you

14    understand that an appointed attorney would do that?

15         MS. ZAYAS: Yes.

16         THE COURT: And do you understand that an attorney could

17    help you investigate and explore possible defenses to the

18    allegations that the Department has made in this case?

19         MS. ZAYAS: Yes.

20         THE COURT: And do you understand that an attorney would

21    help prepare any motions that—that would be brought in this

22    case?

23         MS. ZAYAS: Yes.

24         THE COURT: All right. So, let me ask you a few questions

25    about what you understand if you represent yourself. So, do

1    you understand that if you decide to represent yourself, the

2    judge cannot be your attorney, and the judge can't give you

3    any legal advice?

4        MS. ZAYAS: Yes.

5        THE COURT: Do you understand the Department couldn't give

6    you any legal advice?

7        MS. ZAYAS: Yes.

8        THE COURT: And if there were a CASA involved in this

9    case, they couldn't give you any legal advice.

10       MS. ZAYAS: Yes.

11       THE COURT: And, do you understand that the judge and the

12   Department's attorney and other attorneys involved in the

13   case are not required to explain court procedures or the law

14   to you?

15       MS. ZAYAS: Yes, I do understand that.

16       THE COURT: And, even though you are not an attorney, that

17   you'd be required to follow all legal rules and procedures,

18   including the Rules of Evidence.

19       MS. ZAYAS: Yes.

20       THE COURT: And, do you know that it will probably be

21   difficult to do a good job if you're your own attorney?

22       MS. ZAYAS: Oh, no. It would be spectacular if I could do

23   it. I would love to do it.

24       THE COURT: But, you haven't gone to law school; is that

25   right?

1        MS. ZAYAS: Uhm, yes, but there's really nothing to do

2   because I haven't done anything. So, I'm, like—I mean, it's

3   easy to find out really. I mean, I—I've got [inaudible]

4   nothing. I've got something. I mean, there's—I—I win, so it

5   wouldn't even be a question.

6        THE COURT: All right. So, do you—do you understand that

7   if you represent yourself, that the judge isn't required to

8   provide you with an attorney as a standby counsel or to help

9   you as a legal advisor in any way?

10       MS. ZAYAS: Yes, I understand that.

11       THE COURT: All right. And I just want to make sure that

12  you—you don't have any legal training or experience; is that

13  correct?

14       MS. ZAYAS: Uhm, I've been through five or six

15  dependencies. And so, I know exactly what's about to happen.

16  And so, yeah, that to me is, like, the best training anyone

17  could ever have is actually living through it. But, yeah.

18       THE COURT: All right. So, has—

19       MS. ZAYAS: I don't have any school training, but—

20       THE COURT: Okay.

21       MS. ZAYAS: —yeah.

22       THE COURT: Has anyone made any threats or promises to

23  you to encourage you to represent yourself?

24       MS. ZAYAS: My daughter. She's five, though, so it doesn't

25  matter.

1          THE COURT: All right. So, I—I meant—I'm asking you a

2     serious question. Has anyone threatened or promised you—

3          MS. ZAYAS: No.

4          THE COURT: —anything—

5          MS. ZAYAS: No.

6          THE COURT: —to represent yourself?

7          MS. ZAYAS: No, no.

8          THE COURT: All right. Thank you. And, are you making this

9     decision voluntarily?

10          MS. ZAYAS: Yes, of course.

11          THE COURT: And is this what you want to do, represent

12     yourself?

13          MS. ZAYAS: Yes.

14          THE COURT: All right. Mr. LaRaus, any questions?

15          MR. LaRAUS: I do have a couple of questions, Your Honor.

16          First, ma'am, do you understand that if you represent

17     yourself at trial and you lose, you can't appeal on the basis

18     that you didn't have proper representation? If you make this

19     decision, you face the consequences of representing

20     yourself.

21          MS. ZAYAS: Yes, I understand that.

22          MR. LaRAUS: Okay. And I hope the Court will grant me some

23     leeway. I want to use an analogy here. Ms. Zayas, do you

24     know how to play rugby?

25          MS. ZAYAS: No. No, I'm sorry. No.

1          MR. LaRAUS: Okay. You understand there are rules to the

2     game of rugby like there are rules to any other game, right?

3          MS. ZAYAS: Yes, yes.

4          MR. LaRAUS: Okay. If I said to you, let's bet your entire

5     life savings on whether you can win a game of rugby, do you

6     think it would be a good idea for you to make that bet if

7     you didn't know the rules?

8          MS. ZAYAS: If you've had experience, uhm, being the

9     victim of the rules for 20 years, then I would bet my whole—

10     yeah, I definitely would.

11          MR. LaRAUS: So, you would bet everything you have on

12     winning a game where you didn't know the rules?

13          MS. ZAYAS: When I know the evidence is in my favor and

14     there's nothing else unless it's, you know, created by some

15     weird fashion, then, yeah, I—I don't doubt anything but in

16     truth and innocence on my part. So, yeah, there's nothing I

17     can—I can say I would even need a lawyer for. Yeah.

18          MR. LaRAUS: Let me ask you something else. You filed a

19     lot of documents in this case so far, right?

20          MS. ZAYAS: Yes.

21          MR. LaRAUS: Have any of them achieved anything for you?

22          MS. ZAYAS: Nope. I'm learning. And you know what? I'm

23     learning also in the other court and—and it's a learning

24     process, and no one's going to tell me how to do it because

25     that's going to cost money. So, of course, yes, I'm learning.

1    It's—it's going to be a little bit of a process, but I have

2    learned not to do that. Uh, what—the things that I have filed

3    are probably still sitting there, nobody cares, but that's

4    okay. To me it's a learning experience, and I think that,

5    uhm—I think that I know a little bit about working copies,

6    and I'm sorry to learn how to, uhm—when and how or who gets

7    them or how it works. But, it's still a learning process. I

8    honestly don't think that it will even get that far to where

9    we need to do anything like that. Uh, it's [inaudible] it's

10   not complicated. And I'm confident that I can do it.

11       THE COURT: Anything else, Mr. LaRaus?

12       MR. LaRAUS: This is just—it's a bad idea, but no, no

13   further questions. Thank you.

14       THE COURT: All right. And Mr. Symons, any additional

15   questions?

16       MR. SYMONS: No, Your Honor. Thank you.

17       THE COURT: All right. Thank you. So, Ms. Zayas, I am

18   going to find that you are waiving your right to counsel

19   knowingly, intelligently, and voluntarily. I think that the

20   responses to the questions, I think you understand—I think

21   you understand what you're doing, and I think that you

22   understand the—the allegations in the petition and the

23   consequences if you are to represent yourself, even if that

24   leads to you not being successful.

25       I have previously found that you appear to be competent

1    and that—so, I'm going to find that you are exercising your

2    right to represent yourself. And, with that, I will allow

3    Mr. Symons to withdraw from your case. And, Ms. Zayas, you

4    may represent yourself.

5         MS. ZAYAS: Thank you.

6         THE COURT: So, with that, Mr. LaRaus, when is the next

7    hearing in this case? I can have my bailiff look it up if

8    you wish.

9         MR. LaRAUS: I think it's the—well, let me double-check.

10   It's—we've got a pretrial—sorry, I don't have my schedule—

11        THE COURT: Hold on. We'll look it up.

12        MR. LaRAUS: —right here.

13        THE COURT: Just give the Court one second.

14        MR. LaRAUS: I think it's the 19th, if I recall correctly.

15        THE COURT: We're still looking. One sec.

16        MR. LaRAUS: Oh, the pretrial con—sorry. The pretrial

17   conference and fact-finding have both been continued to

18   July 6th.

19        MS. ZAYAS: That's my daughter's birthday.

20        MS. COWAN: I also have a fact-finding listed for

21   July 6th, Your Honor, at 1:30.

22        THE COURT: Okay. So, let's see. Ms. Zayas, your next

23   hearing then is July 6th at 1:30 p.m.

24        MS. ZAYAS: Okay.

25        THE COURT: And, you can—well, I guess we'll see you at

1    that hearing. You could most likely get your schedule and

2    other documents from your counsel that you may need to

3    represent yourself at that pretrial hearing. And so, we will

4    see you—and it will be by phone, so—because during COVID

5    that is the way that we are doing hearings. And so, you can—

6    do we have the call-in information for that?

7        THE BAILIFF: Yes.

8        THE COURT: Is it the same as today's?

9        THE BAILIFF: No, Your Honor. It's going to be the

10   pretrial conference line, which I will give the folks right

11   now.

12       THE COURT: All right. Ms. Zayas—

13       MR. LaRAUS: So, this is David—

14       THE COURT: Oh, sorry.

15       MR. LaRAUS: —LaRaus. I—

16       THE COURT: Mr. LaRaus? Go ahead.

17       MR. LaRAUS: I was just going to say, I have Ms. Zayas's

18   email, so I can forward her the court information for that

19   hearing. And I'll forward her the calendar once it comes

20   out.

21       THE COURT: All right. Thank you. That would be helpful.

22       THE BAILIFF: And also, Ms. Zayas, if you have a pen and

23   paper, I can give you the court call-in number so you have

24   it today for notice. Are you ready to write that number down?

25       MS. ZAYAS: Okay. Yes, go ahead.

1        THE BAILIFF: Okay. So, it will be the conference line

2    number, which is 206-263-8114. And let me know when you're

3    ready for the PIN number.

4        MS. ZAYAS: Go ahead.

5        THE BAILIFF: The PIN number specifically for that

6    calendar when your hearing will be called is 1347939. And

7    then you'll want to press pound when you are prompted to.

8        MS. ZAYAS: Okay.

9        THE BAILIFF: Mr. LaRaus, are you able to circulate an

10    order to Ms. Zayas for signature via email?

11        MR. LaRAUS: I—I'm sorry. I think Mr. Symons has to sign

12    off on it as well because there's some portions in which he

13    was representing the mother. So, I will circulate a proposed

14    order to Mr. Symons and Ms. Zayas and Ms. Cowan that

15    encompasses all of the findings and act—actions taken in

16    this hearing.

17        THE COURT: All right. Thank you, everyone. And thank you

18    for everyone's patience and hard work. And we will see you

19    again on this case July 6th at 1:30. Thank you all. And that

20    concludes this hearing.

21        MR. LaRAUS: Thank you.

22        MR. SYMONS: Thank you, Your Honor.

23        MR. LaRAUS: Bye-bye.

24        THE COURT: Thank you. Bye-bye.

25        [Session ends at 10:43 a.m.]

1

2

3          [Session ends at 11:20 a.m.]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

01010157

LEGEND OF SYMBOLS USED

—       Indicates an incomplete sentence or broken thought.

...     Indicates there appears to be something missing from original soundtrack.

[inaudible]    1. Something was said but could not be heard.
               2. Speaker may have dropped their voice or walked away from microphone.
               3. Coughing in background, shuffling of papers, et cetera, which may have drowned out speaker's voice.

[sic]          1. The correct spelling of that word could not be found, but is spelled phonetically, or ——
               2. This is what it sounded like was said.

[No response.]    There is a pause in proceedings, but no response was heard.

[No audible response.]
               Possible that something was said, but word or words could not be heard.

[Off-the-record discussion.]
               1. Discussion not pertaining to case.
               2. Discussion between counsel and/or the Court, not meant to be on the record.

<u>C E R T I F I C A T E</u>{PRIVATE }

STATE OF WASHINGTON        )
                           )  ss.
COUNTY OF SNOHOMISH        )


    I, Barbara A. Lane, certify under penalty of perjury under the laws of the State of Washington that the following is true and correct:

    1.    That I am a certified transcriptionist;

    2.    I received the electronic recording directly from the trial court conducting the hearing;

    3.    This transcript is a true and correct record of the proceedings to the best of my ability, including any changes made by the trial judge reviewing the transcript;

    4.    I am in no way related to or employed by any party in this matter, nor any counsel in the matter; and

    5.    I have no financial interest in the outcome or end result of the litigation.

    Dated this 17th day of March, 2021 at Snohomish, Washington.


Barbara A. Lane, CET**D-687
Northwest Transcribers

# NORTHWEST TRANSCRIBERS

## March 17, 2021 - 9:48 AM

## Transmittal Information

**Filed with Court:**            Court of Appeals Division I
**Appellate Court Case Number:**  81980-1
**Appellate Court Case Title:**   In re the Dependency of: A.C.-Z., Myriam Zayas, Appellant v. DCYF, Respondent

**The following documents have been uploaded:**

- 819801_Report_of_Proceedings - Volume 3_20210317094730D1937203_2767.pdf
  This File Contains:
   Report of Proceedings - Volume 3, Pages 576 to 613, Hearing Date(s): 06/09/2020, Supplemental: yes
  *Report of Proceedings Total Number of Pages: 38*

   *The Original File Name was In Re Dependency of* ███ ACZ ███ *Volume 3.pdf*

**A copy of the uploaded files will be sent to:**

- Dobsonj@nwattorney
- Sloanej@nwattorney.net
- casa.group@kingcounty.gov
- dobsonj@nwattorney.net
- jcowan@kingcounty.gov
- kellyt1@atg.wa.gov
- shsseaef@atg.wa.gov

**Comments:**

---

Sender Name: Barbara Lane - Email: nwtranscribers@comcast.net
Address:
P. O. Box 12192
Mill Creek, WA, 98082
Phone: (425) 497-9760

**Note: The Filing Id is 20210317094730D1937203**

# EXHIBIT 11

```
 1
 2                  UNITED STATES DISTRICT SUPERIOR
 3                   WESTERN DISTRICT OF WASHINGTON
 4                            AT TACOMA
 5
 6   MYRIAM ZAYAS,                        )
                                          )
 7                      Plaintiff,        )
                                          )
 8                 vs.                    ) No. 2:20-cv-00747JCC
                                          )
 9   ANNETTE MESSITT, JEFFREY WHITNEY,    )
     AMBER WHITNEY,                       )
10                                        )
                        Defendants.       )
11                                        )

12
                 VIDEOTAPED DEPOSITION OF MYRIAM ZAYAS
13
                            June 14, 2021
14
                        Via Videoconference
15

16

17

18

19

20

21

22

23

24

25   REPORTED BY:  Valerie L. Torgerson, CCR, RPR
                   License No. 2036
```



Page 2

```
1        APPEARANCES - (Via Videoconference)
2   For the Plaintiff:
3          Myriam Zayas
           Pro Se
4          27369 129th Place SE
           Kent, WA 98030
5          360.602.1444
           ACZ .angel@hotmail.com
6
7   For Defendants La Raus and Whitney:
8          Brendan M. Lenihan
           Office of the Attorney Generalk
9          P.O. Box 40126
           Olympia, WA 98504-0126
10         360.586.6419
           brendan.lenihan@atg.wa.gov
11
12  For Defendants Duke, Cowan, Messitt, and Danieli:
13         Julie D. Cook
           Senior Deputy Prosecuting Attorney
14         500 Fourth Avenue
           Suite 900
15         Seattle, WA 98104-2316
           206.477.1966
16         julie.cook@kingcounty.gov
17
18  Also present:
           Dan Bassett, Videographer
19
20
21
22
23
24
25
```

Page 3

```
1                EXAMINATION INDEX
2   EXAMINATION BY:                          PAGE NO.
3   Mr. Lenihan                                     5
4   Ms. Cook                                       60
5   Mr. Lenihan                                    99
6
7                 EXHIBIT INDEX
8   EXHIBIT NO.    DESCRIPTION               PAGE NO.
9
10  Exhibit No. 1  36-page amended complaint.      12
11  Exhibit No. 3  11-page shelter care hearing    28
                   order.
12
    Exhibit No. 7  2-page clerk's minutes dated    32
13                 3/17/2020.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1     BE IT REMEMBERED that on Monday,
2  June 14, 2021, Via Zoom, at 9:01 a.m., before Valerie L.
3  Torgerson, Certified Court Reporter, RPR, appeared MYRIAM
4  ZAYAS, the witness herein;
5     WHEREUPON, the following proceedings
6  were had, to wit:
7
8            <<<<<< >>>>>>
9     THE VIDEOGRAPHER:  We are on record.
10 Time now is 9:01 a.m.  Today's date is June 14, 2021.
11 This is Volume 1 of the remotely-recorded video
12 deposition of Myriam Zayas taken in the matter of Zayas
13 versus Messitt, et al., filed in the United States
14 District Court for the Western District of Washington at
15 Tacoma.  Case number is 2:20-cv-00747JCC.
16    My name is Dan Basset.  I am the videographer.  Our
17 court reporter is Val Torgerson.  We are both with B&A
18 Litigation Services.
19    Counsel, please identify yourselves for the record,
20 and then the witness may be sworn in.
21    MR. LENIHAN:  Yes.  Good morning.
22 This is Brendan Lenihan on behalf of Jeff Whitney, Amber
23 Whitney, and David La Raus.
24    MS. COOK:  And good morning.  My name
25 is Julie Cook, and I am here on behalf of Annette

Page 5

1  Messitt, Ann Danieli, Pauline Duke, and Jennie Cowan.
2
3  MYRIAM ZAYAS,         having been first duly sworn
4              remotely by the Certified Court
5              Reporter, testified as follows:
6
7            EXAMINATION
8  BY MR. LENIHAN:
9  Q  Okay.  Good morning, Ms. Zayas.  Can you please give us
10    your full name for the record and spell your last name,
11    please?
12 A  Myriam Zayas, Z-a-y-a-s.
13 Q  Okay.  Thank you.
14    So my name is Brendan Lenihan.  I'm an Assistant
15    Attorney General with the State of Washington, and as we
16    talked about earlier, I represent Jeff Whitney, Amber
17    Whitney, and David La Raus.  So I am going to ask you
18    some questions first, and then after I'm done, we will
19    have further questions by Julie Cook on behalf of her
20    clients -- so that will be kind of the chronology of
21    this -- and I might have some follow-up after Ms. Cook.
22    Does that make sense?
23 A  Yes.
24 Q  Great.
25    So where are you physically located right now for



MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 6

1    this deposition?
2  A   27369 129th Place Southeast, Kent, Washington 98030; in
3      my living room.
4  Q   Okay.  Great.
5          So you're in your home; right?
6  A   Yes.
7  Q   Is anybody else in the room with you?
8  A   No.  My son's upstairs, but he doesn't hear anything
9      because he has those video game headphones on, so we're
10     good.
11 Q   Okay.  Thank you.
12         So let me just go over some of the basic rules of
13     the deposition so it's -- so we're all on the same page.
14     Your answers -- as you -- you just swore an oath to tell
15     the truth here, so your answers will be under oath and
16     subject to penalties of perjury the same as if you were
17     testifying in a courtroom.
18         So does that make sense?
19 A   Yes.
20 Q   Okay.  Great.
21         And the testimony you give today may be used later
22     in this proceeding or at trial as evidence.  You
23     understand that?
24 A   Yes.
25 Q   Great.

Page 7

1          So if at any point today you don't understand a
2      question I've posed to you, please just ask me to repeat
3      or rephrase.  I want to make sure that my question is
4      clear, and if you're unclear what I'm asking, just ask me
5      to rephrase it for you.
6          Okay?
7  A   Okay.
8  Q   And I want to make sure that you testify to your own
9      personal knowledge.  So I'm not asking you and I don't
10     want you to guess or speculate as to answers if you don't
11     know what the answer is.  If you don't know, then you
12     don't know, and that's fine.  So just give me your
13     personal knowledge as to what you can actually testify to
14     from your own knowledge, not to what you can speculate or
15     your conjecture about something else.
16         Okay?
17 A   Okay.
18 Q   So everything we say is being taken down by the court
19     reporter, and she's making a written transcript.  And so
20     for the sake of the court reporter's sanity, I'm just
21     going to make sure that we -- let me finish my question.
22     Even if you think -- guess where I'm going with the
23     question, just make sure you let me finish so that we're
24     not interrupting each other, and that will make it easier
25     for the court reporter to have a clean transcript.  And

Page 8

1      then I'll make sure to give you plenty of time to answer,
2      and I'll do my best to let you finish before -- I'll do
3      whatever I can to make sure I'm not interrupting you too.
4          Okay?
5  A   Okay.
6  Q   Okay.  Have you reviewed any records to prepare for the
7      deposition today?
8  A   I tried to read through the installments that I've
9      gotten, and -- yeah, I got four or five of them just to,
10     you know, get an idea of what -- what else I was missing,
11     but otherwise, for the most recent incident, it -- it's
12     pretty much right there.  I remember most of it.
13         I don't -- I don't -- I don't want to think about or
14     remember most of it, but I do.  I know that -- the dates
15     pretty much by heart and, you know, the most important
16     details.
17 Q   Okay.  So when you say "installments," you're referring
18     to the -- am I correct that you're referring to the
19     public records requests that you've -- information that
20     you've received?
21 A   Yeah.  When I first received them before, I never looked
22     at them because I was really upset, so I kind of bypassed
23     them, but lately I've been dissecting them, so it's been
24     interesting.
25 Q   Okay.  And I forgot to mention this, but we'll -- I want

Page 9

1      to right up front say that we'll take breaks as needed
2      throughout the deposition, perhaps every hour or so, but
3      if you need it sooner than that for some reason, feel
4      free to just say you need a quick break, and then you can
5      go on mute and turn off the video.  And just the only
6      rule with that is that if I've posed a question to you,
7      just please answer the question before we go on break.
8          Okay?
9  A   Okay.
10 Q   Okay.  So are you -- are you currently employed,
11     Ms. Zayas?
12 A   No.  I've been on unemployment for about -- since October
13     2019.
14 Q   Okay.  Since October 2019.
15         And what job did you have prior to October 2019?
16 A   Quality control inspector for Zack Aerospace.
17 Q   I'm sorry.  Say that again.  Control inspector for who?
18 A   It's a quality control inspector for Zacks Aerospace.
19     It's like -- we inspect small airplane parts for Boeing
20     and Amazon -- or Blue Origin.  Sorry.  Blue Origin.
21 Q   Okay.  Thank you.
22         And how long were you with them?
23 A   Just about a year.  Not even that.  And before that I was
24     in school for two years.
25 Q   Okay.  And what were you in school for?

1  A  Business technology.

2  Q  Okay.  Did you obtain a degree from the schooling?

3  A  I was one class short when I started -- I lost that one

4     class, but that was about the time when they started

5     asking me for drug tests, and so I just dropped.

6               (Reporter clarification.)

7  A  It was about the time Kejana started contacting me about

8     taking drug tests and saying that if I didn't take a drug

9     test that they would take ACZ from me.  So I kind of --

10    I wouldn't say that's the reason that I failed the class,

11    but it definitely put a -- I don't know -- load on me, I

12    guess.  I don't know.

13 Q  (By Mr. Lenihan)  Okay.  And when you say "Kejana,"

14    you're referring to CPS social worker Kejana Black?

15 A  Yes.

16 Q  And when you say " ACZ " you're referring to your

17    daughter,     ACZ     .

18 A  Yes.

19 Q  Okay.  Thank you.

20    And so you stopped pursuing the degree in

21    approximately September -- or September of 2019 due to --

22    and explain this to me again.  What was the reason for --

23 A  Well, I continued.  I just didn't get an A or a B, like a

24    passing grade.  I finished; I just didn't get the grade I

25    thought I would get, and I think that it had a lot to do

1     with the fact that they were back, and it was like not

2     even two years prior when I just got done, I thought,

3     with everything, so...

4  Q  Okay.  Understood.

5     And can you -- what was the name of the school that

6     you were attending for --

7  A  Bellevue College.

8  Q  Ability College?

9  A  Bellevue.  Sorry.  Bellevue College.

10 Q  Oh, Bellevue College.  Thank you.

11    Okay.  So since October of 2019, you have been

12    unemployed; is that correct?

13 A  Yeah.

14 Q  Okay.  And what sources of other income, if any, do you

15    have right now?

16 A  Just unemployment.  They've actually gone up since the

17    pandemic.  I don't know if you guys know, but they're

18    actually pretty -- it's not the same as regular

19    unemployment.  It's higher up.  They added, like, 300 to

20    each check pretty much.

21 Q  Okay.  Understood.

22    Just to get some clarity on the lawsuits you have

23    currently pending, Ms. Zayas, aside from the one we are

24    here to discuss today, how many other lawsuits do you

25    have currently pending in federal and state court?

1  A  Four.  Yeah, four.  Yeah, four.

2  Q  And are these -- are all of these lawsuits related to the

3     dependency of your child,     ACZ     ?

4  A  Yes.  They're also -- well, related to her birth and the

5     hospital mandated reporters and -- oh, and her teacher

6     and -- what was the other one?  Yeah, they're all pretty

7     much related.

8  Q  Okay.  So let me -- did you receive the password to open

9     up the exhibits that we sent you this morning?

10 A  Yes.

11 Q  Great.

12    If you could take a look at Exhibit No. 1.  Tell me

13    if you can get that open for me.

14 A  I have to find where I put things first.

15    Okay.  Yeah.  Wait a minute.  Is it called 12th

16    Amended Complaint?

17 Q  Correct.  Correct.

18    So you have that open now?

19 A  Yeah.  It might take a second.  My computer is slow.

20 Q  Sure.  And take a quick second to look at that, and let

21    me know when you've had a chance to -- if you recognize

22    that document.

23    I'll represent to you --

24         MS. COOK:  And, Brendan, I'm sorry to

25    interrupt.  I was unable to open the exhibits.  I'm fine

1  with the way you're referring to them, but are you going

2  to publish those at all during the deposition?

3         MR. LENIHAN:  You mean on the Zoom

4  screen?

5         MS. COOK:  Exactly.

6         MR. LENIHAN:  I wasn't going to.  I

7  can -- if you need me to, I certainly -- I can do that.

8  I certainly will get you the exhibits after we complete

9  the deposition, but if you need me to, I can try to

10 publish it on the Zoom screen as -- oh, sorry.  Is this

11 Julie asking me?

12        MS. COOK:  This is Julie.  I'm sorry.

13        MR. LENIHAN:  Okay.  I'm sorry.  I

14 thought it was the court reporter.  Yes, Julie, let me

15 just -- I will have -- let me just send a quick message

16 to my paralegal to send you a copy of all the exhibits.

17    Is that okay?

18        MS. COOK:  Okay.  That's fine.  I'm

19 familiar with them.  I just didn't have them all handy,

20 so thank you.

21        MR. LENIHAN:  Sure.

22        THE WITNESS:  Okay.

23        MR. LENIHAN:  Okay.  Julie, you should

24 be getting that soon.  All right?

25        MS. COOK:  Thank you.



1 Q  (By Mr. Lenihan)  Okay.  Ms. Zayas, if you have that

2  open, this is -- this -- you filed -- this is -- was your

3  12th amended complaint in this lawsuit that you filed on

4  November 25th, 2020?

5      And you can see that at the top of the document.  Do

6  you see that?

7 A  Yeah.

8 Q  Okay.  This is your most recent version of your

9  complaint.  So let me -- and this is Docket No. 35 in the

10  court docket.

11      Do you recognize this?

12 A  Yeah.  I mean -- yeah.

13 Q  Great.

14      So it looks like this -- let's go to Page 19,

15  please, real quick.  And when you get there, I see a

16  signature -- your signature is at the bottom.  Is that

17  accurate, that you signed this document certifying --

18 A  How do you know which one is -- okay.  Yeah, I see.  Got

19  it.  Yeah.  I went crazy.  Yeah, I lost it.

20      Yeah.  That's me.  I signed it.

21 Q  Okay.  So that's your signature?

22 A  Mm-hm.

23 Q  Is that a yes?

24 A  Yes.  Yes.

25 Q  Okay.  Thank you.

1      It's -- I should have said this.  For the sake of

2  the court reporter as well, I need you to verbalize "yes"

3  or "no" because she can't type down the "mm-hm," so --

4 A  Yeah.

5 Q  I'm sorry.  I should have told you that earlier.

6 A  Sorry about that.

7 Q  Okay.  So that's on Page 19, but the document is 38 --

8  or, I'm sorry, is 36 pages long.  So I just want to make

9  sure that I understand that this is -- your complaint is

10  Pages 1 to 19 of this document, and then 20 to 36 are the

11  documents you attached in support of the allegations you

12  raised in the complaint; correct?

13 A  Yes.

14 Q  Okay.  And this 12th amended complaint accurately and

15  fully captures your allegations against David La Raus,

16  Amber Whitney, and Jeff Whitney, and all of the

17  defendants; is that right?

18 A  Yes.  All -- all of -- all of my complaints are, I think,

19  relevant because I didn't know about the forgery until

20  July.  So even the first one where I said, "Hey, you

21  know, this lady's not listening to me," I think is

22  completely relevant because I think judges should not

23  silence people in court, and I think it's important that

24  parents be able to speak when their children are being

25  taken.

1      So even though the first complaint was not correct

2  because I didn't know about the forgery yet, it was

3  still, I think, completely relevant because I don't think

4  anybody should be silenced when a child is being taken

5  away.

6 Q  Okay.  And you discuss in this 12th amended complaint

7  your allegations about that shelter care hearing on

8  March 17th, 2020, and that's what you're referring to,

9  right, as what you -- is what you're stating was un- --

10  well, fraudulent, I think you referred to in the

11  complaint?

12 A  Well, yeah, because I never met Danieli, so I don't know

13  who that is.

14 Q  Okay.  So let's walk through the complaint for a minute

15  just because you have -- you named seven different people

16  as defendants in the lawsuit, so I want to make sure I'm

17  understanding who you're accusing of what, and I also am

18  seeking some clarity as to what exactly your allegations

19  are.

20      Okay?

21 A  Okay.

22 Q  So if you can please go to Page 3 of your complaint,

23  Paragraph 3.  I'm looking at the first sentence of

24  Paragraph 3, which says, "Defendants, the" -- "the

25  'Whitneys' Jeffrey and Amber Whitney at all times

1  relevant hereto is/was the foster-to-adopt parents who

2  immediately received 'adoption assistance' too soon for

3  any reasonable efforts to have been made with respect to

4  the Adoption and Safe Families Act of 1997."

5      Did I read that correctly?

6 A  Yes.

7 Q  Okay.  What do you mean by "adoption assistance"?

8 A  It starts on day one of pickup.  It shouldn't, but it

9  does.  CPS has -- they've just gone -- they've gone

10  crazy.  I don't know what's going on.  They started --

11  they don't -- they're not the same like they used to be.

12  I've been dealing with them for 20 years, believe it or

13  not, since 2001, so I know what an in-home dependency

14  consists of.  I know what adoption assistance is.  I've

15  studied it for the last year and a half.

16      And they collected it on .  Even when she was

17  born and she was still with me, they still collected it.

18  I don't know how, but -- they're only supposed to collect

19  it when the child is placed with foster -- in a foster

20  home that's licensed.  They can't collect adoption

21  assistance any other way.

22      And adoption assistance is, like, an astronomical

23  amount of money that is paid to the State and to the

24  foster parents -- but they only get, like, 900, not even

25  that much, but the State gets, like, 17,000 to 39,000

Page 18

1  depending on the situation, where the -- whether the kid
2  is on medication or the kid has issues or priors or
3  whatever. They just prep all kinds of little points that
4  go in there to make it higher.
5      And this money starts -- it's supposed to start when
6  the termination petition is filed, which they secretly
7  squeezed into the shelter care hearing order, I believe,
8  maybe not. I think the sentence is below the signature
9  line of the shelter care -- I might be wrong. It might
10 not be the shelter care hearing order. It might be the
11 fact finding -- one of those hearings, there's a sneaky
12 little sentence that says, you know, you just agreed to
13 us filing a petition to terminate blah, blah, blah.
14 That's because they have to do that to start this
15 funding, the adoption assistance funding.
16     So basically concurrent planning is U.S. law, and
17 they have to do -- they have to do concurrent planning,
18 so they have to basically put out for adoption on day
19 one. But according to the Adoption of Safe Families Act,
20 they have to have made reasonable efforts, and I guess --
21 I guess there wasn't really -- I guess maybe their theory
22 of reasonable effort was made in the prior dependency of
23 ACZ maybe that's where they get it from, but I can't
24 think of why they would think that reasonable efforts
25 were made on the first day of pickup, I mean, because

Page 19

1      they forced the licensed foster placement --
2  Q  Okay.
3  A  -- and they --
4  Q  Oh, sorry.
5  A  Go ahead.
6  Q  So you say "they." You're referring to "they." Are you
7      referring to the Whitneys, or are you referring to DCYF?
8  A  Well, the Whitneys accepted it. They accepted adoption
9      assistance on day one, so they knew what they were
10     accepting when they accepted it. So whether they -- you
11     know, they accepted it. They knew the money, what they
12     were accepting. They knew it was adoption assistance, so
13     they knew -- I mean, if they don't know what they're
14     receiving, they should probably, you know, be educated on
15     it. I'm pretty sure they know what they're receiving.
16 Q  Okay. Okay. What evidence are you relying on to make
17     the -- that allegation, Ms. Zayas?
18 A  That I attempted to voluntarily place her three weeks
19     prior, and Kelsey Owens refused voluntary placement when
20     I was in the hospital and I needed someone to come watch
21     ACZ . She came to my house the day before and said,
22     "You need to go back to the hospital or else you're going
23     to get in trouble and, you know, you could die," blah,
24     blah, blah.
25         So I went under the impression that she was going to

Page 20

1  help me or -- I don't know. Really, I didn't know if she
2  would help me or not. I really didn't think they were
3  going to keep me. I didn't know. And so when we did,
4  then I called her back, and she said no. I was like,
5  what? Like, I didn't get it. And I -- it didn't click
6  then, you know. I didn't realize what it was, but they
7  can't accept voluntary placement. They won't get any
8  funding for that. They have to have a judge determine
9  to -- the judge is in charge of the money --
10 Q  Okay.
11 A  -- you know, funding and stuff.
12 Q  Anything else? Any other evidence you rely on for that
13     assertion that Jeff and Amber Whitney accepted adoption
14     assistance?
15 A  They asked for the money in the emails through Olive
16     Crest. Olive Crest was bugging -- what you call it --
17     Jamal -- I want to say Jamal, maybe Julie -- emailing
18     them saying, "Hey, where's the payment? Where's the
19     payment?"
20         Because they weren't too happy with not getting paid
21     right away or something like that. And they got it
22     because they stopped emailing about it in that 2,500
23     pages of repetitive emails.
24 Q  Okay. So I think I requested those documents from you in
25     the request for production I sent you. So will you be

Page 21

1  sending us those emails that you state prove your point
2  here?
3  A  Yeah. There's a link to it, but the thing is, each email
4     happens, like, five times. I don't know why they do
5     this. Like, the same email will happen five times, and
6     then the next email won't come until -- yeah, it's weird.
7     It's like a tread, so you get a lot of repetitive emails.
8     You have to, like -- I don't know how they do that,
9     but --
10 Q  Understood. But so you will send that --
11 A  I sent --
12 Q  You did send it?
13 A  Yeah, I sent it to the -- I sent it in a link and in an
14     email, but it's really a big document.
15 Q  And you sent that to our office?
16 A  Yeah.
17 Q  Okay.
18 A  I sent it via either link or also attachment as an email.
19     Yeah, it's called "emails redacted." It was from public
20     disclosure, and it was sent to me in a USB form --
21 Q  Okay.
22 A  -- because there was so much email.
23 Q  Understood.
24         And these emails are -- your allegations are those
25     emails show that the Whitneys accepted adoption



MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 22

1   assistance money; is that correct?
2 A  Well, accepted federal funding.  I mean, I'm assuming
3    it's adoption assistance.  They did say something
4    about -- I mean, there was a few emails about the funding
5    and it not coming on time, and then -- yeah.  Because
6    they weren't going to, like -- it was kind of like they
7    were frustrated because they weren't getting paid or
8    something at first, but then they did get paid and -- it
9    was just weird.  So you'd have to read -- but the first
10   50 pages have all their -- between Olive Crest and Jamal
11   and Julie going back and forth about when they should be
12   receiving this payment for -- and it's from -- they said
13   federal funding, so I'm not sure.
14       You're right.  It might not have been adoption
15   assistance, but, I mean, my guess is that's why they
16   forged the foster placement because they had another
17   option, but they wouldn't even consider her as placement,
18   so...
19 Q  Okay.  So you just said they forged their foster
20   placement.  Who is "they"?
21 A  Julie, the social worker.
22 Q  Okay.  Julie --
23 A  DeCamp.
24 Q  -- DeCamp, you're saying that she forged a foster --
25 A  Forged foster -- yeah.  Because they had -- they had a

Page 23

1    person that they could have placed her with, but they
2    refused to place her there because they said something
3    about some old CPS case she had or something like that
4    from 20 years ago.
5 Q  Okay.  And that -- so that allegation you just made
6    there, is that reflected in your complaint anywhere, your
7    12th amended complaint?  I don't read that --
8 A  No.  Because it really didn't have anything to do with
9    Messitt, so it really didn't have anything to do with the
10   court actual proceeding.  I didn't want to, you know,
11   bring the social workers into this, but at the same time,
12   I mean, I guess -- it's not her job to make sure that
13   they, you know, find relatives or whatever.  It's their
14   job, I guess.
15 Q  Okay.  So that allegation is related to a different
16   case --
17 A  Yeah.
18 Q  -- am I correct?
19 A  Yeah.  I tried not to -- I mean, even though the Whitneys
20   only dealt with social workers, they still -- they knew
21   that they were getting the adoption assistance, I mean.
22 Q  Okay.  And you say the reason for that is -- why do you
23   think they knew that?
24 A  Because they -- I mean, they emailed and asked for it and
25   complained about it, or somebody did from Olive Crest.

Page 24

1    They didn't, like, themselves, but --
2 Q  Okay.  Understood.  Thank you.
3       So let's move on to Page 4, Ms. Zayas.  If you take
4    a look at Page 4 of the complaint, the -- well, let me
5    briefly --
6           MR. LENIHAN:  Julie, were you able to
7    open the exhibit?
8           MS. COOK:  Sorry.  I'm following along
9    on my copy right now, and I will -- yes, I can open it
10   now.
11          MR. LENIHAN:  Okay.
12          MS. COOK:  Thank you very much.  I
13   appreciate that.
14          MR. LENIHAN:  Great.  All right.
15 Q  (By Mr. Lenihan)  Ms. Zayas, the bottom of Page 4, that
16   final paragraph, do you see where it starts -- the first
17   sentence says, quote, "Number 4-6 conspired with Judge
18   Messitt and continue to cover the forgery" -- did I read
19   that correctly?
20 A  Yes.
21 Q  Okay.  So number 5 on this page is David La Raus, so are
22   you alleging that David La Raus conspired with Judge
23   Messitt to cover the forgery, as you put it?
24 A  He was the first one in the hearing of June 9th who swore
25   that it wasn't, you know, her who was the judge and

Page 25

1    claimed that -- you know, and the way he just, like,
2    slaughtered me, like, saying I'm mentally ill all of a
3    sudden, I just knew.  I knew something was up, you know,
4    because he went nuts.  I don't even know this guy, and he
5    just -- he stuck up for her like he was a Pit Bull, and I
6    was like, whoa, and I couldn't believe, like, the
7    stuff -- like, he put me -- like, mentally ill, blah,
8    blah, blah, like, immediately.
9        I never met this guy, don't know him from anywhere.
10   He barely knows me.  I mean, I guess -- maybe he thinks
11   he knows me.  It was like an instant hate, like, boom,
12   and it was so obvious that he was trying to cover
13   something or, like -- and he kept insisting, you know,
14   that that was -- "She doesn't have the right judge, Your
15   Honor.  She doesn't have the right judge."
16       And I'm like, wow, I didn't go there, but okay.  I
17   didn't even say anything about that.  But as soon as I
18   mentioned the hearing and said, "Hey" -- you know,
19   something about, "Do you know why my daughter is in
20   foster care?"  And he flipped out, like -- and I knew
21   just by the instant -- talking over everybody that he --
22   and I have a link to that one too, the audio from that
23   where he's just going crazy.
24       Because I guess I just was being kind of mean maybe,
25   but I guess I hadn't had a hearing in months, so I just

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 26

1  kind of -- I just lost it a little bit, but she didn't
2  say anything. He spoke for her, and I think because he
3  knew the answer, and he knew to protect her from whatever
4  I was accusing her of, which I didn't even know about the
5  forgery at that time. I didn't find the forgery until
6  way later, but I just knew that --
7  Q  Okay.
8  A  I just knew that -- I just thought it was -- and he
9  confused me a lot about it being Messitt or Danieli. He
10  did a good job of confusing me. That was weird, but
11  yeah.
12  Q  So you're saying he -- well, let's -- when you're saying
13  he -- he protected her or defended her, you're referring
14  to Judge Messitt; is that correct?
15  A  Yeah. He wouldn't let her answer the questions or
16  anything. He just, you know, jumped in like Superman,
17  and I just -- I knew something was up with that, you
18  know, just how -- and I don't know him. He was so mean
19  to me so suddenly, and I just thought, wow.
20  Q  Understood.
21      And so this is in reference to the -- what you said
22  was the June 9th, 2020, hearing?
23  A  There's one on the 18th and one on the 9th, but I have
24  them both in the same folder. I probably added the link
25  under the -- saying it was the first hearing after the no

Page 27

1  hearing for months, two months no hearings and everybody
2  ignored my kind of thing. So that was -- either 5/18 or
3  6/9 was the first two hearings.
4  Q  5/18 or -- May 18 or June 18?
5  A  5/18 was the first -- very first hearing, and I think
6  that's the one where he was yelling. The 6/9 one I think
7  was a different judge because they played a switcheroo
8  because -- you know, just trying to make it look like
9  they had switched judges all the time, which they don't.
10  I don't know. It's just trying to confuse me, you know,
11  threw another judge in there. For what reason, I don't
12  know.
13  Q  Okay. So am I summarizing this correctly? Based on --
14  based on what you -- the evidence you have and the
15  transcripts from those court hearings, you're alleging
16  that David La Raus conspired with Judge Messitt; is that
17  right?
18  A  Yes.
19  Q  Okay. And you said -- you said you found a forgery later
20  that -- yeah, I think you just testified to that.
21      So what do you mean by -- what forgery did you find?
22  A  The shelter care hearing order I never had. Nobody
23  ever -- the first person to send it to me was Kathleen --
24  I forget her last name. My lawyer's boss. She sent it
25  to me via email. I didn't even know -- the one that I

Page 28

1  found on the docket myself, by paying for it, did not
2  have anyone's signature on it but Danieli's, and that was
3  just because I paid for it because I was, like, trying to
4  get evidence for the -- what Kelsey said, but I wouldn't
5  find anything with what anybody said because nothing was
6  recorded.
7      So all I found was just what was filed with the
8  docket, and that was all -- what was it? -- the shelter
9  care hearing order, the healthcare authorization form,
10  but nothing was signed by anybody but Danieli. So it was
11  just no signatures at all.
12  Q  Well, let's -- okay. Let's see if I --
13  A  I sent everything to you guys, but --
14  Q  Right.
15      So, Ms. Zayas, can you take a look at Exh bit 3 --
16  if you bring that up real quickly -- and this is what I
17  believe you mean by the shelter care hearing order on
18  March 17th, 2020.
19      Let me -- correct me if I'm wrong.
20  A  No. The one on the docket doesn't have Sebastian or
21  Hannah Gold's signature on it. It only has Danieli.
22  They signed it afterwards because -- I think because they
23  didn't want to sign it prior to because that's a crime if
24  you file that official docket. That actual -- that makes
25  them felons, so of course they're not going to do that,

Page 29

1  you know. They can't -- like, once they filed it, that's
2  the crime. There's no crime if they don't file it; it's
3  just forgery. But if they file it, then they're, like,
4  making it official. So the one on the docket doesn't
5  have their signatures at all.
6  Q  So if you -- do you have Exhibit 3 open?
7  A  Yeah. Mm-hm.
8  Q  Okay. Now, this is the shelter care hearing order from
9  March 17th, 2020. If you go to Page 10 -- if you take --
10  please take a look at Page 10.
11  A  Yeah.
12  Q  So are these the signatures that you say are -- explain
13  to me again what you believe is fraudulent with this
14  document.
15  A  Kelsey signed it, obviously, but Sebastian didn't sign
16  it, the one on the docket, and neither did Hannah Gold.
17  I believe that they signed it afterwards because they
18  knew that, you know, if they signed it before, then
19  they're just guilty of forgery.
20      But you can tell Kelsey wrote that for commissioner
21  because the top of the S is similar to her signature.
22  It's just similar to her handwriting.
23  Q  Okay. So your allegation is that Kelsey signed this
24  document on behalf of the commissioner?
25  A  She may have not -- she may have just wrote the word

B&A LITIGATION SERVICES

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 30

1    "commissioner," and then someone else signed it.  I don't
2    know who signed it.
3  Q  Okay.  And correct me if I'm wrong, but Hannah Gold is --
4    or was your attorney at the time of this dependency --
5  A  Yes.
6  Q  -- hearing?
7  A  She was, yeah.
8  Q  Okay.  If you can return to your Exhibit 1, your 12th
9    amended complaint, if you can bring that up again and go
10   to Page 5, please.
11       Let me know when you're there.
12 A  I'm here.
13 Q  Okay.  The third paragraph down, it reads, quote, "The
14   court clerk, bailiff, and all parties related to the
15   creation of the fake fraudulent audio, connected to the
16   shelter care hearing 'minutes' added 5 months after
17   March 17th, 2020, include David La Raus, Jennie Cowan,
18   Pauline Duke, all of them approved of this false forged
19   document under oath at the Plaintiff's trial in their
20   attempt to further the fraud, they continue to conspire
21   today and are now holding her child away from her without
22   probable cause for removal from day one."
23       Did I read that correctly?
24 A  Yes.
25 Q  Okay.  What is the -- what, quote, "fake fraudulent

Page 31

1    audio" are you referring to?
2  A  It was exhibit -- probably -- I'd say the exhibit -- his
3    exhibit list was like -- he had -- the audio was one of
4    the first -- it was their way of proving that it did
5    happen, the shelter care hearing.
6        And so, yeah, they created this fake audio.  And I
7    know -- I don't -- I'm the only person who echos in that
8    audio, by the way.  Nobody else echos.  And, I mean, I
9    could hear the file cabinet door slam at two minutes
10   after Kelsey first started talking.  I don't remember any
11   file cabinets in the courtroom.  Maybe I'm wrong.  But I
12   never met Danieli.  That's for sure.  So I don't -- that
13   couldn't have been me.  If I never met Danieli, then that
14   was completely false and fake.
15       And they didn't, of course -- they did add it to the
16   docket, but they also added it to their evidence in
17   trial.  And being that Pauline and Jennie both agreed --
18   because they're thinking, hey, you know, if we agree, we
19   can trick her into thinking it's really real and -- like
20   I'm stupid or something.  And that's their move, you
21   know.
22 Q  So is -- are you alleging that you were not at a hearing
23   on March 17th, 2020?
24 A  I mean, apparently I wasn't.  If Danieli was the judge, I
25   couldn't have been.  That couldn't have been me because I

Page 32

1    never met Danieli.
2  Q  Well, do you have --
3  A  I mean, unless -- unless they had a hearing somewhere
4    else with Danieli and -- I never -- I never met Danieli.
5    There was no way I was at a hearing with Danieli because
6    I don't know who she is.  And their cost of accusations
7    of me being delusional, I don't -- I know who I've met
8    and I know who I haven't met, and I know the reason that
9    Judge Messit didn't want to see me for so long, because
10   she was hoping I would forget what she looked like.
11   That's what she was hoping for, that I would forget, and
12   then if I ever saw the document again, I would -- I would
13   think, oh, well, it might have been.
14 Q  Okay.  So aside from your allegation that Ann Danieli was
15   not present at the hearing, do you recall being at a
16   72-hour shelter care hearing on March 17th?
17 A  With Judge Messitt.
18 Q  Okay.
19 A  Not with Ann Danieli.
20 Q  Okay.  If you can please open Exhibit 7 real quickly.
21   This is the minutes -- the clerk's minutes from the
22   March 17, 2020, hearing.
23       And let me know when you have that open.
24 A  Mm-hm.
25 Q  Do you recognize this document?

Page 33

1  A  Yeah.  They made that after I said something.  That's
2    when they made that.
3  Q  What do you mean by they made that up after you said
4    something?
5  A  I emailed them, and I said -- I said, "Excuse me.  I
6    don't see any minutes on" -- and the clerk explained to
7    me what -- I didn't know what the docket was -- consisted
8    of.  I didn't know what minutes were.  I didn't know
9    anything.  She explained and educated me on what the
10   docket consisted of and what minutes were and if there
11   were no minutes there was no hearing type thing.
12       And so I'm like, "Really?"  And, you know, when I
13   found that out, I emailed David -- I emailed everybody,
14   and I said, "Okay.  There's no minutes.  Do you" -- and
15   they're like, "Oh, okay.  Well, here.  We have minutes
16   right here."
17       So they made this, and this is their way of trying
18   to -- but it's not even close to true because the
19   agreement was not -- what is it called -- two hours.  It
20   was four hours for visitation.  And it says that in the
21   shelter care hearing order.  So, I mean, there's a few
22   things that they did wrong that, you know, they, of
23   course, will say is no big deal, but --
24 Q  So if you look at the top, and it says -- under the
25   heading "Appearances" -- do you see that?



MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 34

1  A   What do you mean?
2  Q   Do you see the -- near the top of this Exhibit 7, right
3      beneath the title of the court, it says "Appearances,"
4      and then it lists the people --
5  A   Oh, yeah.  Mm-hm.  Yeah.
6  Q   Okay.  Other than your allegation that Ann Danieli was
7      not at this hearing, is everybody else -- do you agree
8      that everybody else who made an appearance according to
9      this clerk's record was at the hearing?
10 A   Yes.  Except for -- I don't know -- never -- I don't --
11     like I said, I don't know who Sebastian Miller is, so --
12     I mean, he could have been Tom, Dick, and Harry.  I
13     don't -- I just know that that's who I think he is.
14 Q   Okay.
15 A   At this point, I don't really trust any of them, so I
16     don't know.
17 Q   Okay.
18 A   Yeah.  I don't know -- I've never seen Tara Shoemaker in
19     my life either, so I don't know -- I've never seen -- I
20     just know that they're the clerk because she says she is,
21     but I don't -- I didn't -- I don't visually know these
22     people.
23 Q   Okay.  But to the best of your recollection, there was
24     nobody else present other than the people listed here
25     under "Appearances"; correct?

Page 35

1  A   Ann Danieli was not present.  I don't know who that is.
2  Q   Okay.  Aside from Ann Danieli, was anybody else --
3  A   Yeah, I don't -- I don't -- yeah, everybody else --
4      yeah.
5  Q   Okay.  So you're not alleging that anybody else was
6      present outside of the people listed on this appearance
7      and yourself; correct?
8  A   Oh, wait.  I am right there.  That's right.
9          No.  That's -- that's -- yeah.  No.  That's it.
10 Q   Okay.  Just to make sure I understand, this is -- the
11     people listed under the appearances heading is everybody
12     who was present at the hearing; correct?
13 A   I want to say -- yeah, that's it.  Yeah.
14 Q   Okay.  So -- and your -- and help me understand this
15     again.  Your allegation for why this document is
16     fraudulent is because it was -- well, because you're
17     saying that the judge is not the judge who was present at
18     the hearing?
19 A   They created this for me to try to make me think that it
20     was -- but these are -- they named this document
21     "Minutes" and added it to the docket and said, "Hey,
22     here's those minutes."
23         It's just a document.  It's not minutes.  But I
24     don't know.  I was stupid, so probably bought it for a
25     split second.

Page 36

1  Q   Okay.  And that's the reason why you believe it's
2      fraudulent; correct?
3  A   Well, I know it's fraudulent because I've never met
4      Danieli and because they created it after I said
5      something.  They didn't -- it wasn't there before.  It
6      was added after I said I know -- you know, I know what's
7      going on or whatever.
8  Q   Okay.  Please take a look at Page 7 of your complaint.
9      And if you're there, it's the -- I guess the third
10     paragraph.  It's the first sentence.  It says, quote,
11     "Two forged and falsified documents filed on March 17th,
12     2020; a fake hearing was held no minutes exist on the
13     document [sic]," unquote.
14         Is that what you're referring to right now?
15 A   Yes.
16 Q   Okay.
17 A   Mm-hm.
18 Q   And you say --
19 A   It wouldn't be -- it wouldn't -- to them it doesn't
20     matter, you know.  They say, "Well, we had a hearing,
21     and that's good."  But I wasn't heard, so we didn't have
22     a hearing.  So I wasn't heard.  I -- my court wasn't
23     heard on the record.  That makes a huge difference in
24     legality and everything.
25         So whether we had a fake hearing and it being okay

Page 37

1      with the world, it's not okay with the official document
2      because it's not -- it doesn't exist.  So whether -- it
3      doesn't matter whether we -- the hearing was fake.  That
4      matters because, I mean, God knows how many other
5      hearings were fake.  God, I would just double-check all
6      the hearings.  But it matters as far as, you know -- even
7      though a hearing was held, I wasn't heard.  My case
8      wasn't heard.  So they really don't have proof that I
9      ever abused my child on the official docket, and that's
10     all that matters is the official docket.
11 Q   So when you say you weren't heard, do you mean you didn't
12     have a chance to speak personally, or do you mean your
13     attorney didn't have a chance to speak on your behalf?
14 A   I was silenced.  My attorney spoke in her own gibberish.
15     She didn't let me speak.  She said no, I could not speak.
16     No, I was not allowed to speak, according to her.
17 Q   Okay.  So are you blaming the defendants in this lawsuit
18     for your attorney's instructions that you should not
19     speak at this hearing?
20 A   Messitt did this.  Messitt did this too.  She shooed me
21     away.  She -- come on.  She did it too.  They were all in
22     on it.  It was all rushed.  Chop, chop.  Come on.  Hurry.
23     Hurry.  And she kept rolling her arms like, you know,
24     hurry up.  You're taking too long.  And then when I
25     started to speak, she went like this, like -- and then my

Page 38

1  attorney of course -- yeah.  No.  She's -- Hannah Gold
2  is -- she's just -- I mean, she's not good at being a
3  criminal.  That's for sure.  I mean -- yeah.  No.  They
4  all had a part, and they all knew exactly what was
5  happening.
6 Q  Okay.  And you are no longer represented by Hannah Gold
7  in any capacity; correct?
8 A  Thank God.  Yeah.  No.
9 Q  Okay.
10 A  They won't give me an attorney.  Uh-huh.
11 Q  So am I correct that the reason you feel that the
12  March 17th, 2020, shelter care hearing was fraudulent was
13  because you personally were not given a chance to explain
14  yourself, but it was done through your attorney instead,
15  and that was -- am I correct?
16 A  No.  That's part of it, but I would say just because I
17  wasn't heard on the official docket because I wasn't --
18  my daughter's reason for being removed was not said.
19  There's no oath.  There's no -- there's nothing stated
20  that proves why she was removed.
21      So no matter how hard I try to prove that they're
22  liars, it doesn't -- I have no evidence to prove it
23  because nobody ever said anything on the docket.  So --
24  and I see that they're liars, and I have proof that
25  they're liars, but I can't even prove that they lied

Page 39

1  because they never did what they were supposed to do, and
2  they never put it on the record like they should have.
3  Because no matter what I say, it's just me saying it.
4  It's not official because it's not on the docket.
5 Q  And when you say -- so is it -- your allegation is that
6  DCYF or the Department of Children and Youth and
7  Families, that they did not put -- strike that.  Let me
8  rephrase the question.
9      There's no -- is it your allegation that there's no
10  explanation in any of the court records as to why your
11  child was removed?
12 A  She was removed for, they say, dirty UA from the 5th of
13  March, but then there was a clean one on the 13th of
14  March.  So -- and they received word of this clean one
15  three days prior to removing her.  So technically, on the
16  day that she was taken, I was clean, and so they really
17  didn't have any good reason.  I mean, there was the dirty
18  and then there was the clean, but they refused to
19  acknowledge the clean anywhere in the shelter care -- in
20  the dependency whatever.
21      It's on Page -- I want to say -- like, 13 of the
22  discovery, but, yeah, nobody ever mentioned it.
23 Q  Okay.
24 A  And their other reasoning was the baby.  Being high
25  pregnant, that is not in their jurisdiction either at

Page 40

1  all.
2 Q  Sorry.  Say that one more time.
3 A  She mentioned in her email that me being high pregnant
4  was a part -- the other reason why they took ACZ and
5  they -- they have no jurisdiction over the fetus, so -- I
6  don't think.
7 Q  Okay.  All right.  Can you please go to Page 10 of the
8  complaint --
9 A  Yeah.
10 Q  -- Paragraph 11.
11 A  You mean number 11?
12 Q  Right.  Page 10, Paragraph 11, or number 11, yeah.
13      You state here, halfway through the paragraph -- or
14  the second sentence in that, quote, "There is no proof
15  the hearing ever happened other than 2 documents filed on
16  the docket that day," unquote.
17      What two documents are you referring to?
18 A  The shelter care hearing order and the healthcare
19  authorization form.
20 Q  Okay.
21 A  They were actually not even filed that day.  They were
22  filed -- I found out -- the next day or possibly even the
23  day after the next day because there wasn't -- I guess
24  the next filing wasn't -- it's weird how the docket
25  works.  If -- it was filed, but it could have been filed

Page 41

1  anywhere between the 17th and the 19th or something
2  because -- I don't know when it was filed.  It was after
3  the 17th.
4 Q  Okay.  Got it.
5 A  I was just learning how to read those things, by the way.
6 Q  Right.  Understood.
7      Can you go to Page 11 and look at Paragraph 15?
8 A  Yeah.
9 Q  And I -- this might be -- I apologize if I'm asking you
10  something that is -- I think you make the same allegation
11  several times in your complaint, but I just want to make
12  sure it's the same point you're making here.  But the
13  third -- well, I guess it's the second sentence of that
14  paragraph.  It says, quote, "The Plaintiff found the
15  forgery after getting her court records from the clerk in
16  her attempt to gather evidence for her allegations
17  against the social workers for perjury," unquote.
18      What is -- what forgery are you referring to?  Is
19  this the same --
20 A  The forgery -- oh, you mean -- oh, the forgery is the
21  shelter care hearing order.  I didn't see that Danieli
22  was written on there until July 13.
23 Q  Okay.  The forgery is the shelter care hearing order?
24 A  Mm-hm.
25 Q  Okay.  Understood.



MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 42

1    Okay.  If you go to -- look at Page -- or
2  Paragraph 19 on that same page.  It says, quote,
3  "Plaintiffs counselor and doctor can both testify that
4  the Plaintiff was in a severely depressed state mentally
5  after this happened," unquote.
6    Can you give us the names, please, of your -- of the
7  counselor and doctor?
8  A  Dr. Christ.  THS -- her name was -- shoot.  She stopped
9    working for them.  That's why I stopped going because I
10    didn't -- she was the only one that I think I trusted for
11    that time, but Dr. Christ heard the -- he heard the most
12    of it, but not the worst.
13  Q  Okay.  And I guess maybe I could clarify this by saying,
14    this was one of the requests for production of documents
15    that we sent you.  So are you going to be sending us the
16    names of your doctors?
17  A  You guys got 2,000 pages of my medical records.  I mean,
18    that is what David La Raus subpoenaed, and he got it,
19    2,000 pages from the Attorney General -- actually, it's
20    in one of those little -- like, you guys just made me log
21    in, the Attorney General, to go -- he has one of those
22    also with 2,000 pages of medical records of mine from my
23    doctor, so he knows a lot more than I do about my medical
24    history.
25  Q  So you're referring to records that you gave to --

Page 43

1  A  Yeah.  Any -- he got everything.  He got the mental
2    health, everything.  My doctor just gave him everything.
3    I was shocked.
4  Q  Okay.  Understood.  Thanks for clarifying.
5    But we still need you to --
6  A  Yeah.
7  Q  -- produce the records for us because this is a separate
8    lawsuit, and so --
9  A  Well --
10  Q  Are you going to be sending those to us in response to
11    the request for production?
12  A  Well, yeah, but, see, the thing is, when -- when I'm
13    trying to fight for my kid, to get her back, it doesn't
14    help that I'm slaughtering myself with this, you know,
15    because if I do admit, I was mentally -- I was, but I
16    don't want that to be -- because they -- I mean, I guess
17    I'll -- I don't care.  I really don't care what they
18    think.
19  Q  Okay.  Well, I just wanted to point that out to you --
20  A  Yeah.
21  Q  -- that this was one of the requests that's pending that
22    we're waiting for from you, but I'll let --
23  A  Well, they don't show these things to me, what -- the
24    things they say about me, at least I don't think they do.
25    I can ask them, but I definitely don't think they'll show

Page 44

1    them to me, anything bad that they say about me.
2  Q  Okay.
3  A  I don't know.  Maybe.
4  Q  Okay.  So if we go to Page 13, please, of your complaint,
5    Paragraph 26.  That first sentence, quote, "By not giving
6    her a 72-hour hearing that was fair and valid," unquote,
7    you're referring to the March 17th, 2020, hearing; right?
8  A  Yeah.
9  Q  Okay.  I just wanted to get clarity there.
10    And then Paragraph 27, same page, you say, quote,
11    "The Defendant violated the Plaintiff's fourth amendment
12    rights to the U.S. constitution by agreeing and signing
13    an order to remove her child without probable cause,
14    without oath or affirmation, and without having a shelter
15    care hearing that was recorded or transcribed," unquote.
16    Who is the defendant you're referring to here?
17  A  All of the state official defendants.
18  Q  Okay.
19  A  Any defendant that I say had the official capacity --
20    because obviously foster parents don't -- but that has
21    the power to agree, remove, sign, whatever -- if they
22    have official power, then they -- yeah, they're the
23    guilty party.  The state official defendants.  I should
24    have clarified that.
25    (Reporter clarification.)

Page 45

1    THE WITNESS:  The state official
2  defendants.
3    THE REPORTER:  Thank you.
4  A  And I want to say that Pauline, Jennie, and David, even
5    though they were not the original felons, the ones who --
6    the fact that they continued and agreed and said, hey,
7    this is true and correct evidence makes them just as
8    guilty possibly, neglect to prevent.
9    I mean, they just -- they had the power to say,
10    "Hey, something's not right here," and they didn't.  They
11    said -- they said, "Okay.  Yeah, we agree this is true
12    and correct," and accepted it as evidence in my trial
13    against me.
14    And what is it called?  At the trial, I don't know
15    if they were under oath, but they did accept it as
16    evidence.  The first piece of evidence was the shelter
17    care hearing order.
18  Q  Okay.  And when you say "without oath or affirmation,"
19    what do you mean by that?
20  A  On the 16th of March, there should have been a hearing.
21    The signature was not a hash, and that means there's
22    usually going to be a hearing or transcription created
23    where the social worker says the reason that the child is
24    going to be removed.  No hearing is on the docket for
25    that.



Page 46

1    I know that usually when they sign with a hash you
2  can get away with not having that, but I honestly don't
3  even think Judge Messitt was there that day.  I think
4  Kelsey just used a page with her signature and winged it,
5  and then she had to come in the next day to do the
6  shelter care hearing because she was obliged to because
7  of Kelsey.  That's my --
8  Q   Okay.
9  A   -- theory.
10 Q   So Paragraph 27 is referring to the March 16th hearing
11    or --
12 A   Not having the oath or affirmation is, yes.
13 Q   And that's the day before the 72-hour hearing on
14    March 17th --
15 A   Yeah.
16 Q   -- right?
17    Okay.  And you're saying that whatever -- "without
18    having a shelter care hearing that was recorded or
19    transcribed" -- are you referring to the March 17th
20    hearing there?
21 A   Yes.
22 Q   Okay.  Okay.  So explain to me what you mean by "without
23    recorded" because I thought you said -- you testified --
24 A   Going on the record.
25 Q   -- earlier that it was recorded.

Page 47

1  A   It wasn't recorded.  They created that audio on their
2    own.  That wasn't the hearing.
3  Q   Okay.
4  A   Yeah.  That hearing is, like -- I don't even know who
5    that person is talking.  That's not my hearing.  That's
6    not -- I mean, that's me talking.  They cut me out of
7    some other hearing and added that in.  I'm not sure what
8    they did.  It's definitely obvious.
9  Q   Okay.  And your reason -- and your evidence for why it
10    was not a real audio transcript or that it was
11    manipulated is because you claim that you were not at
12    that hearing; correct?
13 A   I -- not with Danieli, no.  I've never been at a hearing
14    with Danieli, and that's who stated she was at that
15    hearing, so it couldn't have been me.
16 Q   Okay.  Okay.  Are you -- are you alleging that any of
17    this -- your allegations about what happened during the
18    March 16th or March 17th hearings are -- does any of that
19    involve the Whitneys?  Are you alleging that the Whitneys
20    had anything to do with that, or is that totally
21    separate?  By "the Whitneys," I mean Jeff and Amber
22    Whitney.
23 A   Just -- just accepting the adoption assistance, but that
24    happens, yeah, on day one, I think, I'm pretty sure.
25 Q   Okay.

Page 48

1  A   No, that's -- nothing in the hearings, no.
2  Q   Okay.  So aside from your allegation that they accepted
3    adoption assistance too soon, you're not alleging that
4    they were committing fraud or forgery with respect to
5    these hearings?  They're -- that's a --
6  A   No.
7  Q   They're a separate -- okay.
8  A   No.  Yeah.  No.
9  Q   Okay.
10 A   It was just -- I didn't ask for any, you know, like,
11    punishment of them.  I just wanted to -- I had to -- I
12    don't know.
13 Q   Okay.  And that's what I was going to ask you next.  Are
14    you -- when you say you're not asking for punishment from
15    them, what do you mean by that?
16 A   I mean, I didn't -- I just wanted to make a statement
17    that, you know, there's a reason -- there's a
18    mathematical thing going on here where the foster parents
19    are the end result, and they are the -- you know, they
20    are the holders and the caretakers of the children.
21    Without them, there would be no -- you know, nowhere for
22    them to place these children.
23    So I think that they have some responsibility in
24    knowing that, especially when they get these orders, you
25    know, like, hey, you know, you might have a kid that's

Page 49

1    stolen, or you might have a kid that was taken
2    unlawfully.  And she knew just, you know, by the -- by
3    the restraining order she filed, you could tell she knew
4    that something was not right about them placing 
5    there during the lockdown, and she said something about
6    it right away, that she just had a feeling about it,
7    and --
8  Q   Okay.  So your allegation against them is that they
9    should have known something was --
10 A   Well, just with the receiving the adoption assistance
11    right away.
12 Q   Okay.
13 A   That part.  I mean, that would be --
14 Q   Understood.
15    And when you say "the restraining order," are you
16    referring to the restraining order that they filed
17    against you?
18 A   Yeah.
19 Q   Okay.  And what is your understanding as to why they did
20    that, or do you know why?
21 A   Because [inaudible] told them to.  That's my theory.
22              (Reporter clarification.)
23 A   Yeah.  Jamal McGhee told them to, the social worker.
24 Q   (By Mr. Lenihan)  Okay.  So are you -- are you seeking
25    any monetary damages or compensation from the Whitneys,

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 50

1   or are you just --
2 A   (Witness shakes head.)
3 Q   No.  Is that a no?
4 A   No, not at all.
5 Q   Okay.  Are you seeking anything else for the -- I mean,
6     are you -- well, what is -- what is it you would l ke
7     from them then, if not monetary damage?  What are you
8     asking for, if anything?
9 A   To probably not accept stolen children again maybe.  I
10    don't know.  Like, don't play along with the -- what the
11    social worker says just because -- I don't know.  I think
12    that they kind of fell victim to the same thing I did, so
13    I don't really -- you know, whatever was written -- I
14    realize that a lot of stuff was written intentionally to
15    make me upset, I guess.  It worked.
16        So, you know, everything -- everything that happened
17    surrounding me and the Whitneys was intentionally brought
18    on by Child Protective Services pretty much.
19 Q   Okay.  So -- understood.
20        So you're not asking for anything from them from the
21    lawsuit, but you're just trying to make them aware by
22    suing them of what --
23 A   Well, because the -- because they -- I don't know if
24    they're told to go by Mommy and Daddy, like -- from kids
25    they don't know, but -- if that's, like, a rule or

Page 51

1     something.  Maybe that's their instruction manual;
2     they're told to say, "Hey, I'm your Mommy" and "I'm your
3     Daddy."  I never knew that was in the rule book, so --
4 Q   Okay.
5 A   -- maybe that would be --
6 Q   So is it fair to say that you're just -- you named them
7     in this lawsuit to send a message to them that they
8     need -- that -- you're not asking for something from them
9     in the lawsuit other than you're sending a message to
10    them by the lawsuit itself; is that fair?
11 A   Well, they can't go by Mommy and Daddy.  That's not their
12    title.  And they don't know my daughter, so, I mean, I
13    Daddy/daughter date, whatever, it's just -- it's
14    unnecessary.  It's painful and hurtful, and they know
15    this, and it's almost like they're playing along with
16    this game with these social workers.  Because I wouldn't
17    tell any child I just had in my home for one week, "You
18    can call me Mommy."
19 Q   Okay.
20 A   I mean, I don't know.
21 Q   Understood.
22        So I'm going to ask you about David La Raus next,
23    but it sounds like you're not seeking monetary damages or
24    any other relief from the Whitneys, but you're sending --
25    the lawsuit was to send a message to them that it was --

Page 52

1     that you were hurt by what they did; is that fair?
2 A   Common sense.  Yeah, common sense.
3 Q   Okay.  Common sense.
4        All right.  So let me ask you the same question with
5     respect to David La Raus.  Are you seeking any damages or
6     monetary compensation from him?
7 A   No.  What happened was the trial was so shocking that I
8     just thought, oh, my God.  These people have to lose
9     their jobs.  And that's why I added them.  I would have
10    created a whole new one and separated everybody, but it
11    was so jaw dropping that I had to -- I had to -- I had
12    to -- I don't know.
13 Q   Okay.  So am I -- so you're not seeking damages or
14    compensation from him, but you're trying to -- you're
15    suing him because you'd l ke him to lose his job; is that
16    the --
17 A   Yeah.
18 Q   Is that the relief you'd like?
19 A   Yeah.  All the state officials should lose their job.
20 Q   Okay.  And that's your goal?  That's the extent of the
21    relief?  You want him to lose his job for this?
22 A   (Witness nods head.)
23 Q   Okay.  Understood.
24 A   Yes.
25        MR. LENIHAN:  Okay.  So we've been

Page 53

1     going for a little more than an hour.  I don't have much
2     more.  I really don't have much more to ask you, but I
3     want -- I'll take a look at my notes, and maybe we take a
4     quick -- is a 10-minute break okay for everybody?
5        And then I'll probably just be a few more minutes
6     with you, Ms. Zayas, and then Julie Cook will ask you
7     some questions.
8            THE VIDEOGRAPHER:  All right.  Very
9     well.  Going off record.  Time now is 10:11 a.m.
10           (Recess 10:11 - 10:26 a.m.)
11           THE VIDEOGRAPHER:  Back on record.
12    Time now is 10:26 a.m.
13           EXAMINATION (Continuing)
14    BY MR. LENIHAN:
15 Q   Okay.  Ms. Zayas, I am almost done.  I just wanted to
16    kind of summarize and make sure I understood a couple
17    things correctly.  And the first is -- because -- I'm
18    just trying to get clarity because you have a bunch of
19    people you sued in this lawsuit, a bunch of defendants,
20    and I -- and so am I correct that you're -- the extent of
21    your allegations against David La Raus in this lawsuit is
22    that he -- that he was trying to cover something up or
23    conspire with the judge with respect to the hearings on
24    May 18th, 2020, and June 9th, 2020?  Is that accurate?
25        I think that's what you testified to, but tell me if

Page 54

1   I'm wrong.
2   A   Yes.  He also had the note from the principal of Pine
3       Tree Elementary that said that my daughter didn't have
4       any discipline records.  He received those -- well, he
5       didn't.  Whoever the Attorney General at the time of --
6       the beginning of time, I guess -- it doesn't matter --
7       but basically, they received the discipline records and
8       attendance records on the first week that she was
9       removed, and he knew -- obviously, he knew that.
10          I think that they do that as, like, protocol for
11      most removals.  They get attendance records right away
12      and discipline records right away, but during the trial,
13      he pretended that he did not know these facts, I guess.
14  Q   Okay.  So during -- during the dependency trial which
15      happened in October, I believe -- is that right?
16  A   Yes.
17  Q   Okay.  So during the October 2020 dependency trial, you
18      said he -- David La Raus knew about disciplinary records
19      with respect to your daughter, ████ACZ████, that
20      he -- tell me again.  He didn't --
21  A   Well, he pretended he didn't know, and he questioned the
22      teacher and acted like he did not -- and did not provide
23      it as far as evidence that was documented.
24          The judge reminded me during the trial that, you
25      know, if you say something, it better come with

Page 55

1       documentation.  That was one of the rules that they had
2       during the trial, and I was like -- so I thought, because
3       she said attendance, that he would provide that
4       automatically.  I wasn't there for so many days out of
5       the trial that I didn't know he didn't provide it or
6       whatever.  So he pretended like he did not know what her
7       attendance records were and what her discipline records
8       were, and he did -- he knew but never provided it for the
9       court.  Basically, he withheld exculpatory evidence from
10      the court and everything.  Yeah.
11  Q   So -- okay.  So just to clarify, you're saying that he --
12      David -- your allegation is that David knew what your
13      daughter's disciplinary and attendance records were, and
14      he did not provide those to the judge?
15  A   Well, he questioned the teacher and asked her what her
16      attendance was like and what her discipline was like, and
17      when the teacher lied, nobody jumped in to save the day.
18      Nobody provided records of these lies.  And he had them.
19      He had the records since the 17th of March 2020.
20  Q   Okay.  So he questioned the teacher, and when the teacher
21      lied during the trial, he didn't question --
22  A   He didn't provide --
23  Q   -- her about that?
24  A   -- yeah, proof of the lies that she was telling,
25      basically.

Page 56

1   Q   And the proof of the lies you're saying are the
2       attendance and disciplinary records of your daughter?
3   A   Which there are no discipline records, so that would make
4       everything she said a lie pretty much --
5   Q   Okay.  So --
6   A   -- by comparing to what the teacher said.
7   Q   So you're saying during the trial the teacher was saying
8       that your daughter had had attendance and disciplinary
9       issues?
10  A   Yeah.
11  Q   And David did not question her about her testimony?
12  A   He pretended like he didn't know, yeah, that her
13      attendance was perfectly fine.  They knew that from day
14      one.
15  Q   Okay.  Okay.  And so he should have -- your allegation is
16      he should have cross-examined her about why she was
17      saying something like that --
18  A   Well, just like they told me when I said something.  They
19      said that I had to provide proof.  So why didn't you,
20      know, she provide proof of this discipline problems, as
21      far as, like, documented proof.  She could not provide --
22      or did not provide.
23  Q   Okay.  And during that trial, were you represented by
24      Hannah Gold?
25  A   Heck no.  No.  I asked for an attorney.  No, they

Page 57

1       wouldn't give me one.  Because the lady that sent me the
2       forgery was my boss, so I threatened to sue her, and
3       then she said, you know, that because of that -- well,
4       she didn't say because of that, but when I called again
5       for a new attorney, they said they can't help me.
6           And I called the only two departments there are in
7       Washington state, I guess, and they both said they could
8       not help me get another attorney, so I went to trial
9       without an attorney, but I didn't really mind because I
10      thought -- I thought that they would be honest with
11      people.
12  Q   Okay.  So you represented yourself at the trial?
13  A   Yeah.  I tried not to, but of course, like I said, it
14      didn't work out that way.
15  Q   And by "trial," I'm referring to the October 2020
16      dependency trial of your daughter ████ACZ████;
17      correct?
18  A   Yeah.  The reason why I added the last three --
19  Q   Okay.
20  A   -- state officials, yeah.
21  Q   Okay.  And so -- so you've clarified now that the alleged
22      misconduct of David La Raus for which you're suing him is
23      because of what you -- the May 18th, 2020, hearing and
24      June 9th, 2020, hearing, where you allege he was
25      conspiring with the judge or --



1  A   Covering.

2  Q   -- covering -- well, explain again.  What was he

3      covering?

4  A   That she was -- saying that she was not the judge, saying

5      that Danieli was the judge and I had the wrong person; I

6      was accusing her of the wrong thing.  Yeah, I had the

7      wrong person is what he said.

8  Q   I'm sorry.  I'm -- so he said --

9  A   I accused her of -- what did I say?  I said, "Do you even

10     know why my daughter was taken?"  And she didn't know.

11     And I just kind of, like, flipped out, and he's like,

12     "Wait a minute.  You have the wrong" -- and he jumped in

13     to speak for her, and she didn't stop him, so --

14 Q   Okay.  Okay.  Understood.

15         So because of his conduct in the -- because of what

16     he said in the May 18th, 2020, hearing and the June 9th,

17     2020, hearing, as well as what he -- his not

18     cross-examining the teacher about what her lies were

19     during the dependency trial, these are the reasons why

20     you're suing David La Raus; is that right?

21 A   Yeah.  It kind of fell apart with -- after the trial

22     ended.  Judge Ramseyer basing her decision on the

23     perjury, that kind of floored me, so yeah.

24 Q   Okay.  But I -- did I just accurately recite all the

25     reasons why David is being named as a defendant?

1  A   Yeah.

2  Q   Okay.

3  A   Yeah.

4  Q   Thank you.

5         And I think -- and then you -- I'm just reciting

6      this again because I think you already clarified this,

7      but you're suing Jeff and Amber Whitney because of their

8      receiving adoption assistance too soon, and just so

9      that -- but you're trying to send a message to them that

10     this is --

11 A   I'm pretty sure they knew that document was -- something

12     was not right with it.  At what point they're supposed to

13     do anything about it, I don't know.

14 Q   Okay.  So that's -- but that's the reason for suing them,

15     is because of their receipt of adoption assistance money?

16 A   Yeah.

17 Q   Okay.

18 A   And the Mommy and Daddy thing, too, is kind of a part,

19     but that's -- it's not the main reason.

20 Q   Oh, by them -- by  calling them Mommy

21     and Daddy?

22 A   Right.

23 Q   Is that what you --

24 A   Yeah.  She's only five.  Yeah.

25 Q   Okay.  So those are the two reasons that --

1  A   Yeah.

2  Q   Okay.  Understood.

3         MR. LENIHAN:  I think I am -- I think

4      I am done with questions.  What I'm going to do is I'll

5      -- Julie Cook, I imagine, has some questions for you, and

6      then after she's done, I might have another question or

7      two, but I'm pretty much done.  So thank you for talking

8      to me.  I appreciate it.

9              EXAMINATION

10 BY MS. COOK:

11 Q   Okay.  Good morning, Ms. Zayas.

12 A   Hi.

13 Q   I don't have a lot of questions for you.  I am going to

14     try not to ask the same questions that Mr. Lenihan asked.

15     There may be some follow-up that I have regarding some of

16     his questions, but bear with me.  I'm trying not to do

17     this whole thing all over again.

18         The same rules apply to the questions that I ask

19     you, and that is, if I ask you something that you don't

20     understand or that is confusing to you in any way, please

21     just let me know.  It's not my intention to confuse you

22     or make these issues more complicated than they already

23     are.

24         And it's completely appropriate to answer with "I

25     don't know," "I don't have that information," and to

1      offer explanations if you feel those are necessary in

2      order to answer your questions completely.

3         And then finally, as Mr. Lenihan also explained to

4      you earlier, these answers that you provide are under

5      oath and should be from your personal knowledge.  If

6      there is something that you feel like needs to be

7      answered with information that you gathered elsewhere,

8      then please just let me know that so that the record

9      reflects that.

10        Does that all make sense to you?

11 A   Yes.  Yeah.

12 Q   Okay.  And I am going to be looking down.  My camera is

13     not the best right now, so I know that looks like I'm

14     kind of looking up at the sky, but I will be looking down

15     for some of this as well because I'm taking some notes,

16     so I just wanted you to know that I'm not trying to not

17     look you in the eye --

18 A   I do it all the time.

19 Q   Okay.  Fair enough.

20        I do want to go back to just the beginning of some

21     of Mr. Lenihan's questions and see if you can provide a

22     little bit of clarity.

23        You were asked about public records requests, and

24     you had referred to the records that you reviewed.  And

25     if I'm understanding correctly, you reviewed some

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 62

1  installments that you received from those public records
2  requests; is that correct?
3  A  Yes.
4  Q  Okay.  Can you just clarify who those public records
5  requests were made to and what you're referring to when
6  you're talking about those installments?
7  A  Bonnie White from public disclosure and Rebecca Schiffman
8  are the two people that I've been working with the
9  most --
10  Q  Okay.
11  A  -- and haven't really been too nice to them either, but
12  they have sent me the most -- the bulk of everything that
13  I've received so far.
14      And I'm still in the process of getting a lot of it
15  unredacted because they have so much of it.  It's
16  overwhelming.  But there's a lot of it that's blacked out
17  and is relevant to the other case that I really want to
18  get unredacted, but otherwise, every installment is a --
19  now that I'm actually reading them -- I wasn't reading
20  them at first because I could not -- you know, I just
21  couldn't.  But now that I'm starting to, it's kind of eye
22  opening, I guess, finding little bits and pieces that I
23  did not know happened.  It's interesting.
24  Q  And so those two individuals that you're working with,
25  Bonnie White and Rebecca -- and I'm sorry.  I don't

Page 63

1  remember the last name --
2  A  Schiffman.
3  Q  -- but are those -- Schiffman?
4  A  Yeah.
5  Q  Okay.  Thank you.
6      Are those two individuals with the Attorney
7  General's Office?
8  A  No.  They're with the public disclosure, DCYF, like the
9  main --
10  Q  Okay.
11  A  Yeah.
12  Q  So your public records requests then were made to DCYF?
13  A  Yes.  Yeah.
14  Q  Okay.  Have you made any public records requests to King
15  County specifically?
16  A  No.  I did for Pierce County, but I could not get -- some
17  of the transcripts were, like, $350, so I just gave up
18  right there.  It was from 2009, I believe, they couldn't
19  give them to me, but only the price of the court -- the
20  court stuff is more pricey than -- DCYF is free, so --
21  Q  Okay.
22  A  -- yeah, it's a little different.
23  Q  And I guess I should have clarified.  When I said "King
24  County," I mean King County Superior Court.
25  A  I'd gotten the original when I first when in -- what was

Page 64

1  it -- to the clerk's office a long -- was it on the -- it
2  was right before July 13th because that's when I emailed
3  and asked about the signature and then got the answer I
4  did not want, but right before then is when I went in
5  there and paid, I think it was, like, $35 -- no --
6  50-some dollars for all the documents, even the ones I
7  filed onto the case, just to -- you know, just to have
8  them, you know --
9  Q  Okay.
10  A  -- and investigate --
11  Q  And you received those records just from the King County
12  clerk's office?
13  A  Yeah.  I just went up there with my ID and paid them
14  cash.
15  Q  Okay.  Thank you for clarifying that.
16  A  Yeah.
17  Q  And then just real quick, you had talked a little bit
18  about your education and stated that you had attended
19  Bellevue College.
20      Did you ever take any classes or do you have any
21  education related to the legal field or any legal
22  training?
23  A  No.  I don't -- as a matter of fact, I was a student for
24  a long time.  I -- yeah, I was -- I don't know what I was
25  thinking.  For, like, 20 years, I signed these dependency

Page 65

1  orders like a dummy, and I don't know what I was
2  thinking.  I had no clue that I was pretty much, you
3  know, hanging myself.  I lost my two oldest kids because
4  of signing -- signing them away pretty much, never
5  fighting, never refusing, never -- always cooperating,
6  always doing what they say.  That's how I lost my kids.
7  So I just didn't want to do the same thing as before
8  because that didn't get me anywhere, and -- and that's a
9  whole separate case.
10      But there's a thing about this one I wanted to
11  mention also, is the emergency order that was in place at
12  the time that required the removal to be mission
13  critical.  And I didn't mention that in the last
14  questioning, but I think it's important because I think
15  that that's part of the reason why the -- it even
16  happened, and that's unfortunate.
17      Like, I felt like that was why I was ignored for a
18  long time, and not just because of the lockdown, but
19  because of the avoidance of the document and the lockdown
20  and, you know, them knowing of, you know, what was about
21  to happen.  I had no clue what was about to happen.  I
22  just gave birth, so I was in the hospital for a long
23  time, and I didn't know about what was -- this order that
24  was going on.  I had no clue.  And they --
25  Q  When --



MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 66

1  A  -- knew.

2  Q  I'm sorry.  Go ahead.

3  A  On top of the shelter care hearing order, they wrote a
4     sentence that said that it would be months before the
5     next court date, but they never told me that, you know.

6  Q  Okay.  And just to be clear, when you're talking about
7     the emergency order, are you talking about orders related
8     to the COVID-19 pandemic or something else?

9  A  The emergency order -- I believe it was number 6.  Yeah.
10    It started on the 16th of March at noon, and it -- it
11    required that they request permission prior to having any
12    hearings because -- especially with child removals
13    because they wanted -- they had to get permission from
14    Judge Helson, and unless -- like, to prove that it was
15    critical or whatever.  So that was, like, something that
16    was important then, I guess.

17  Q  Okay.  And is there something that you are alleging was
18     wrong --

19  A  Yeah.

20  Q  -- or insufficient about that emergency order?

21  A  Well -- well, all removals better be mission critical.
22    That's for sure.  I don't think removing a child should
23    not be mission critical.  It should be always mission
24    critical.  And the fact that they're removing kids for
25    anything else is barbaric, but I think that -- well, I

Page 67

1     didn't realize that either until later, but basically my
2     entire email string to them was, "You guys weren't
3     supposed to do this.  It was emergency orders section,
4     and you knew it, and you played me."

5        And it was like -- because four months I had no
6     visits in person, and she's never -- she's never been with
7     anybody but me her whole life.  She doesn't know anybody
8     but me.  We slept in the same bed for her entire life.  I
9     mean, there's no -- she never even went to sleep in her
10    own room.  And the way they just, like -- no visits for
11    four months, and I couldn't see her for two months, no
12    contact at all.  So, I mean, I just -- I think it was
13    intentional.  I know it was intentional.

14  Q  I'm going to have you -- do you still have the exhibits
15     up?

16  A  Yeah, I do.  Uh-huh.

17  Q  Okay.  So if you can refer back to Exhibit No. 1, which
18     is your 12th amended complaint, and I'm going to have you
19     go to Page 3, Paragraph 3, which begins with "Defendants
20     the 'Whitneys' Jeffrey and Amber Whitney" --

21  A  Yeah.

22  Q  Do you see that paragraph?

23     Okay.  So I want you to move down to about the third
24     sentence, and it reads, "The adoption assistance was
25     received illegally on the part of Judge Messitt lacking

Page 68

1     proper judicial determination required during a mandated
2     emergency order #6, when such actions were deemed
3     prohibited by the court above, yet she still distributed
4     all funding for a period of going on 7 months today."

5        Is that sentence a part of what you just described
6     on the record when you were talking about the emergency
7     order?

8  A  Yes.  The fact that, you know, she was removed without a
9     mission critical reason is a violation of that emergency
10    order, and also the fact that, you know, the person who
11    I've never met before signed it is also part of the, you
12    know -- making it basically an invalid order during a
13    time when -- I mean, I think it was a little bit more
14    important to have these orders correct because the reason
15    why they were created, the emergency order, is because
16    the Supreme Court knew that it would be months before I'd
17    see my daughter again.  They knew this.

18       And I believe -- I know that Judge Messitt knew
19    this, and I just can't -- I -- for the life of me, I
20    cannot understand why somebody would intentionally just
21    let it happen and then, like, forced it, like -- yeah, it
22    had to be intentional.  There's no other -- there's no
23    other explanation because everybody knew but me what was
24    going to happen.

25       I know for sure everybody knew but me because if I

Page 69

1     would have known, I wouldn't have been just, "Yeah.
2     Okay.  Hi," you know.  I would have been irate if I had
3     known I wasn't going to see her for months.  I had no
4     clue.  And they knew.  They all knew.  I had no clue.

5  Q  And -- okay.  And I don't want to belabor these issues
6     because I know you've provided several answers already
7     during Mr. Lenihan's questioning.

8        I do have one point of clarification, and it still
9     relates to Exhibit No. 1, Paragraph 3 that we're
10    discussing, and the sentence that reads, "The adoption
11    assistance was received illegally on the part of Judge
12    Messitt lacking the proper judicial determination" -- can
13    you explain what facts you are relying on in making this
14    statement, and specifically, how did Judge Messitt obtain
15    adoption assistance illegally?

16  A  No oath or affirmation was given on the 16th.  There's
17    no -- every top page of every, you know, little order in
18    the removal order -- not the shelter care hearing order,
19    but the other one before that, every top page has to be
20    stamped by the clerk, notary of the court.  It was not
21    stamped by the clerk.  It was not -- meaning it could
22    have not been filed.  I would never know.  Nobody would
23    know by looking at it that it was filed to the court
24    because it does not contain the stamps of the court,
25    meaning that it may not have been filed.



MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 70

1    Of course, I seen it was filed on the docket, but it
2  was also filed without the stamp, which is weird and not
3  even legal, I don't think.  I mean, it's not -- it's
4  against the rules, I'm sure, of King County to, you know,
5  file something and not stamp it, I think.  I'm pretty
6  sure.
7    But also, it was missing the approval signature of
8  the Attorney General, and the CPS supervisor's signature
9  was missing as well.  So that was part of the not legal
10  lawyer, I guess.
11 Q  Okay.  And you're referring to the March 16th, 2020,
12  order that was signed by Judge Messitt?
13 A  Yeah.  Yeah, that's what it says, yeah.
14 Q  Okay.  Let's -- I have a few more questions related to
15  Exhibit No. 1 as well.  And I want to move to Page No. 4,
16  and you were asked about this paragraph already.  It's at
17  the bottom of Page No. 4, and it starts with "Number 4-6
18  conspired with Judge Messitt and continued to cover the
19  forgery" -- can you explain -- number 4 through 6, I
20  should say -- number 4 in the preceding paragraph is
21  identified as Defendant Pauline Duke, and number 6 is
22  identified as Defendant Debbie Cowan.
23    And first of all, before I ask that question, are
24  you referring to Debbie Cowan as CASA Attorney Jennie
25  Cowan or --

Page 71

1 A  Yeah.
2 Q  Okay.  I just wanted to --
3 A  I had her name wrong forever.
4 Q  -- clarify.
5    Okay.  That's fine.  I just wanted to make sure that
6  was the same person.
7 A  Yeah.
8 Q  Can you explain or elaborate on how you are alleging
9  Pauline Duke and Jennie Cowan conspired with Judge
10  Messitt to continue the forgery?
11 A  Because the reason for removal, period, like drug use by
12  parent, is not probable cause for removing anybody's
13  child, and I think that they have the law backwards.
14  They don't know the law.
15    I remember a time -- and I guess I'm old, but I
16  remember a time when they didn't used to take kids for --
17  when parents got high.  They would just be like, okay,
18  ding, you get to do more stuff now.  I mean, I don't know
19  what happened.  Like, they turned into probation officers
20  of the public, and not just anybody, but the public.
21  They are, you know, probation officers.  They come and
22  they say, "Hey, give me your pee."  If you don't give it
23  to them, they take your kid.  And that's just -- that's
24  what they did to me.
25    And, like, I gave it to them, and they still took my

Page 72

1  kid.  And I'm like, "Dude, you can't do that.  That's
2  against the law, like, the constitution."
3    And I didn't read all of this, of course, until
4  after, you know, she was taken and I had all this time on
5  my hands.  During the four months I wasn't able to visit
6  her, you know, I started reading the constitution, which
7  is a dreadful thing, if you've ever read it, but you
8  can't take kids for that, you know.
9    And how adamant they were about, you know, like,
10  keeping my kid.  Like, what?  Like, it didn't make sense
11  to me.  Dude, first of all, it's risk only pickup.  My
12  pee was clean on the day you picked her up, and you can't
13  take kids for that anyway.  It wouldn't even matter if I
14  was high on crack, heroin every day of my life.  That
15  does not matter.  It wouldn't matter if I was a member of
16  the mafia.  It wouldn't matter if I was a serial killer.
17  If I did not abuse my kid, you can't take my kid.  You
18  can assume that the future might bring, you know, child
19  abuse, but that's not proof of child abuse.  That's just
20  an assumption.  And future predicting is not under RCW
21  that I could find, you know, and their future risk of
22  harm -- any kid could be picked up based on their future
23  risk of harm.  That's just unconstitutional all the way
24  around.
25    They can't -- they're using the most

Page 73

1  unconstitutional RCW known.  And it's changed too.  They
2  just changed it the other day, I think.  Yeah, they just
3  changed it the other day.  It's like -- probably this
4  month they changed it, but it doesn't go into effect
5  until 2023.  They've just now added probable cause.
6  Before it was reasonable cause to believe.  So they could
7  just go around, say, "Oh, well, we think you're going to
8  abuse your kid, so we're going to take your kid."
9    Now, come 2023, they have to have probable cause,
10  which under the constitution already -- already -- they
11  already said that.  So it's like they -- this RCW wasn't
12  unconstitutional from day one.  They know you -- you
13  know, you can't predict the future.  Nobody can predict
14  the future.  That's not -- all the RCW language in 26.44
15  is past tense.  There is no future predicting.
16    So they knew when they said it and when they did it
17  what they were doing was unconstitutional, unlawful, and
18  because they were using RCW that was unconstitutional,
19  knowing that it's, like, just beyond comprehensible that
20  they're even able to get away with this and bragging
21  about it too -- it's just -- why?  Why go through all of
22  that?
23    Well, I think it was to cover for -- I can't think
24  of any other reason but to cover for Messitt because I
25  know I am not that big of a deal.  And if I'm that big of

B&A LITIGATION SERVICES

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 74

1 a deal, then I shouldn't have any of my kids. I don't
2 think that what I did was that serious, but they make it
3 into such a huge deal because they have to get me to
4 cooperate to make it look like what she did was, you
5 know -- she forged it, so make it look like I needed her
6 or something, so their, you know, attempt to try to force
7 me into their system has failed repeatedly.
8 Q  Can I ask you just a couple of more specific --
9 A  Yeah.
10 Q  -- clarifying questions?
11      So I think it's already been established that the
12  forgery -- or you are contending that the forgery is
13  Exhibit 3, the shelter care order; is that correct?
14 A  Shelter care hearing order and the healthcare auth- --
15 Q  Yes.  The March 17th order.
16      Okay.  And so are you -- I guess I'm specifically
17  wondering when you are contending that Pauline Duke, as
18  you say in this paragraph on Exhibit 1 -- I think you
19  specifically say that -- "Numbers 4 through 6 conspired
20  with Judge Messitt to continue to cover the forgery" --
21  is this something that they did at the time the
22  March 17th order was filed, or are you saying this
23  happened at some point later?
24 A  By -- well, I believe by confirming and agreeing that the
25  shelter care hearing order was true and correct outright

Page 75

1  would be considered forgery basically because --
2 Q  Okay.
3 A  -- you're just saying it's true and correct.
4      I wouldn't have -- I would have -- if I were
5  Ramseyer, I would have struck it a long time ago.  And
6  what can I say if someone strikes it?  I can't say, oh,
7  yeah, it has to be forgery.  I mean, I can accuse them of
8  it, but if they would have struck it months ago, then
9  nobody would have had to have had to approve it.  And
10  when they approve it, it's just -- it makes it worse for
11  everybody because it just makes them criminals.  Like,
12  it's just join the criminal roundabout.
13      And, I mean, they know Danieli doesn't work for King
14  County.  I mean, they -- they go to work every day for
15  this county.  They go to this courthouse every day.  I'm
16  pretty sure they are aware which judges work and don't
17  work for King County.
18 Q  Okay.  So if I can maybe summarize, and please let me
19  know if I don't have this correct.  Your -- you are
20  saying that both Pauline Duke and Jennie Cowan continued
21  to cover the forgery because they were assuming that this
22  March 17th order was correct and accurate, and they
23  continued to base their actions on it?  Is that --
24 A  Well --
25 Q  -- an inartful way of saying it?

Page 76

1 A  Well, they -- when, you know, Judge Ramseyer says, hey,
2  do you approve this document as evidence towards -- like
3  against me, and they said, okay, sure, yeah, we approve
4  it, they're saying that document is true and correct
5  to the best of their knowledge.  That's what they're
6  saying.  So when they say that, I mean, to me and to the
7  laws of forgery, it means they committed forgery, I
8  think.
9 Q  Okay.
10 A  By knowing its existence and then not, like, halting
11  it -- I mean, I guess -- I don't know.
12 Q  Okay.  Thank you for clarifying that.
13      So do you -- another matter that I just wanted to
14  get clarity on.  What hearings are you saying Judge
15  Messitt presided over?
16      And I don't have all of the exhibits, but if you
17  want to name them by name --
18 A  The --
19 Q  -- if you can -- go ahead.
20 A  The shelter care hearing, I think.
21 Q  Okay.
22 A  But --
23 Q  Is that -- go ahead.
24 A  That was -- let's see here.  She said she didn't, but
25  it's weird because she said that -- in the email, she

Page 77

1  said, you know, no ex parte communication, but I'm like,
2  wait a minute, like -- I wasn't emailing her.  I was
3  emailing Danieli.  So how is that ex parte communication?
4      I don't know.  But I guess to her I was emailing the
5  judge, but she was the judge, but -- I don't know.  I
6  guess it was really confusing because they tried to make
7  me look crazy, and -- and they tried to act like it
8  worked too, and that was the real confusing part because
9  I was like, whoa, it really did just work.
10      And Ramseyer is covering for her too, which is
11  really sad, because I think they think that when they
12  keep repeating, you know, hey, this -- it's true.  It
13  really did happen, that I'm just going to believe it one
14  day, I guess.  I don't know.
15 Q  So are you saying that it was Judge Messitt who presided
16  over the shelter care hearing and not Ann Danieli?
17 A  I've never met Ann Danieli, so it couldn't have been
18  Danieli.  Whatever hearing Danieli heard or whatever they
19  say she heard, I wasn't at that hearing.
20 Q  Okay.
21 A  Yeah.
22 Q  So who are you saying presided over the shelter care
23  hearing?
24 A  Judge Messitt did.
25 Q  Okay.

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 78

1 A  Yeah.
2 Q  And then who are you saying presided over the
3    March 16th --
4 A  Nobody.
5 Q  There was nobody who presided over that hearing?
6 A  No.  Because there was no -- I don't -- I wasn't at that
7    hearing.  There was -- I didn't see any hearing on the
8    docket.  But the thing is, what happened after that is
9    because -- it wasn't just because she faked the hearing.
10    It was because she avoided me for four months after that.
11    And I mean deliberately told my lawyer not to let me have
12    a hearing.
13        And I got the emails from her -- I paid $20 each
14    time to try to get these hearings to get in person visits
15    with my daughter, and every time I paid this $20, they
16    would deny my hearing.  And I'm like --  and I got all
17    the emails finally where Linda Nguyen is saying, "Look,
18    Myriam, just file this, and just don't -- we're not going
19    to have a hearing, but it says that we're having a
20    hearing, but we're really not having a hearing."
21        So they were avoiding me like the plague, and I got,
22    you know, text messages where my lawyer is telling me I
23    can't go to the hearing on the 18th.  She said I can't
24    go.  I was like, "Why can't I go?"
25        And I have all the text messages.  She's like,

Page 79

1    "Well, because it's not one of those hearings where
2    you're supposed to be," or some weird excuse she said.
3    I said, "Really?"  I said, "That's funny.  I haven't
4    had a hearing in months."
5        And it was like they were still trying to avoid me,
6    and it was because of that damn forgery.  And it was
7    like -- I didn't know then why they were doing it, but it
8    drove me nuts.  Like -- and that is the real -- it's not
9    necessarily her action of forgery, but it was her
10    avoidance of me to try to hide that forgery that made it
11    50 million times worse.  And then everyone else piling
12    on, doing the same thing, trying to cover and create this
13    false, you know -- and I'm just like, dude, I wouldn't
14    have cared if they would have just let me see my daughter
15    in person.  And we were allowed to ask for that, and she
16    ignored me, and that -- that is the number one reason
17    that I think -- that I think she should pay.
18 Q  Okay.  So if I can again try to summarize what you stated
19    regarding these hearings.
20        Your testimony is that there wasn't a hearing on
21    March 16th; is that correct?
22 A  There wasn't one that I've seen, no.
23 Q  Okay.  And then the March 17 shelter care hearing was
24    presided over by Judge Messitt; is that correct?
25 A  Yes.

Page 80

1 Q  Okay.  And was Pauline Duke in attendance, to your
2    knowledge, at that March 17th hearing?
3 A  No.
4 Q  Okay.  And was Jennie Cowan, to your understanding,
5    present at that March 17 hearing?
6 A  Neither was David La Raus, but they sure were
7    cheerleaders of the hearing and, you know, affirmed this
8    hearing as far as evidence during trial, you know,
9    claimed my insanity from saying it didn't exist and all
10    kinds of crazy stuff.  So yeah.
11 Q  Okay.  And then going back to Exhibit No. 3, which is the
12    order from the March 17th hearing, you're saying that the
13    signature, where it's dated March 17th -- and this should
14    be on Page No. 10 of the order.  And where it says
15    "Commissioner Ann Danieli," that those were forged or
16    added after the hearing?
17 A  That's not -- that's not who was there.  And it was
18    probably just to avoid the accountability part of the
19    mission critical not being part of my case.
20 Q  Okay.  Bear with me.  I'm just going through the notes,
21    and I want to make sure I don't ask the same questions
22    that you were already asked, so it's going to take me
23    just one moment here.
24        And just to clarify as well, are you saying you were
25    present at the March 17th hearing but that you were not

Page 81

1    able to speak or say anything?
2 A  Yes. I was not.
3 Q  Are those statements correct?
4 A  Yes.
5 Q  Okay.  So there was a hearing, but you weren't able to
6    speak at it?
7 A  Yes.  No, I wasn't.  I think that they -- that the audio
8    that they created was from another hearing or something
9    because I -- yeah, I never -- I don't think I was
10    laughing that day at all.  And in that hearing that they
11    created, I was laughing and giggling, and I don't -- I
12    don't recall ever laughing even a little bit during that
13    hearing.  I was -- I was confused as to why I couldn't
14    say anything.  I was more upset that I couldn't say
15    anything, and I wanted to say more than what -- I didn't
16    say anything.
17 Q  Okay.
18 A  So yeah.
19 Q  And I have a couple of similar questions to what you were
20    asked about before, but my questions are going to
21    specifically relate to the individuals that I represent.
22        So if I'm understanding your testimony correctly,
23    your allegations regarding the GAL, Pauline Duke,
24    specifically relate to her covering up or continuing to
25    act based on this March 17th order which you're saying

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 82

1  was forged; is that correct?
2  A  I can't think of any other reason why someone would lie,
3     I guess, that much for somebody other than they probably
4     know each other -- maybe they know Judge Messitt.  Maybe
5     they're friends with her.  Maybe they worked -- I'm
6     pretty positive they do work together because Jennie
7     Cowan has several cases under appeal right now that
8     actually were around the same time my case was, so they
9     should also be forged.
10 Q  Okay.
11 A  About the same day the KW dependency appeal was -- around
12    the 23rd of March.  So that one should also be forged,
13    and Jennie Cowan is actually on that case too, so --
14 Q  Okay.  Just going back to Pauline Duke, is there anything
15    else that you are alleging Pauline Duke did as part of
16    your lawsuit?
17 A  Well, she lied during the trial and said that she saw my
18    daughter -- or met with my daughter, and she actually
19    never met with my daughter.  She said she met her in
20    September 2020.
21 Q  Is that -- is that in -- I don't have your other --
22 A  I --
23 Q  -- complaints --
24 A  It was something that she stated during, I guess, her
25    testimony that I didn't listen to until after the trial,

Page 83

1     so I didn't really put it in that, but the trial itself
2     was a big bundle of, like, lies.
3  Q  Was there anything else though that Pauline Duke
4     specifically did that you've outlined in --
5  A  I probably didn't outline -- that's the thing.  I
6     probably didn't outline it in the earlier complaints.  I
7     just knew that -- I think the shocking -- the perjury was
8     what did it most, and my assumption that she did speak to
9     the teacher first and so did Jennie because they had a
10    meeting with her prior to the trial.  I want to say prior
11    to the trial, but I think it might have actually been
12    during the trial.
13        And I sent over all the audio, but I think that they
14    had this meeting because I remember Jennie saying, "Can I
15    talk to Pauline privately real quick before the
16    testimony?"  And they let them go off to the -- you know,
17    a second room or whatever in the Zoom land or whatever,
18    and I think that that -- that that was either where they
19    agreed to what questions they were going to ask and --
20    well, what questions she should ask.
21        And Pauline was the one who spoke with the teacher,
22    and Jennie -- I don't think Jennie was.  I think Jennie
23    was just the person who questioned the teacher, but she
24    told -- I believe at that time is when she told -- it's
25    my theory that that's when she told Jennie exactly what

Page 84

1     questions to ask.
2  Q  And -- okay.  And what's your understanding of the
3     relationship?
4         And when I say "relationship," I mean professional
5     relationship between Jennie Cowan and Pauline Duke.
6  A  That's her attorney, I think.
7  Q  Okay.  And then I'm going to ask the same question that I
8     had previously asked you about Pauline Duke as it relates
9     to now Jennie Cowan.
10        Essentially, is the primary complaint against Jennie
11    Cowan in that she acted based on the March 17th order
12    which you are alleging was forged?  Is that correct?
13 A  I just can't think of any other reason why because I
14    completed everything they asked me to.  And other than
15    the dirty UAs that don't -- you know, dirty pee
16    doesn't -- doesn't make someone into a child abuser.
17    Apparently it does when there's forgery involved.  That's
18    my theory.
19        I don't know what -- why they would hate me so much
20    and hate my daughter so much that they want to keep us
21    apart for no reason because it's really no reason.  Right
22    now, at this point, I think it's just because of the
23    forgery because there's no other reason for them to have
24    her.  Like, I haven't signed anything, you know, and they
25    still, you know -- I don't know.

Page 85

1  Q  So -- and again, is there anything else you recall in
2     your prior complaint that Jennie Cowan did that you are
3     suing her for other than this forgery related to the
4     shelter care order?
5  A  You see, that's -- no.  Just the following up of the --
6     you know, the continuance of knowing that -- you know,
7     that -- it's just so obvious.  Like, they could at
8     least -- I don't know.  Like I said, they could have
9     struck it a long time ago.  But the requirement under
10    Section 1983, to get off on something like that, you have
11    to make remedial efforts to fix it, and they never ever
12    did.
13        And I guess by the time they -- you know, I started
14    suing everybody, they probably thought, oh, well, it's
15    too late now.  Might as well go with denying it.  And
16    that's even worse.  They could have just -- and if they
17    said, "Hey, look, you know, Myriam, I'm sorry.  You know,
18    this is what happened.  Can we redo the hearing?"  I
19    wouldn't be able to charge them with anything because
20    they made -- even though they did a huge harm, they made
21    a remedial effort to fix it.
22        But in my case, they never -- I guess they really
23    think they're bulletproof.  I don't know.
24 Q  Okay.  So are you alleging -- or is it your -- let me --
25    I'm being very inartful right now.

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 86

1    Is it your testimony that Ann Danieli did not appear
2  at any point or preside over any hearing related to this
3  lawsuit?
4  A  I believe if she did she would have replied and said -- I
5    don't know -- something halfway decent instead of not
6    replying and forwarding it to Messitt.  I know if it were
7    me, I had someone accuse me of something like that and I
8    really didn't do it, I would say, "I was there.  What are
9    you talking about?" or something.
10    I don't know.  I don't think not replying it and
11    forwarding it to the culprit is the -- is something I
12    would do.  That's not something I would do.
13  Q  And when you're talking about not replying, you're saying
14    that you --
15  A  I --
16  Q  -- emailed Ann Danieli, and that she forwarded your email
17    to Judge Messitt, and then Judge Messitt responded to you
18    saying no ex parte communication?
19  A  As if I --
20  Q  Do I have that correct?
21  A  Yeah.  But, see, Messitt, I think her initial goal was to
22    confuse me, like I was going to think she was Danieli for
23    a second.  But I'm like, wait, you guys have two
24    different names.  Like, don't do that.  Don't confuse me
25    because I'm already old.  But I just thought, wow, that

Page 87

1  was bad.  Like, okay, so now they just proved they're
2  friends.  That's great.
3    But to them, to like a normal person who's never
4  been raped by the system, like, they probably believe
5  that.  They'd be like, oh, okay.  Yeah.  But, see, I'm
6  just not normal.  I just lost all my kids in my --
7  repeatedly in bad ways, like way worse than this.  This
8  is like -- honestly, I've never had oath or affirmation
9  for any of my kids.  And I have seven kids -- wait.  Six
10  kids.  I have six kids.  Two -- my oldest are 21 and 18.
11  No -- no oath or affirmation ever.  Probably forgery.
12  Probably.  I don't know.
13    I mean, I don't -- I can't dig up those because
14  they're so far away, but I can just say that the reason
15  why I seen it is only because of my priors and not
16  believing anything anybody says anymore, you know.
17  Q  Okay.  So -- and again, I just want to make sure I am
18    understanding correctly.  So it's your testimony -- and I
19    think as outlined in Exh bit 1 -- that Ann Danieli,
20    according to you, did not preside over any of your court
21    hearings; is that correct?
22  A  Yeah.  I have never met her.  Hm-mm.
23  Q  Okay.  And then I know you were asked about what you were
24    seeking related to damages, monetary or otherwise,
25    related to Mr. Lenihan's clients, and I'm going to ask

Page 88

1  you the same questions related to mine.
2    So are you seeking any damagement -- damages rather
3  or monetary --
4  A  Yeah.
5  Q  -- claims against Pauline Duke?
6  A  Oh, wait.
7  Q  Let's just talk about Pauline Duke.
8  A  No.  Pauline Duke -- no.  Yeah.  No.  I think she should
9    just be fired.
10  Q  Okay.
11  A  Yeah.
12  Q  And the same question related to --
13  A  Jennie.
14  Q  -- Jennie Cowan.
15  A  Fired.  I can't believe she's in the Supreme Court just
16    chitchatting like she never did anything.  I watch her
17    sometimes.  I'm like, how do these people get up there?
18    They don't deserve their position.
19    Now, that is child abuse, when you remove a child
20    that is not abused and you keep her away for going on
21    almost 500 days.  I mean, that's child abuse to me.
22  Q  Okay.  And what damages, if any, monetary or otherwise,
23    are you seeking against Judge Messitt?
24  A  I asked for her pay until my daughter's 18th birthday,
25    but I also asked for, yeah, like -- you know, judges

Page 89

1  aren't supposed to pay anything, you know.  They say
2  that.  Whatever.  But judges don't commit felonies
3  either.  So it's like -- to me, there's a fine line
4  between, you know, like -- it's just not common practice,
5  you know, and the evil intentional forcing me away is --
6  I get it.  Okay.  You made a mistake.  Big deal.  I get
7  it.  Okay.  So what?  I wouldn't have cared.  But don't
8  avoid me for four months, and then have all your homies
9  avoid me, lie, cheat, steal and everything to keep my
10  daughter from me.  That's like -- that's what did it.
11    Her original crime wasn't so bad if she would have
12  just turned around right there and said, "Hey, I fucked
13  up."
14    But, you know, she rode it out, and that was
15  torture.  To me, that was torture.  That was unnecessary
16  torture.  That made me learn the law, and I didn't
17  need -- didn't want to learn the law.  I didn't want to
18  sue anybody.  I don't want -- I hate being a lawyer.
19  Being a lawyer is depressing for me, and I cannot
20  stand -- I mean, I like reading about the law, but not
21  when every single thing reminds me of how they've ripped
22  me a new asshole.  I don't like reading about it.
23    And so when I don't have a lawyer, I have to read
24  about it.  And so I don't, like, want to learn this
25  stuff.  This wasn't my plan.  I didn't ask for the

Page 90

1  forgery to be committed against me. I didn't ask for
2  them to, you know, have the teacher lie after that and
3  all of that. And it's just all for what? For what?
4  Like -- I don't know.
5      Like, the initial crime wasn't as bad as -- it kind
6  of includes everything, and she gets to go to work every
7  day, and I still don't have my kid.
8 Q  Okay.
9 A  And it's been, like, this long, and it's, like, insane.
10     This is the second judge. Beverly Grant -- I don't know
11     if you know her or not. Beverly Grant, she is an old
12     judge. She's -- oh, my God. She's the devil. But she
13     created court orders that specifically mandated my
14     children be with black families and not white families,
15     and so -- and it was written in the court order. And I
16     complained about her so many times to Rico Culner
17     [phonetic], commissioner of judicial conduct. He's
18     worthless. But I complained to him for years about this
19     woman. Nobody did anything.
20     And I said, "They're racist. They're racist.
21     They're racist," every month. Nobody cared.
22     So this is the second judge that has not listened to
23     me, that has ignored me deliberately and committed
24     huge -- I mean, Beverly Grant was just racist, but --
25 Q  And, Ms. Zayas, can we --

Page 91

1 A  That's it.
2 Q  And I --
3 A  Yeah. I'm sorry.
4 Q  I hate to cut you -- no.
5 A  No. It's okay.
6 Q  I just want to get back to this lawsuit.
7 A  Yeah.
8 Q  I understand your frustration.
9 A  Well, I'm just -- repeat injury, you know. Like, that's
10     what I'm trying to get at.
11 Q  Okay.
12 A  Like, it's the second judge, and I don't know how many
13     judges can do this before I go nuts. And I don't mean to
14     be -- I mean, I can't talk even bad to judges because
15     they're judges, and I'll got to jail, but I just -- I
16     don't know how to -- I didn't know I could see a new
17     judge.
18 Q  So just to summarize, related to Judge Messitt, you are
19     asking that her salary be awarded to your daughter or to
20     yourself. It doesn't -- I don't know if you're
21     distinguishing, but basically, what damage --
22 A  Well, I'm going to have to homeschool my kids, and I
23     can't work if I homeschool my kids, and I would like,
24     yeah, to be --
25 Q  So those are the damages that you're seeking, is

Page 92

1  Ms. Messitt's salary until she is 18 years old; is that
2  correct?
3 A  Mm-hm.
4 Q  ACZ --
5 A  So that I can homeschool her and not have to work, that
6  kind of thing.
7 Q  Okay. And then are you requesting any damages, monetary
8  or otherwise, related to Ann Danieli?
9 A  Well, I suppose she could help her pay it. I'm sure
10     she's got some money. I mean, I don't know. They kind
11     of together committed the same -- well, Danieli wasn't --
12     she was kind of forced to be a part of this, but if I
13     were her, I would have forwarded that to the police. I
14     wouldn't have forwarded it to -- I mean, that's just -- I
15     don't know.
16 Q  Forwarded what?
17 A  Just -- you know, the email. I wouldn't have said, oh,
18     well, let me tell the person who committed the crime. I
19     would get the law enforcement involved or something
20     because if it's a crime and I'm involved and I'm a party
21     of it -- they're accusing me of it -- I mean, yeah, I'm
22     going to want the right people to take care of it and not
23     the person who committed the crime. But they're friends,
24     so they trust each other, I guess.
25 Q  Okay.

Page 93

1 A  I don't know.
2 Q  And I want to just ask you a couple more questions. I'm
3  almost done.
4 A  Yeah.
5 Q  Relating back to -- or referring you back rather to
6  Exhibit 3, which is the shelter care order, on Page 8 of
7  that order, Paragraph 3.3, that governs attorney and
8  guardian ad litem appointments, and that order states
9  that the guardian ad litem will be appointed for ACZ
10     , and --
11 A  And they actually --
12 Q  I am assuming --
13 A  I'm sorry.
14 Q  Let me finish my question.
15 A  Go ahead.
16 Q  And so I am assuming that we are ta king about Pauline
17     Duke when you are referencing guardian ad litems just
18     during our testimony? Is there anybody different, to
19     your understanding, who does work as a GAL on --
20 A  They -- they postponed the guardian ad litem assignment
21     for months.
22 Q  Okay. But I just want to make sure that we're talking
23     about Pauline here when we're talking about --
24 A  That's the only one I ever --
25 Q  Okay. Okay. Just for a point of clarification.



MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 94

1    But Pauline was not involved in the March 16th
2    hearing, to your understanding?
3  A    No.  But there is an email where the Attorney General is
4    stating something like, "Don't tell Myriam the --
5    Pauline's information because she will sue her," blah,
6    blah, blah.  And I believe this was even prior to me even
7    knowing that I had one because for months they said I
8    didn't have one, and I just knew they were lying because
9    everyone else was getting one.
10    And I was like, "Hey, how come" -- I heard all of
11    the hearings because I'm my own attorney, so everyone
12    else got a guardian ad litem, but I just kept for some
13    reason not getting one, and I knew something was up,
14    so...
15  Q    Do you recall a hearing on June the 12th of 2020, before
16    Judge Messitt, where you had requested to represent
17    yourself?
18  A    I think that was the 9th, wasn't it?  Or was it the 12th?
19  Q    It may have been.  And I apologize.  I don't have --
20  A    It's okay.
21  Q    But you recall a hearing?
22  A    It probably is the 12th.  They probably -- no.  I do
23    remember that hearing.  Yes, I do.
24  Q    Okay.  You do recall that hearing.
25    And so you did request to proceed pro se, without an

Page 95

1    attorney, while Judge Messitt was presiding over your
2    case?
3  A    She kept forcing these attorneys on me, and I just -- I
4    told her -- well, because I knew -- at that point, I
5    think -- I think it was right around the time I was about
6    to find out about the forgery, so I also found out
7    about something that Hannah did wrong.  I can't remember
8    what it was, but I was really upset about it.  And I
9    couldn't get rid of Hannah.  That was hard enough.
10    And then she stuck me with another one, forced me to
11    have another attorney, and I couldn't believe it.  I'm
12    like, wait a minute.  I don't know -- I don't believe I
13    knew what I was doing at all, but I could do better by
14    myself.  I couldn't have these attorneys just -- I'm glad
15    I did that because I got my discovery, and that was --
16  Q    Okay.  And that was your request to proceed pro se?
17  A    Yeah.
18  Q    Okay.  Give me just one more minute, Ms. Zayas.  I just
19    want to look through my notes again.
20    And just one other point of clarification.  You were
21    asked questions about the audio recording of the hearing
22    on March 17th, and again, just to summarize and perhaps
23    paraphrase, it's your testimony that that audio was
24    created at some point later, that it didn't represent the
25    hearing, and that that was part of the forgery as well?

Page 96

1    Is that -- is that correct?
2  A    Well, that -- I think it was just their way of trying to
3    trick me into believing that the person was Danieli, who
4    I knew wasn't Danieli.
5  Q    Okay.
6  A    And that's just their like -- they thought, well, hey, if
7    we make a hearing, she'll -- maybe she'll think she
8    forgot something, and we'll get her to believe us.  But I
9    knew the second that I heard the voiceover of Danieli, I
10    knew it wasn't the hearing anymore.
11  Q    Okay.  And are you alleging that Pauline Duke was
12    involved in altering that audio tape in some way?
13  A    No.  But if she listened to it, which I don't know if she
14    did or not -- it was offered as evidence.  I don't know
15    if any of them listened to it or cared to listen to it,
16    but if they would have listened to it, they would know
17    that it was fake.
18  Q    Okay.  Are you alleging that Jennie Cowan was involved in
19    creating that audio tape in some way?
20  A    No.  The only people that were involved were Sebastian
21    Miller, Kelly Owens, Hannah Gold, and David La Raus.  I
22    believe only because David La Raus was the first person I
23    told that this minutes didn't exist, and so he went off
24    on his little way to go make sure it was created.
25  Q    Okay.

Page 97

1  A    So -- but the people that were involved in the making of
2    it were the people who were at the shelter care hearing,
3    yeah.
4  Q    Okay.  So does that include -- not Ann Danieli.  Does
5    that include Judge Messitt?  Are you alleging that she
6    was involved in creating --
7  A    She had to be -- I mean, she had to be involved in the
8    creation of it because -- yeah, because Linda Nguyen
9    was -- had to be.  I mean, there's no -- I mean, because
10    they were the only other two people that would have had
11    to tell their side of the story and get it straight or
12    whatever, you know.
13  Q    And are you alleging that Ann Danieli was involved in
14    creating a false audio recording as well?
15  A    I think there was an email that Linda sent on -- God, I
16    can't remember what day that was.  I found it recently,
17    but it was -- she said that they were taking people's
18    testimony for the shelter care hearing on that day.
19    It was -- oh, yeah.  It was on 6/9 that they said
20    they were taking default testimony for the -- an email
21    that Linda Nguyen sent to -- but my attorney at the time
22    was not my attorney.  It was Grant Simmons.  So Grant
23    didn't never tell me, of course, that they were taking
24    default testimony for the shelter care hearing.
25    And then when I -- later on when I said, "Hey, I

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 98

1    found this email from Linda that said they were taking
2    default" -- why would it be important for her to tell
3    everyone to call back later?  Why couldn't they be
4    present for this, I guess is what I was wondering,
5    because if it wasn't -- if it was just a hearing, then
6    why would everyone have to wait to call back?  Why -- I
7    mean, I sat through plenty of people's hearings that I
8    didn't even know, being my own lawyer, so I think that
9    her reason for not allowing anyone else to call in during
10    this hearing or to listen in or whatever is because it
11    was the default testimony for the fake shelter care
12    hearing that they created.
13 Q   Okay.
14 A   That's my theory.  I don't know.
15 Q   But -- okay.  And then -- I'm sorry if I'm repeating
16    myself.  Are you alleging that Ann Danieli was involved
17    in that?
18 A   She -- they said that's who was -- if you listen to the
19    hearing, that's who's talking is Danieli --
20 Q   Okay.
21 A   -- they say.
22 Q   Okay.  So I take that to mean that, yes, you are alleging
23    she was involved in it?
24 A   Yeah.  She had -- well, according to their recording,
25    yeah.

Page 99

1             MS. COOK:  Okay.  I think those are
2    all the questions that I have.  I appreciate you bearing
3    with me, and I hope I didn't repeat myself too much.
4             Mr. Lenihan may have some follow-up questions based
5    on what I just asked, so I'm going to turn it over to him
6    and mute myself.
7             MR. LENIHAN:  Thank you, Julie.
8             FURTHER EXAMINATION
9    BY MR. LENIHAN:
10 Q   Just very briefly.  Ms. Zayas, can you tell me the
11    teacher, if you recall, who you said was lying in the
12    dependency trial about your child's attendance and
13    disciplinary records?
14 A   Erin Boyett.
15 Q   I'm sorry.  Do you know how to spell that last name?
16 A   Yeah.  It's B-o-y-e-t-t, with no E at the end.
17 Q   Thank you.
18    And the first name, Aaron, as in A-a-r-o-n?
19 A   E-r-i-n.
20 Q   Okay.  Thank you.
21    And I just want a little clarification because when
22    I was talking to you, you testified that -- we went over
23    the three reasons why you were suing David La Raus, and
24    that was his statements on the record and the hearing on
25    May 18th, 2020, as well as the statements on the record

Page 100

1    on June 19th, 2020, and his -- what you said was his
2    failure to cross-examine the teacher on the stand in
3    October 2020 during the dependency trial about this; is
4    that correct?
5 A   Yes.  It was my job to cross-examine her, but at the
6    time, like I said, I assumed that everyone was following
7    the rules that the judge put forward.  Judge Ramseyer
8    said, "If they testify to something that is documented,
9    it must also be provided as evidence."
10    So I assumed that because the teacher testified to
11    it that David La Raus already had the attendance records.
12    I wasn't there for a few days of the trial either, so I'm
13    not -- like I said, I wasn't sure if it had been
14    presented or not because there was, like, a few days I
15    was gone, and it may have been presented in those days.
16    So when I cross-examined her, I never asked, "Did
17    you provide the attendance records?" because I just
18    assumed she would.  I didn't know what the attendance
19    records said either, so I just didn't -- I didn't want to
20    jump the gun and say, hey, my daughter never missed any
21    school for sure because I didn't know what it
22    said.  So I had to wait and see what it said first and
23    then come back around because I couldn't -- you know, you
24    never know.  They might have wrote down something
25    different.  I don't know.

Page 101

1 Q   Okay.  But you had also just -- when Ms. Cook was asking
2    you a question, you mentioned that David La Raus was --
3    you said something about he made sure the minutes from
4    the March 17th, 2020, hearing were created.  So what do
5    you mean by that?
6 A   That document -- the document is -- that was added to the
7    docket in August by -- I don't know who it was added by,
8    the clerk, some -- oh, Tara Shoemaker -- somebody was --
9    somebody added it who was the creator of the document.
10    The name of the document is "Minutes," and that's it.
11    There are no minutes that were added.  Just the document
12    was added with the name of "Minutes" basically.
13    So I had to go -- I went to the clerk, and I said,
14    "Hey, can I get these minutes?"
15    And she's like, "Yeah."
16    She pressed me up two pieces of paper, and that's
17    what it is.
18    I'm like, "These aren't minutes.  I need audio."
19    And she's like, "I don't know what you're talking
20    about."
21    So then I go back to my email, and I'm like, "Excuse
22    me.  You didn't add in minutes."
23    And so basically, I go back to the clerk again, and
24    she finally gives me minutes, and that's when I got the
25    fake shelter care hearing.

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 102

1  Q  Okay.  So understood.  So David --
2  A  Actually, he didn't bring that until trial.
3  Q  Okay.
4  A  I don't even think I got that from the clerk until --
5     yeah.  No, I didn't get that until trial.
6  Q  You didn't get --
7  A  The audio -- the fake audio until -- the trial is when it
8     was presented basically.
9  Q  Okay.  So am I -- is your testimony that aside from the
10    three things we talked about that you're accusing David
11    La Raus of in this trial, there's a fourth one -- I mean
12    in this lawsuit -- there's a fourth one, and this is --
13    you're saying that he worked with the court to make sure
14    that there was minutes added to --
15 A  Yeah, the document minutes.  Like -- okay.  I said I
16    needed minutes, and he said that that document would be
17    fulfilling of the minutes because of it's a
18    transcription, blah, blah, whatever.
19        And I said, well, I wasn't okay with that because I
20    know that there should be audio, I guess, and -- because
21    I know that most hearings are heard -- heard, not, you
22    know, read, and so I -- I guess since it's called a
23    hearing, I was waiting for the audio or the transcription
24    that was not just a minute entry or, you know -- that
25    wasn't -- that wasn't -- that was his way of, "All right.

Page 103

1     Here are the minutes.  Boom.  I'm done.  That's all I
2     need to do."
3        And that wasn't good enough to me because I know
4     that there was more to it, and I think he knew that too,
5     which is why he created that -- or how do you say it --
6     instigated the creation of the audio.
7  Q  David -- your testimony is that David instigated the
8     creation of an audio?
9  A  Of the audio of the shelter care hearing that was not
10    real.
11 Q  Okay.
12 A  If I wouldn't have pressed it -- if I would have just
13    been okay with the minutes document, he wouldn't have
14    went off and did that, I don't think.
15 Q  Okay.  So your -- so you acknowledge that there is an
16    audio file related to the March 17th, 2020, shelter care
17    hearing, but you're saying --
18 A  That he created.
19 Q  That David created?
20 A  Yes.
21 Q  Okay.
22 A  Not the actual one.  The actual one, who knows what they
23    did with that?
24 Q  Okay.  All right.  So that's your fourth allegation then
25    against him.

Page 104

1        Is that the totality of your allegations against
2     him, these four things we've talked about?
3  A  Well, I could go on, but it would be continuing to this
4     last month, and so that would be not fair to him since I
5     filed this a long time ago.
6  Q  Well, it's important that I --
7  A  Well --
8  Q  -- understand just what -- I mean, because it's -- I'm
9     relying on what you put in your complaint, and so the
10    allegations that we've discussed today, these four --
11    four separate allegations, I guess, are those the extent
12    of what you're suing him for --
13 A  Yes.
14 Q  -- in this lawsuit?
15 A  Yeah.  That's what -- that's --
16 Q  Okay.  And so I understand that you've explained what you
17    say is his role in the creation of the audio from the
18    March 17th, 2020, shelter care hearing.  You've explained
19    that you believe he instigated that -- the creation of
20    that fake audio tape; correct?
21 A  Yes.
22 Q  Okay.  And then the next is on March -- on May 18th,
23    2020, you testified that he -- it was obvious that he was
24    covering something up during -- in what he stated on the
25    record.

Page 105

1        Can you explain to me, what was obvious that he was
2     covering up?
3  A  Well, because I didn't know him, and he didn't know me,
4     and he immediately jumped down my throat about being
5     mentally ill, and he just went off the deep end.  "No.
6     She should have an attorney.  Make her have an attorney.
7     She's crazy.  She's mentally ill," blah, blah, blah.
8        And I'm like, what the -- I mean, I guess anybody
9     would be mentally ill after four months of not seeing
10    their child, but I don't know.  Maybe I was a little off
11    the rocker, but it was their fault that I was off the
12    rocker.
13 Q  Okay.  And --
14 A  I mean, it was their fault that I was being whatever he
15    said I was being, and they knew that.  I think he knew
16    that.
17 Q  Okay.  And because he was pointing out on the record
18    what -- he was saying that you were needing an attorney
19    and that you were acting mentally ill, so that is what
20    you were saying was the obvious?
21 A  He didn't know me from Adam to say that, but at the same
22    time, I think that he did that to cover for -- you know,
23    like, to get on me to take the focus off of me finding
24    out about the forgery.  Yeah.  Because I don't think I
25    knew at that -- I didn't know at either one of the

B&A LITIGATION SERVICES

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

Page 106

1    hearings, 5/18 or 6/9, about the forgery until 7/13.  So
2    I didn't -- yeah, I had no clue.  And his focus was to
3    make sure that my focus was not on the shelter care
4    hearing at all.
5  Q   Okay.  And on June 9th -- your third allegation is
6    June 19th, 2020 -- is that the same -- you're saying that
7    this -- he was making the same statements that you
8    thought would demonstrate that he was obviously covering
9    something because he was telling the judge that you
10    had -- you needed a lawyer and that you --
11  A   That's when they switched the judge, and I told him -- I
12    said, "What's this judge's name?"
13        And he wouldn't tell me the judge's name.  And then
14    he said -- then I said, "I'm suing this judge."
15        And he's like -- he starts freaking out.  Like, "Why
16    are you going to do that?  Don't do that."
17        And he starts freaking out, and I'm like, "Oh, wow.
18    This guy's" -- like, it's so obvious.  He's so obvious.
19    I think what they should do is lower the age range of
20    these court officials if they want to commit high crimes
21    like this because their technology is like -- I mean, the
22    obviousness of their crimes is like -- they're not good
23    criminals.
24  Q   Okay.  So --
25  A   And so when he just basically --

Page 107

1  Q   Okay.  I think I understand.  So that's the June 19th,
2    and that's -- okay.  So this is what he was doing on
3    the -- in the hearings on the record on those -- on
4    May 18th and June 19th?
5  A   Yeah.
6  Q   Okay.
7  A   And he's been an Attorney General for 17 years, I think.
8    I think he knows Ann Danieli is not -- you know what I
9    mean?  Like, these people have been doing this for a long
10    time.
11        MR. LENIHAN:  Okay.  Thank you.  I
12    think -- I appreciate your time.  I think that's --
13    that's all of my questions.
14        So, Julie, I apologize if you have anything else
15    again, but I'm done.
16        MS. COOK:  I don't.  Thank you very
17    much.
18        Actually -- actually -- no, I don't.  Never mind.
19        THE VIDEOGRAPHER:  All right.  Very
20    well.  This concludes the deposition of Myriam Zayas.
21    Time now is 11:43 a.m.  We are going off record.
22                (Exhibit Nos. 1, 3, and 7
23                 marked for identification.)
24                (Deposition concluded at
25                 11:43 a.m.)

Page 108

1                (Signature reserved.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 109

1                A F F I D A V I T
2
3
4    STATE OF WASHINGTON )
                         )  ss.
5    County of Pierce    )
6
7
8        I, Myriam Zayas, hereby declare under penalty of
9    perjury that I have read the foregoing deposition and that
10    the testimony contained herein is a true and correct
11    transcript of my testimony, noting the attached corrections.
12
13
14
15        _____
16                    Myriam Zayas
17
18
19
20
21    Date: _____
22
23
24
25

Page 110

```
 1   STATE OF WASHINGTON )    I, Valerie L. Torgerson, CCR, RPR,
                         ) ss a certified court reporter
 2   County of Pierce   )    in the State of Washington, do
                              hereby certify:
 3
 4
          That the foregoing deposition of MYRIAM ZAYAS was taken
 5   before me and completed on June 14, 2021, and thereafter was
     transcribed under my direction; that the deposition is a
 6   full, true and complete transcript of the testimony of said
     witness, including all questions, answers, objections,
 7   motions and exceptions;
 8        That the witness, before examination, was by me duly
     sworn to testify the truth, the whole truth, and nothing but
 9   the truth, and that the witness reserved the right of
     signature;
10
          That I am not a relative, employee, attorney or counsel
11   of any party to this action or relative or employee of any
     such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;
13        That I am herewith securely sealing the said deposition
     and promptly delivering the same to Brendan M. Lenihan.
14
          IN WITNESS WHEREOF, I have hereunto set my signature on
15   the 16th day of June 2021.
16
17
18
19   _____
                     Valerie L. Torgerson, CCR, RPR
20                   Certified Court Reporter No. 2036
                     (Certification expires 09/3/21.)
21
22
23
24
25
```

Page 112

B&A Litigation Services

2208 North 30th Street, Suite 202

Tacoma, WA 98403

253.627.6401

_____

CORRECTION SHEET

_____

Instructions: Please carefully read your deposition and on this correction
sheet make any changes or corrections in form or substance that you feel
should be made.  You may add additional sheets, if necessary.  After completing
this form, please sign your name in the space provided.

Please do not mark the transcript.  Thank you.

| PAGE # | LINE # | CORRECTION | REASON FOR CORRECTION |
|--------|--------|------------|-----------------------|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

SIGNATURE OF WITNESS:_____

Page 111

B&A Litigation Services

2208 North 30th Street, Suite 202

Tacoma, WA 98403

253.627.6401

Date:  06/21/2021

To:  Myriam Zayas

ACZ.angel@hotmail.com

Pro Se

27369 129th Place SE

Kent, WA 98030

Case:  Zayas v. Messitt

Deposition of:  Myriam Zayas

Date Taken: June 14, 2021

The above transcript must be read and the Correction Sheet signed within

30 days of this notice or before the trial date.  If the Correction Sheet

is not signed within that time period, signature will be deemed waived

for all purposes.

Please contact our office and make an appointment to come in and read your

deposition transcript.  Office hours are 8:00 a.m. to 5:00 p.m., Monday

through Friday.  Without a scheduled appointment, the transcript will not

be available.

Reporter: Valerie L. Torgerson

License No.: 2036

CC: brendan.lenihan@atg.wa.gov, julie.cook@kingcounty.gov









MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam -  June 14, 2021

ACZ



MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam -  June 14, 2021

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021

MYRIAM ZAYAS vs ANNETTE MESSITT
Zayas, Myriam - June 14, 2021